FILED IN
COURT OF CRIMINAL APPEALS

January 13, 2015

ABEL ACOSTA, CLERK

COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/29/2014 9:08:43 PM
Accepted 1/13/2015 9:18:15 AM
ABEL ACOSTA
CLERK

**No. AP-77,030**

*ORAL ARGUMENT IS REQUESTED*

# IN THE
## COURT OF CRIMINAL APPEALS
## OF TEXAS

## MATTHEW LEE JOHNSON,
### APPELLANT

## V.

## THE STATE OF TEXAS,
### APPELLEE

*On appeal from the 363rd Judicial District Court of Dallas County, Texas
In Cause No. F12-23749*

## STATE'S BRIEF

**Craig Watkins**
**Criminal District Attorney**
Dallas County, Texas

*Counsel of Record:*

**Christine Womble**
**Assistant District Attorney**
State Bar No. 24035991
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *fax*
CWomble@dallascounty.org

*Attorneys for the State of Texas*

# TABLE OF CONTENTS

Index of Authorities ....................................................................................................v

Statement Regarding Oral Argument ......................................................................1

Statement of the Case ..............................................................................................1

Statement of Facts ...................................................................................................1

Summary of the Arguments....................................................................................47

Argument ................................................................................................................50

State's Response to Issue Nos. 1 through 7:...........................................................50

THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S BATSON
CHALLENGES.

State's Response to Issue Nos. 8 through 19:.........................................................71

THE TRIAL COURT DID NOT ERR IN GRANTING THE STATE'S CHALLENGES
FOR CAUSE.

State's Response to Issue Nos. 20 through 27:.......................................................86

THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S CHALLENGES
FOR CAUSE.

State's Response to Issue Nos. 28 through 30:.....................................................113

THE TRIAL COURT DID NOT ERR IN GRANTING THE STATE'S CHALLENGES
FOR CAUSE.

State's Response to Issue Nos. 31 and 32: ..........................................................119

APPELLANT WAS NOT DEPRIVED OF A LAWFULLY CONSTITUTED JURY.

State's Response to Issue No. 33:..................................................................120

THE EVIDENCE IS LEGALLY SUFFICIENT TO SUPPORT APPELLANT'S CONVICTION FOR CAPITAL MURDER.

State's Response to Issue Nos. 34 and 35: ............................................126

THE TRIAL COURT PROPERLY ADMITTED THE SURVEILLANCE VIDEO OF THE INSTANT OFFENSE AS WELL AS STILL PHOTOGRAPHS FROM THAT VIDEO. ALTERNATIVELY, ANY ERROR IS HARMLESS.

State's Response to Issue Nos. 36 and 37: ............................................137

THE TRIAL COURT PROPERLY ADMITTED THE AUTOPSY PHOTOGRAPHS AND THE PHOTOGRAPHS OF THE COMPLAINANT IN THE HOSPITAL. ALTERNATIVELY, ANY ERROR IS HARMLESS.

State's Response to Issue Nos. 38 through 40:.......................................143

THE TRIAL COURT PROPERLY ADMITTED EVIDENCE OF STATEMENTS MADE BY THE COMPLAINANT PRIOR TO HER DEATH.

State's Response to Issue No. 41:..................................................................153

THE TRIAL COURT PROPERLY ADMITTED EVIDENCE OF APPELLANT'S ACTIONS AFTER HE FLED THE WHIP-IN.

State's Response to Issue No. 42:..................................................................157

THE TRIAL COURT PROPERLY INSTRUCTED THE JURY ON VOLUNTARY INTOXICATION.

State's Response to Issue Nos. 43 and 44: ............................................160

THE TRIAL COURT PROPERLY ADMITTED EVIDENCE DURING THE PUNISHMENT PHASE OF APPELLANT'S EXTRANEOUS OFFENSES.

State's Response to Issue Nos. 45 through 48:.........................................................165

> THE TRIAL COURT PROPERLY ADMITTED EVIDENCE OF APPELLANT'S ARRESTS AND CERTAIN JUDGMENTS AND SENTENCES.

State's Response to Issue No. 49:.........................................................................170

> THE TRIAL COURT PROPERLY ADMITTED THE TESTIMONY OF WARDEN MELODYE NELSON.

State's Response to Issue No. 50:.........................................................................173

> THE EVIDENCE IS LEGALLY SUFFICIENT TO SUPPORT THE JURY'S FINDING THAT APPELLANT IS A FUTURE DANGER.

State's Response to Issue Nos. 51 through 53:.........................................................178

> THE TRIAL COURT PROPERLY DENIED APPELLANT'S REQUESTED JURY INSTRUCTIONS AND OVERRULED HIS OBJECTIONS TO THE CHARGE.

State's Response to Issue Nos. 54 through 65:.........................................................183

> THE TRIAL COURT PROPERLY DENIED APPELLANT'S CHALLENGES TO THE DEATH PENALTY STATUTE.

Prayer ......................................................................................................................187

Certificate of Compliance .......................................................................................187

Certificate of Service ..............................................................................................188

# INDEX OF AUTHORITIES

## Cases

*Apolinar v. State*,
106 S.W.3d 407 (Tex. App.—Houston [1st Dist.] 2003) *aff'd*, 155 S.W.3d 184
(Tex. Crim. App. 2005) ............................................................. 162, 164

*Apprendi v. New Jersey*,
530 U.S. 466 (2000) ...................................................................184

*Archer v. State*,
607 S.W.2d 539 (Tex. Crim. App. 1980)...........................................155

*Barnes v. State*,
855 S.W.2d 173 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd)..................55

*Barfield v. State*,
63 S.W.3d 446 (Tex. Crim. App. 2001)...........................................124

*Batson v. Kentucky*,
476 U.S. 79 (1986) .................................................................. passim

*Beltran v. State*,
593 S.W.2d 688 (Tex. Crim. App. 1980)...........................................124

*Blue v. State*,
125 S.W.3d 491 (Tex. Crim. App. 2003)...........................................181

*Bodde v. State*,
568 S.W.2d 344 (Tex. Crim. App. 1978)...........................................118

*Bone v. State*,
77 S.W.3d 828 (Tex. Crim. App. 2002)............................................63

*Brooks v. State*,
323 S.W.3d 893 (Tex. Crim. App. 2010)...........................................121

*Camacho v. State*,
  864 S.W.2d 524 (Tex. Crim. App. 1993).........................................................155

*Cantu v. State*,
  939 S.W.2d 627 (Tex. Crim. App. 1997)..................................... 180, 182

*Chamberlain v. State*,
  998 S.W.2d 230 (Tex. Crim. App. 1999).........................................................129

*Chambers v. State*,
  866 S.W.2d 9 (Tex. Crim. App. 1993)...............................................................53

*Colburn v. State*,
  966 S.W.2d 511 (Tex. Crim. App. 1998)....................................... 78, 81, 88, 117

*Coleman v. State*,
  881 S.W.2d 344 (Tex. Crim. App. 1994)..................................... 98, 103

*Cook v. State*,
  858 S.W.2d 467 (Tex. Crim. App. 1993)...........................................................56

*Cooper v. State*,
  67 S.W.3d 221 (Tex. Crim. App. 2002)...........................................................121

*Cordova v. State*,
  733 S.W.2d 175 (Tex. Crim. App. 1987).........................................................103

*Davis v. State*,
  329 S.W.3d 798 (Tex. Crim. App. 2010).........................................................179

*Davis v. Washington*,
  547 U.S. 813 (2006) ........................................................................150

*Devoe v. State*,
  354 S.W.3d 457 (Tex. Crim. App. 2011).........................................................154

*Duffy v. State*,
  567 S.W.2d 197 (Tex. Crim. App. 1978)................................... 181, 182

*Emery v. State*,
   881 S.W.2d 702 (Tex. Crim. App. 1994)...........................................................128

*Escamilla v. State*,
   143 S.W.3d 814 (Tex. Crim. App. 2004)........................................... 89, 140, 186

*Espada v. State*,
   No. AP-75,219, 2008 Tex. Crim. App. Unpub. LEXIS 806 (Tex. Crim. App.
   2008) (not designated for publication)...................................................... 181, 182

*Estrada v. State*,
   313 S.W.3d 274 (Tex. Crim. App. 2010)................................................ 171, 180

*Feldman v. State*,
   71 S.W.3d 738 (Tex. Crim. App. 2002)....................................................... passim

*Flowers v. State*,
   220 S.W.3d 919 (Tex. Crim. App. 2007)................................................. 168, 169

*Furman v. Georgia*,
   408 U.S. 238 (1972) ...................................................................................185

*Gallo v. State*,
   239 S.W.3d 757 (Tex. Crim. App. 2007)........................................................171

*Garcia v. State*,
   887 S.W.2d 862 (Tex. Crim. App. 1994).........................................................149

*Gardner v. State*,
   306 S.W.3d 274 (Tex. Crim. App. 2009).................................................. passim

*Gonzales v. State*,
   353 S.W.3d 826 (Tex. Crim. App. 2011).................................................. 72, 113

*Gordon v. State*,
   784 S.W.2d 410 (Tex. Crim. App. 1990)................................................. 130, 131

*Granados v. State*,
   85 S.W.3d 217 (Tex. Crim. App. 2002)............................................ 85, 117, 119

*Gray v. State*,
  233 S.W.3d 295 (Tex. Crim. App. 2007)...........................................................120

*Green v. State*,
  912 S.W.2d 189 (Tex. Crim. App. 1995)...........................................................181

*Griffith v. State*,
  983 S.W.2d 282 (Tex. Crim. App. 1998)...........................................................171

*Hernandez v. New York*,
  500 U.S. 352 (1991) ..................................................................................61

*Hernandez v. State*,
  176 S.W.3d 821 (Tex. Crim. App. 2005)...........................................................163

*Hernandez v. State*,
  563 S.W.2d 947 (Tex. Crim. App. 1978)............................................................91

*Hooper v. State*,
  214 S.W.3d 9 (Tex. Crim. App. 2007)....................................................... 121-22

*Jackson v. State*,
  33 S.W.3d 828 (Tex. Crim. App. 2000)............................................................181

*Jackson v. State*,
  992 S.W.2d 469 (Tex. Crim. App. 1999)...........................................................181

*Jackson v. Virginia*,
  443 U.S. 307 (1979) ...................................................................................121

*Jones v. State*,
  982 S.W.2d 386 (Tex. Crim. App. 1998)...................................................... passim

*Jordan v. State*,
  928 S.W.2d 550 (Tex. Crim. App. 1996).............................................................171

*King v. State*,
  29 S.W.3d 556 (Tex. Crim. App. 2000)......................................... 74, 78, 81, 121

*King v. State*,
   953 S.W.2d 266 (Tex. Crim. App. 1997)............................................................135

*Ladd v. State*,
   3 S.W.3d 547 (Tex. Crim. App. 1999)...................................... 98, 129, 141, 173

*Lane v. State*,
   933 S.W.2d 504 (Tex. Crim. App. 1996)............................................................165

*Lane v. State*,
   822 S.W.2d 35 (Tex. Crim. App. 1991)...................................................... 91, 93, 112

*Leza v. State*,
   351 S.W.3d 344 (Tex. Crim. App. 2011)............................................................182

*Long v. State*,
   823 S.W.2d 259 (Tex. Crim. App. 1991)............................................................142

*Luna v. State*,
   301 S.W.3d 322 (Tex. App.—Waco 2009, no pet.)............................................162

*Martinez v. State*,
   327 S.W.3d 727 (Tex. Crim. App. 2010)............................................................174

*Mason v. State*,
   905 S.W.2d 570 (Tex. Crim. App. 1995)............................................................114

*Matamoros v. State*,
   901 S.W.2d 470 (Tex. Crim. App. 1995)...................................................... 132, 134

*Matchett v. State*,
   941 S.W.2d 922 (Tex. Crim. App. 1997)............................................................181

*Mathis v. State*,
   67 S.W.3d 918 (Tex. Crim. App. 2002)..............................................................54

*Medellin v. Dretke*,
   378 F.3d 270 (5th Cir. 2004)...............................................................................59

*Middleton v. State*,
187 S.W.3d 134 (Tex. App.—Texarkana 2006, no pet.) ......................................55

*Miller-El v. Dretke*,
545 U.S. 231 (2005) ........................................................ 58, 63, 70

*Montgomery v. State*,
810 S.W.2d 372 (Tex. Crim. App. 1990)...........................................129

*Morales v. State*,
32 S.W.3d 862 (Tex. Crim. App. 2000).............................................135

*Moses v. State*,
105 S.W.3d 622 (Tex. Crim. App. 2003)............................................154

*Mosley v. State*,
983 S.W.2d 249 (Tex. Crim. App. 1998)................................... 180, 183

*Munoz v. State*,
853 S.W.2d 558 (Tex. Crim. App. 1993).............................................124

*Narvaiz v. State*,
840 S.W.2d 415 (Tex. Crim. App. 1992)............................................181

*Nieto v. State*,
365 S.W.3d 673 (Tex. Crim. App. 2012)..............................................57

*Paredes v. State*,
129 S.W.3d 530 (Tex. Crim. App. 2004)............................................128

*Patrick v. State*,
906 S.W.2d 481 (Tex. Crim. App. 1995)................................... 124, 125

*Paulson v. State*,
28 S.W.3d 570 (Tex. Crim. App. 2001).............................................181

*Pena v. State*,
285 S.W.3d 459 (Tex. Crim. App. 2009).............................................79

*Purkett v. Elem*,
514 U.S. 765 (1995) ...................................................................................53

*Raby v. State*,
970 S.W.2d 1 (Tex. Crim. App. 1998)........................................................183

*Rachal v. State*,
917 S.W.2d 799 (Tex. Crim. App. 1996).....................................................78

*Reed v. Quarterman*,
555 F.3d 364 (5th Cir. 2009)................................................................ 51, 62

*Reese v. State*,
33 S.W.3d 238 (Tex. Crim. App. 2000)......................................................177

*Renteria v. State*,
206 S.W.3d 689 (Tex. Crim. App. 2006).....................................................181

*Rhoades v. State*,
934 S.W.2d 113 (Tex. Crim. App. 1996).....................................................182

*Roberts v. State*,
220 S.W.3d 521 (Tex. Crim. App. 2007).....................................................180

*Robertson v. State*,
871 S.W.2d 701 (Tex. Crim. App. 1993).....................................................182

*Rocha v. State*,
16 S.W.3d 1 (Tex. Crim. App. 2000)..........................................................179

*Roethel v. State*,
80 S.W.3d 276 (Tex. App.—Austin 2002, no pet.) ...........................................162

*Rojas v. State*,
986 S.W.2d 241 (Tex. Crim. App. 1998)................................................ 140, 142

*Romero v. State*,
800 S.W.2d 539 (Tex. Crim. App. 1990).....................................................128

*Russeau v. State*,
291 S.W.3d 426 (Tex. Crim. App. 2009)...................................................... 181, 182

*Sadler v. State*,
977 S.W.2d 140 (Tex. Crim. App. 1998)......................................................72

*Salazar v. State*,
38 S.W.3d 141 (Tex. Crim. App. 2001)........................................................148

*Saldano v. State*,
232 S.W.3d 77 (Tex. Crim. App. 2007)........................................................ passim

*Sakil v. State*,
287 S.W.3d 23 (Tex. Crim. App. 2009)...................................................... 158, 159

*Santellan v. State*,
939 S.W.2d 155 (Tex. Crim. App. 1997)........................................................139

*Segundo v. State*,
270 S.W.3d 79 (Tex. Crim. App. 2008)........................................................85

*Simpson v. State*,
119 S.W.3d 262 (Tex. Crim. App. 2003)...................................................... 82, 85

*Soliz v. State*,
432 S.W.3d 895 (Tex. Crim. App. 2014)........................................................182

*Templin v. State*,
711 S.W.2d 30 (Tex. Crim. App. 1986)........................................................164

*Thuesen v. State*,
No. AP-76,375, 2014 Tex. Crim. App. Unpub. LEXIS 191 (Tex. Crim. App. Feb 26, 2014) (not designated for publication)........................................................182

*Threadgill v. State*,
146 S.W.3d 654 (Tex. Crim. App. 2004)..................................... 72, 87, 88, 172

*United States v. Figueroa*,
618 F.2d 934 (2nd Cir. 1980) ........................................................129

*Vinson v. State*,
252 S.W.3d 336 (Tex. Crim. App. 2008)...........................................................150

*Walder v. State*,
85 S.W.3d 824 (Tex. App.—Waco 2002, no pet.)...............................................155

*Watkins v. State*,
245 S.W.3d 444 (Tex. Crim. App. 2008)..................................... passim

*Weatherred v. State*,
15 S.W.3d 540 (Tex. Crim. App. 2000)..................................... passim

*Wells v. State*,
578 S.W.2d 118 (Tex. Crim. App. 1979)...........................................................156

*Wesbrook v. State*,
29 S.W.3d 103 (Tex. Crim. App. 2000).................................... 155, 158

*Williams v. State*,
958 S.W.2d 186 (Tex. Crim. App. 1997)...........................................................152

*Witherspoon v. Illinois*,
391 U.S. 510 (1968) ............................................................................78

*Wood v. State*,
18 S.W.3d 642 (Tex. Crim. App. 2000)...........................................................180

*Woodward v. Epps*,
580 F.3d 318 (5th Cir. 2009)............................................................................59

*Young v. State*,
826 S.W.2d 141 (Tex. Crim. App. 1991)...........................................................62

*Zuliani v. State*,
97 S.W.3d 589 (Tex. Crim. App. 2003)................................... 148, 151

**Constitutional Provisions**

Tex. Const. art. I................................................................. 71, 184, 186

U.S. Const. amend. VI .................................................................71

U.S. Const. amend. XIV .................................................................71

**Statutes**

Tex. Code Crim. Proc. Ann. art. 35.16 (West 2006) ..................................... 71, 119

Tex. Code Crim. Proc. Ann. art. 35.16 (a)(9) ................................................ 87, 91

Tex. Code Crim. Proc. Ann. art. 35.16 (c)(2) ......................................... 86, 87, 101

Tex. Code Crim. Proc. Ann. art. 35.17, § 2 ................................................. 75, 79

Tex. Code Crim. Proc. Ann. art. 35.261(a) (West 2006)......................................51

Tex. Code Crim. Proc. Ann. art. 37.07, § 3(g) ............................. 161, 162, 163, 164

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(a)(1).................................................161

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(b)(1).................................................173

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(c).......................................... 101, 173

Tex. Code Crim. Proc. Ann. art. 37.071 § 2(d)(1).................................................173

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(e-f)............................... 182, 184, 185

Tex. Penal Code Ann. § 8.04(a).................................................... 158, 159

Tex. Penal Code Ann. § 19.03 ....................................................... 78, 121

Tex. Penal Code Ann. § 29.02(a)..........................................................121

Tex. Penal Code Ann. § 31.03(a)..........................................................121

**Rules**

Tex. R. App. P. 33.1(a) .................................................. 61, 76, 79, 94, 113, 155, 168

Tex. R. App. P. 38.1(h) ....................................................................... 149, 155, 179

Tex. R. App. P. 44.2(b) ............................................................. 82, 85, 135, 143, 172

Tex. R. Evid. 201 ...........................................................................................58

Tex. R. Evid. 403 ................................................... 128, 129, 134, 137, 138, 140, 142

Tex. R. Evid. 404(b) ................................................................... 153, 154, 161

Tex. R. Evid. 702 ...........................................................................................170

Tex. R. Evid. 801(c) ........................................................................................147

Tex. R. Evid. 801(d) ........................................................................................147

Tex. R. Evid. 803(2) ............................................................... 147, 148, 149

Tex. R. Evid. 804(b)(2) ................................................................... 148, 150

Tex. R. Evid. 1001(b) ......................................................................................128

**TO THE HONORABLE COURT OF CRIMINAL APPEALS:**

The State of Texas submits this brief in response to the brief of Appellant, Matthew Lee Johnson.

### STATEMENT REGARDING ORAL ARGUMENT

The State requests the opportunity to present oral argument if the Court grants Appellant's request to argue.

### STATEMENT OF THE CASE

This is an automatic appeal from a sentence of death. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(h). The trial court sentenced Appellant to death on November 8, 2013 for the capital murder of Nancy Harris. Appellant filed his brief on direct appeal on August 1, 2014. He filed an amended brief on August 21, 2014. He presents sixty-five allegations of reversible error.

### STATEMENT OF FACTS

#### *Guilt/Innocence*

#### *The Offense*

On May 20, 2012, 76-year-old great-grandmother Nancy Judith Harris went to her job as a clerk at the Fina Whip-In (hereinafter, "the Whip-In") convenience store. (RR44:23; RR46:10; SX#2, 25). At 7:07[1] a.m., Appellant entered the store

---

[1] The surveillance video is time stamped 6:07 a.m. (RR44:49; SX#17). Anna Lunceford, the manager of the Whip-In, testified that the time was off by one hour; at the time she had not

1

carrying a lighter and a clear plastic bottle filled with lighter fluid. (RR44:50, 230; SX#17, 79, 83, 85). Once inside, Appellant walked straight to the sales counter, then around and behind and into the area reserved for employees. (RR44:43; SX#17). Nancy was standing behind the counter. (SX#17). She tried to push Appellant back. (SX#17). Appellant poured the contents of the plastic bottle over Nancy's head. (SX#17).

Appellant stood behind Nancy and watched as she tried to open the cash register. (SX#17). He took two lighters from a display to the right of the register. (RR44:231; SX#17, 85). Then, he took two packages of cigarettes from an overhead dispenser. (RR44:231; SX#17, 87, 88). He tried to remove Nancy's ring from her right finger. (RR44:231; SX#17, 89, 90). The ring did not come off easily; Appellant licked his fingers to help slide it off. (RR44:232; SX#17, 90, 91). Nancy finally got the register open[2] and Appellant took all of the cash from the cash tray. (RR44:232; SX#17, 96, 97). Then, he removed the cash tray out of the drawer and took some of the coins. (SX#17).

Almost immediately after Appellant took the money from the register, flames are reflected on the screen above the cash register. (RR44:232; SX#17, 97).

---

realized she would have to manually change the time following the time change. (RR44:35, 49-50; SX#17).

[2] Nancy opened the register for a no sale transaction at 7:10:54 a.m. (RR44:54, 128-29; SX#19, 20).

Nancy, engulfed in flames from her shoulders up, ran out from behind the counter. (RR44:233; SX#17, 98). Appellant followed close behind. (RR44:233; SX#17). Nancy ran to a nearby sink and leaned over to put out the flames. (SX#17). Appellant calmly walked out of the store with his bottle, stopping only to take a few pieces of candy and stuff them in his pocket. (RR44:233-34; SX#17, 98, 99, 100).

Nancy bent over the sink, trying to put out the flames consuming the upper portion of her body. (SX#17). She stopped to pull her shirt over her head and dropped it on the floor. (SX#17). As Nancy leaned back over the sink, her shirt, which was still burning on the floor, lit her left leg on fire. (SX#17). Unable to put out all of the flames, Nancy, still on fire, walked outside and waited for help. (SX#17).

On the morning of the offense, Garland Police Officers Billy Coffey and Simon were dispatched to "the 3300 block of Broadway at the Soulman's Bar-B-Que and also at the plasma center." (RR44:62, 64). Police had received calls regarding an audible alarm. (RR44:62). When the officers arrived at the plasma center, they found the area secure. (RR44:64). They got back into their squad cars and began to proceed to Soulman's when Simon noticed flames across the street inside the Whip-In. (RR44:62, 65-66; SX#24). Concerned, the officers made their way to the Whip-In. (RR44:66). At that point, they had no idea what

3

was on fire. (RR44:83). Coffey was at the red light, waiting to turn into the Whip-In, when he saw "the flames move across the inside of the building." (RR44:66). Now, it was an emergency situation. (RR44:84). Coffey turned on his lights and sirens and hurried into the parking lot. (RR44:66).

By the time the officers pulled into the parking lot, Nancy was standing outside. (RR44:84; SX#17). She was still on fire. (RR44:68; SX#17). Coffey retrieved a fire extinguisher from the trunk of his patrol vehicle, ran up, and extinguished the remaining flames. (RR44:68, 84-85; SX#17). Nancy was "screaming for help." (RR44:69). She told the officers that a man had robbed her and poured something on her. (RR44:69). She gave a description of the robber: a "heavy-set black male with blue jeans . . . and a T-shirt." (RR44:70).

Garland firefighter and paramedic William Crews was in the area on an unrelated call when a police officer flagged him down for help. (RR44:89, 92). Crews pulled up to the Whip-In in the ambulance and began to treat Nancy. (RR44:93). "She was in a lot of pain. She was very worried." (RR44:93). She had "first, second, and third degree burns to her face, her shoulders, her abdomen, both of her upper arms, and to her - - her legs." (RR44:93). Crews loaded Nancy into the ambulance and left for the hospital.[3] (RR44:94). At first, Nancy was

---

[3] Crews was familiar with Nancy. He had "made runs on her before" and was aware of her diabetes, high blood pressure and the fact that she had a pacemaker. (RR44:94, 97, 102). He and his fellow firefighters also patronized the Whip-In. (RR44:94, 101-02).

4

conscious and able to provide her name and history. (RR44:98). As they drove, her airway began to close and she had a harder time communicating. (RR44:98).

At the hospital, Nancy was still conscious and able to speak. (RR45:80-81). April Gradel, a trauma nurse clinician in the burn unit, gave police a few minutes to speak with Nancy. (RR45:85, 172, 178; SX#143). Nancy had "at minimum second to third-degree burns over her entire head, including her face, her neck, her upper torso, and both of her arms." (RR45:174). Given the location of Nancy's burns, Gradel knew that she was going to have to be intubated. (RR45:175). Gradel saw a police officer in the hallway and told him that if he was going to speak with Nancy, it had to be immediately. (RR45:175). Gradel was "quite convinced it would be [Nancy's last opportunity to speak]." (RR45:176). Nancy told Officer Larry Wilson that "a man she described as a black male, heavy-set, short dark hair, and a chubby face, came into the store and demanded money from her. She advised he took the money and then he poured something on her. She didn't know what - - what it was, and then he lit her on fire." (RR45:82).

Dr. John Hunt was also involved in Nancy's care in the Burn Unit. (RR46:5). Dr. Hunt testified when an individual is on fire, the mechanism of injury is the heat. (RR46:7). "Heat destroys." (RR46:7). Dr. Hunt described the three types of burns:

> The way I usually tell it to family is if the skin is an inch thick, a sunburn is a first-degree burn, and let's say hypothetically that's 1/16[th]

5

of an inch. So you've got, you know, 15/16ths of an inch left, and that's not injured and it heals very quickly. A third-degree burn goes through that entire inch of skin. Now, the skin is not an inch thick, but just vision [sic] it as it would be. When that inch of skin is destroyed, that is a third-degree burn. By definition, it destroys any potential for that area that's third-degree to heal on its own. So a second-degree is anyplace between that sunburn which is $1/16^{th}$ and that total inch, which is third-degree, in between. So potentially second-degree burns will heal, depends on how deep they are and how long it takes. But the skin elements are there in a second-degree burn, and potentially it will heal. A third-degree, it will not.

(RR46:8-9). There is also a fourth-degree burn. (RR46:17). This type of burn does not stop at the underside of the skin; it goes all the way through the skin into the fat. (RR46:17).

Dr. Hunt testified that Nancy had burns over 40% of her body. (RR46:10). The burns to Nancy's upper body and face were third and fourth-degree burns. (RR46:18; SX#146). The burns to her left arm and hand were second and third-degree burns. (RR46; SX#147). The burns to her right shoulder and breast were third and fourth-degree. (RR46:19; SX#148). The lower portion of her right arm and hand were second and third-degree burns. (RR46:19; SX#148). The burns to the top of her head were third-degree. (RR46:19-20; SX#149).

Because Nancy's injuries were to her face and neck, she was intubated and placed on a ventilator. (RR46:11). Her face was swollen and her eyes were shut. (RR46:14). She was able, however, to nod her head and gesture with her hands. (RR46:14).

6

Nancy's treatment team determined that Nancy was not going to survive her injuries and that treatment would be futile. (RR44:31; RR46:23). Prior to the instant offense, Nancy executed a DNR, a do-not-resuscitate order.[4] (RR44:30-31; SX#8). On May 25, 2012, given the severity and the extent of Nancy's injuries and in accordance with her DNR, the decision was made to discontinue life support, and Nancy passed away. (RR46:23-24).

Dr. Tracy Dyer, a medical examiner with the Dallas County Medical Examiner's Office, performed Nancy's autopsy. (RR46:25, 29-30; SX#9, 151-59). During the autopsy, Dr. Dyer observed "significant serious burns that involved her entire head, chest, portions of the upper back, and portions of, I believe, it was the left lower extremity or left thigh and leg." (RR46:32). Her hands and palms were completely burned, destroying Nancy's fingerprints. (RR46:32). On the back of her left hand, there were "some areas of skin slippage"; the thermal injuries caused loosening under the layers of Nancy's skin, causing it to peel off. (RR46:36; SX#155, 156). Nancy's right hand was more severely affected. (RR46:37). On that hand, "the superficial layers of the skin are gone, and what you have is that reddened deep tissue in this case, underneath." (RR46:37; SX#157). Dr. Dyer observed skin slippage on Nancy's left leg and thighs. (RR46:37; SX#158).

---

[4] Nancy's DNR is dated May 17, 2002. (SX#8).

7

Nancy's injuries were consistent with flame burns. (RR46:38). Fire was a deadly weapon in this case. (RR46:38). The cause of Nancy's death was thermal injury. (RR46:34, 39). The manner of her death was homicide. (RR46:39).

*Appellant's Capture*

Shortly after police arrived at the Whip-In that morning, calls started coming in about a man hiding in the alleyways and between the homes in the neighborhood directly behind the store. (RR44:70, 86). That person matched Nancy's description. (RR44:70-71, 86). Officers set up a perimeter around the neighborhood behind the Whip-In. (RR44:71). Officer Rafael Perez participated in the search. (RR44:178). In the alley behind Mt. Vernon Street, he noticed a "heavy-set black male, no shirt, with dark pants" matching the suspect's description. (RR44:181-82). Perez identified Appellant as the man he saw in the alley. (RR44:182-83). When Appellant saw Perez, he took off running. (RR44:182-83). Perez lost sight of him briefly, but then he saw Appellant's leg sticking out from under a bush. (RR44:184-85). "He was laid back, kind of leaning against the wall with one leg out." (RR44:185). Perez drew his weapon and instructed Appellant to come out from the bushes and get on the ground. (RR44:185-86). Coffey arrived and they placed Appellant in handcuffs. (RR44:186). Appellant asked the officers, "What took you so long[?] Y'all are getting slow." (RR44:186). Appellant was arrested and searched before he was

8

placed in the squad car. (RR44:74). From Appellant's pockets, Coffey collected a used lighter, a red lighter, a purple lighter, a gold ring, a car key, coins, and cash. (RR44:75-78; SX#6, 26, 28-30, 59, 60). Appellant did not appear intoxicated. (RR44:187).

Coffey transported Appellant to the police station.[5] (RR44:74). On the drive to the station, Appellant tried repeatedly to engage Coffey in conversation. (RR44:80-81; SX#31). He asked, "What am I being booked for, man?" (SX#31, 1:01). When Coffey advised Appellant was arrested for attempted capital murder, Appellant asked, "Attempted capital murder of who?" (SX#31, 11:38-1:39). Appellant continued to try to engage Coffey in conversation. (*See* SX#31). He asked if Coffey was a family man. (SX#31, 2:55). He asked whether Coffey was Coffey or Perez. (SX#31). Coffey did not respond to Appellant's questions. Appellant stated, "I can tell you everything, man. I can tell you what you want to know." (SX#31, 3:32-3:36). A few minutes later, Appellant told Coffey that he had been waiting for police. (SX#31, 6:25). He said that the police came "because I want[ed] you to." (SX#31, 6:32). Coffey testified that during the transport, Appellant did not appear intoxicated. (RR44:79, 87). Appellant did not slur his speech and he did not smell of alcohol. (RR44:79, 87). Appellant appeared "[to be] coming down from [an] adrenaline rush, maybe fatigued." (RR44:79-80).

---

[5] A video recording of the transport video was admitted into evidence as State's Exhibit #31. (RR44:80-81).

Detective Stacy Tooke was the lead detective on the case. (RR44:213-14). Tooke contacted Appellant at the jail after his arrest. (RR44:219). He requested and was granted consent to take a sample of Appellant's DNA. (RR44:219-21; SX#103). A forensic investigator collected Appellant's DNA and took photographs of Appellant's person. (RR44:221). Tooke interviewed Appellant at the jail. (RR44:237).

The jury heard testimony from three of the residents from the neighborhood behind the Whip-In, where Appellant hid after the instant offense. Jim Medley lives across the alley, behind the Whip-In. (RR44:142-43). On the morning of the offense, he was at home alone. (RR44:143-44). He heard his dog barking in the backyard, so he went outside to investigate. (RR44:144). The gate to his rear-entry driveway was open. (RR44:144). On his way back inside the house, Medley saw a "black man without a shirt, pushing a bicycle. That was about, oh, two houses away." (RR44:148). At the time, it "seemed like a lot of commotion in the neighborhood." (RR44:145). Medley saw police cars and could hear sirens. (RR44:145). He noticed his garbage container had been moved and a pack of cigarettes in his driveway. (RR44:146; SX#48, 78). Medley is not a smoker. (RR44:146). He picked them up and put them in the garbage. (RR44:146, 151-53; SX#50). Inside the garbage can, he found a t-shirt. (RR44:147; SX#77).

Ken Marecle was at home with his daughter on the morning of the offense. (RR44:155-56). At one point, Marecle's daughter said a man was on their back porch and was heading for their front door. (RR44:156). Marecle cracked open the front door. (RR44:157). Appellant was standing on the front porch. (RR44:159, 166-67; SX#55). Appellant's "eyes were really wide and big." (RR44:169). He did not smell of alcohol. (RR44:168-69). He was wearing pants and "military style black rim glasses" but he did not have a shirt on. (RR44:162). Appellant told Marecle he needed help. (RR44:157, 159). Then, he tried to force his way into Marecle's home. (RR44:159-60). Marecle used his shoulder to push Appellant outside into the courtyard. (RR44:160, 169). Appellant started fighting and flailing his arms. (RR44:161, 169). He pushed Marecle backwards. (RR44:162). Marecle fell and skinned his arms and knee. (RR44:162, 165; SX#56). When he stood up, Appellant took the glasses off of Marecle's face and fled.[6] (RR44:162-63, 170). Marecle and his daughter were later shown a lineup but neither was able to identify the man they saw that morning. (RR44:210-11).

Lawrence Denson lives on Colonial, near the Whip-In. (RR45:7-8; SX#65). On the morning of the offense, Denson was in his kitchen when he noticed "[Appellant], looked like he was trying to get inside my gate on the side of my house." (RR45:9). Denson went outside to confront him. (RR45:9, 11).

---

[6] The glasses were found several weeks later in the hedges by a neighbor. (RR44:165-66).

Appellant approached Denson "with his arms out, and said, man, I'm in a bad way." (RR45:9, 11-12; SX#51-53). Denson told him that "he needed to get his bad way out of my yard." (RR45:12). A family friend staying at Denson's home came outside. (RR45:12-13). Appellant turned around and ran toward an alley. (RR45:13-15). Appellant did not appear to be intoxicated. (RR45:16). Denson picked Appellant out of a lineup. (RR44:210; RR45:18-19; SX#62-63).

*The Investigation*

On the morning of the offense, Anna Lunceford, Nancy's manager and friend, was notified that the panic button had been activated at the Whip-In. (RR44:35, 38, 44; SX#25). When she arrived at the store, Nancy was not there. (RR44:44). The police asked Lunceford to retrieve the footage from the surveillance cameras.[7] (RR44:46). Lunceford rewound the DVR and played the surveillance video for the police. (RR44:45-46; SX#15, 16, 17).

After she reviewed the surveillance video, Arson Investigator Nancy Carpenter instructed firefighters to look around for the bottle that Appellant was carrying in the video. (RR44:110-11; RR45:48-49). Firefighter Gary Church went outside and walked toward the back of the building. (RR44:111, 113-14). He found a drinking bottle on the ground in the grass. (RR44:111-12; SX#35, 36).

---

[7] Lunceford testified that the Whip-In is equipped with three surveillance cameras. (RR44:39-40; SX#10-12). The images from the cameras are recorded on a digital video recorder. (RR44:45).

12

Inside the bottle was a paper towel, "down inside the bottle, kind of in the neck[.]" (RR45:49; SX#36). The bottle smelled of a petroleum-type product. (RR45:49). Carpenter collected the plastic bottle. (RR45:50-51; SX#36, 114, 115).

Inside the store, Carpenter pulled back the mat on the floor behind the sales counter. (RR45:60). Carpenter discovered a liquid pooled beneath and collected a sample. (RR45:60-62; SX#117, 118, 129). Carpenter transported all of the evidence she collected to the Armstrong Laboratory, a lab capable of testing evidence involved in an arson investigation. (RR45:69).

Dr. Kelly Wouters is a chemist with Armstrong Lab. (RR45:106-07; SX#136). He testified to the results of the chemical testing. (RR45:110, 112, 113; SX#137, 138). Analysis of the contents of the plastic drinking bottle and Nancy's clothing showed "a medium petroleum distillate of the primary recovery, and . . . a lower level of isopropyl alcohol." (RR45:113-14; SX#137). A medium petroleum distillate is "the type of ignitable liquid that we encounter as charcoal starter fluid or paint thinners - - we call it mineral spirits sometimes[.]" (RR45:114). Isopropyl alcohol is rubbing alcohol. (RR45:115). Medium petroleum distillates and isopropyl alcohol are "immiscible"; they do not mix. (RR45:115). The pooled liquid collected from under the mat behind the sales counter contained medium petroleum distillate. (RR45:116). Appellant's t-shirt, pants, belt, left shoe and sock, and his right shoe also contained medium petroleum

13

distillate. (RR45:116-17; SX#138). Neither the pooled liquid nor Appellant's clothes and shoes contained isopropyl alcohol. (RR45:116-17). No ignitable liquids were detected on the swabs of Appellant's hands. (RR45:116).

Dr. Wouters testified that the liquid contained in SX#60, the cigarette lighter, was "probably butane[,]" which is not a medium petroleum distillate. (RR45:118). The same is true for the liquid contained in SX#59, the other cigarette lighter. (RR45:119).

The plastic drinking bottle was swabbed for a DNA sample. (RR45:128-30; SX#160-164). Appellant's DNA was found on the swab of the exterior of the plastic bottle. (RR45:154; SX#142). He was also included as a possible contributor of a DNA profile from the interior and exterior opening of the bottle. (RR45:155; SX#142). Appellant was included as a possible contributor of a low level sample of DNA from the cash drawer. (RR45:156; SX#142). The swab from the cash drawer was not a very strong match to Appellant. (RR45:160). A partial DNA profile from the cigarette package matched Appellant. (RR45:156; SX#142). No DNA profile was obtained from one of the swabs of the T-shirt, one of the stains from the counter, or the door handle. (RR45:150, 152; SX#142). Another stain from the T-shirt was a match to Appellant. (RR45:150; SX#142). There was also a profile of an unknown male and an unknown female obtained from that stain. (RR45:150; SX#142). Nancy Harris was excluded as a possible

14

contributor to the unknown female profile. (RR45:153). A sample from a cutting of the t-shirt was also a match to Appellant. (RR45:153; SX#142). This sample contained a profile of an unknown female and an unknown female as well. (RRR45:153-54).

### *Punishment*

#### *The State's Case-in-Chief*

At punishment, the State presented evidence of Appellant's criminal history and bad behavior while in prison:

In 1993, Appellant lived with Amy Armstrong Franks and three of her children. (RR47:35-37). At the time, Appellant was Franks' boyfriend. (RR47:36). He was 17 and she was 23. (RR47:38). Appellant was good to Franks' children, but over time, he and Franks started fighting. (RR47:37, 39). Appellant "put his hands on [Franks]" and would grab her and hit her. (RR47:40). Franks fought back. (RR47:40, 68).

On one occasion, after a fight, Franks left the apartment and went to a friend's apartment upstairs. (RR47:41). She left her two-year-old daughter downstairs. (RR47:41). While Franks was gone, Appellant took Franks' two-year-old and left. (RR47:41). He eventually returned, and he and Franks reconciled. (RR47:42).

15

The last straw for Franks was when, during yet another fight, Appellant hit Franks while she was holding her daughter. (RR47:42). Her daughter "caught the back part of his hand." (RR47:42). When Appellant left, Franks locked him out and refused to let him back in her apartment. (RR47:42). She called the police and told them what had happened. (RR47:44). Appellant returned after the police left but Franks refused to let him in. (RR47:45). She told him that their relationship was over. (RR47:46). Appellant banged on the door and threatened to kick it in. (RR47:46). He threatened to beat her behind. (RR47:70, 75). Franks barricaded the door and blocked the windows with mattresses and a bunk bed. (RR47:46, 51). She turned off the lights and waited in the hallway with a gun – Appellant's gun. (RR47:47, 70). "And then [Appellant] went around and set my patio on fire." (RR47:46). Appellant threw something onto the patio, setting a rug on fire. (RR47:49). Franks saw the flames and went outside. (RR47:50). She shot at Appellant as he ran away. (RR47:50-51, 73). Then she put out the fire. (RR47:50-51).

On September 8, 1993, Dallas Police Officer Eric Hagen was dispatched to Franks' apartment. (RR47:21). When he arrived, Franks was "extremely agitated and upset" but would not let Hagen inside. (RR47:22). Hagen walked around to the back porch of the ground-floor apartment. (RR47:23, 26). He looked over the

16

fence and saw "a burned piece of wood and burned patio carpet." (RR47:24). It appeared someone had tried to set the carpet on fire. (RR47:26).

On November 9, 1993, Garland Police Investigator Berry Oliver was on routine patrol when he saw Appellant walking down the street smoking a joint. (RR47:101, 104–107). When Appellant saw Oliver, he attempted to conceal the joint by "stick[ing] it down the back of his neck and then [he] immediately starts trying to get into the trunk of the car[.]" (RR47:104-05). Oliver stopped Appellant and patted him down. (RR47:105). He found the joint "between [the] coat and [the] shirt [Appellant was wearing]" and he found a bag of marijuana inside a towel that Appellant was carrying. (RR47:105, 107). Oliver arrested Appellant for possession of marijuana and an outstanding warrant. (RR47:105, 108). Appellant pleaded guilty and received six months' probation. (RR47:109-110; SX#167). His probation was subsequently revoked and he was sentenced to 30 days in jail. (RR47:110; SX#167).

On July 23, 1994, while on patrol Garland Police Officer Blaine Ralston ran a routine check of a license plate on a black four-door Cadillac to check for outstanding warrants. (RR47:116-17). There was an outstanding warrant on the vehicle, so Ralston attempted to initiate a traffic stop. (RR47:117-18). He activated his red and blue lights, but the vehicle did not stop; it "just continue[d] to roll down the road." (RR47:118). Ralston could see there were two people in the

vehicle. (RR47:118). The female driver made eye contact via the rear view mirror. (RR47:118, 120). Ralston activated his siren but the vehicle still did not stop. (RR47:119). The vehicle ran a stop sign. (RR47:119). Ralston could see the male passenger motioning for the driver to ignore Ralston. (RR47:12021). The vehicle "started to slow roll" at which point Appellant jumped out and ran toward a house, ignoring commands to stop. (RR47:122–23). Appellant tried but was unable to open the front door of the house. (RR47:123). Ralston and his partner apprehended him. (RR47:123–24). He told the officers "he had told [the driver, his wife Daphne Johnson] to continue to go and not stop because he had warrants for his arrest." (RR47:125). Appellant was later convicted of evading arrest and given one year of probation. (RR47:127-28; SX#168). His probation was subsequently revoked and he was sentenced to 180 days in jail. (RR47:128; SX#168).

On August 7, 1995, Garland Neighborhood Police Officer M.G. Clark was dispatched to locate Appellant, who was wanted on an ongoing aggravated assault with a deadly weapon call. (RR47:132-33). Throughout the night, Appellant had been making threatening phone calls and police had received a tip he was at a particular location. (RR47:133-34). Clark located Appellant and arrested him for outstanding warrants and the aggravated assault case. (RR47:134-37). At the jail, Appellant threatened Clark so Clark filed a retaliation case against Appellant,

18

primarily for record purposes. (RR47:138-40). Appellant was later convicted of the aggravated assault and sentenced to ten years in prison, probated for five years. (RR47:140–41, 143; SX #169). The complainant on the aggravated assault case was Courtney Johnson. (RR47:143; SX#169). The retaliation charge was no-billed. (RR47:144).

On October 9, 2002, Garland Police Officers Clay Lacey and Gary Steadman responded to a hit-and-run call. (RR47:147, 155). The person who called police was following the vehicle that was involved in the hit-and-run. (RR47:148, 155). By the time Lacy arrived at the scene, "the person in the car was getting out." (RR47:148-49). Lacy and Steadman searched the area and eventually found and apprehended Appellant. (RR47: 150–151, 155–57). Appellant repeatedly ignored Steadman's commands to stop running and to get on the ground. (RR47:157-58). Steadman eventually tackled Appellant and arrested him for evading arrest. (RR47:158-60). Appellant was later convicted of the offense and sentenced to 75 days in jail. (RR47:160-61; SX#170).

On June 14, 2004, Digna Salmeron was in her truck preparing to leave for work when she heard a knock on the window. (RR47:182, 191). The man stated he was sick and needed to use a phone to call an ambulance. (RR47:183). Scared, Salmeron told the man she did not have a phone. (RR47:183-84). The man "just went at [her]." (RR47:184). He tried to force his way into the truck. (RR47:184–

19

85, 191). The man eventually wrested the keys away from Salmeron and threw her into the yard. (RR47:186). He then started the truck and left. (RR47:186). He later wrecked Salmeron's truck, rendering it inoperable. (RR47:188, 197). Salmeron could not fully identify the person who did this to her, except that he was a big and strong Black man. (RR47:189, 192-93).

Garland Police Officer Matthew St. Clair was dispatched as backup on the call regarding the carjacking of Salmeron's truck. (RR47:165, 167). When St. Clair arrived in the area, Officer McClendon had already located the stolen vehicle and "was in the midst of a . . . high speed vehicle pursuit through some neighborhoods." (RR47:166-67). The driver – Appellant – "lost control and wrecked out and struck a wall, some parked cars in a driveway, and the corner of a house." (RR47:168, 170). At that point, Appellant got out and attempted to flee on foot. (RR47:170). He was eventually taken into custody. (RR47:171-72). Appellant was subsequently convicted of robbery and sentenced to five years in prison and assessed a $1,500 fine. (RR47:175-76; SX#171). He was also convicted of evading arrest, sentenced to a year in state jail, and assessed a $1,500 fine. (RR47:175-76; SX#171).

On September 13, 2004, Garland Police Lieutenant John Spera responded to "a family disturbance" call. (RR47:78-79). "[T]here was a suspect there attempting to kick the door in and that there was also a protective order on him."

(RR47:79-80). The complainant was Daphne Johnson. (RR47:80). Daphne told police that Appellant "had told her he was coming over to get some money and that he would kick in the door if he had to." (RR47:84). Footprints were visible on the door. (RR47:85). There were two children in the apartment at the time. (RR47:87). Appellant was subsequently convicted for violation of a protective order and sentenced to 330 days in jail. (RR47:97; SX#166).

The State also presented evidence of a theft committed by Appellant against his former employer. David Contente owns Kwik Kar Oil and Wash in Mesquite. (RR48:157). Appellant worked for him in December 2010, performing State inspections and helping out in the shop. (RR48:158-61). He later became a cashier. (RR48:161, 183). Appellant worked ten hours a day, five days a week. (RR48:180). He was reliable and was given a set of keys to the business. (RR48:162, 164). Appellant did not handle conflict well, however. (RR48:163). "He was too rigid, in our rules, you know." (RR48:163).

On November 14, 2011, Appellant called Contente at 5:00 in the morning. (RR48:163-64). Appellant "said I needed to come down to the store so he could talk to me and that he had done a bad thing." (RR48:164). Contente went to his computer and tried to access the surveillance cameras at the store, but the camera was blacked out. (RR48:165, 166; SX#175-178). Contente "went to the police department and asked a policeman to go down there with me." (RR48:170). He

"thought the worst." (RR48:171). The police accompanied him to the store. (RR48:171). There, Contente discovered that three state inspection booklets, $325 in cash, and a monitor were missing. (RR48:172-73). The inspection booklets and the cash were taken from the safe. (RR48:172-73). The booklets are valued at $2100. (RR48:172). Footage from surveillance camera showed Appellant in the store earlier that morning and that Saturday night. (RR48:174; SX#173, 174). Appellant was arrested. (RR48:178). The monitor was returned but the inspection booklets and the cash were not. (RR48:175, 178; SX#174).

On April 15, 2012, at 5:30 in the morning, Appellant was brought into the emergency room by Dallas police and paramedics. (RR48:190-91; SX#188). He was handcuffed, "highly agitated" and "somewhat combative." (RR48:194). He was in a substance-induced psychosis. (RR48:202-03). It took eight or nine people to hold Appellant on the bed. (RR48:194). He had to be placed in a body net, a four-point restraint that lays over the patient and attaches to the bed. (RR48:194-95). The more the staff tried to hold Appellant down, the more agitated it made him. (RR48:195). Appellant made several statements: "I hope they're getting this on TV, God is watching all of this, XLT and divorce is a bad thing, and I'm going to grab your gun." (RR48:197). Once Appellant was medicated he calmed down. (RR48:198). He reported that he had being smoking

22

crack cocaine, ice, and marijuana laced with PCP. (RR48:198). He did not report any mental health concerns. (RR48:199-200, 208).

Parker was not involved in his discharge, but per hospital protocol, Appellant would have been offered information and resources regarding drug treatment. (RR48:200-01, 205, 208-09).

On the morning of April 26, 2012, Carina Pinzon was working as a housekeeper at the Express Inn in Garland. (RR48:101). She was cleaning one of the rooms and left the door propped open with her cart. (RR48:102). When she was cleaning the bathroom, a man moved her cart and entered the room. (RR48:102-03). Pinzon turned around when the man touched her shoulder. (RR48:103-04). He said something to her in English, but she did not understand him. (RR48:103). She asked if he needed something. (RR48:103). At that point, she noticed that the zipper on his pants was down. (RR48:104, 108). "[H]e had his penis outside and that's when I got scared." (RR48:104). His penis was erect. (RR48:108). He tried to grab her hand. (RR48:105). Pinzon threw a bucket of water at him, pushed him and ran away. (RR48:105). She ran to the office and her manager called the police. (RR48:105-06).

Garland Police Officer Mark Mendoza was dispatched to the Express Inn. (RR48:117-18). There, he spoke with Pinzon and got a description of the suspect. (RR48:119). He then consulted with the manager to determine whether the suspect

23

was a guest at the motel. (RR48:119). The manager gave him some names and Mendoza went to those rooms. (RR48:120). Appellant was one of the possible suspects. (RR48:120). Mendoza recognized Appellant from a prior arrest. (RR48:120). Appellant allowed Mendoza into his motel room, which smelled of marijuana. (RR48:121, 129). Mendoza noticed that Appellant's clothes were wet. (RR48:121, 123). Appellant told Mendoza that he had been smoking crack all night, but he did not appear intoxicated. (RR48:121, 123, 130). Mendoza asked if Appellant had anything illegal in his room. (RR48:122). Appellant advised that he "probably had a crack pipe or something somewhere in the room." (RR48:122). Mendoza asked Appellant about the incident with Pinzon. (RR48:122). Appellant told him that "he was just trying to drop off some towels to the room." (RR48:122). Pinzon confirmed Appellant was the man who had exposed himself to her. (RR48:124). Appellant was not arrested, but he was issued a criminal trespass warning and was ordered to leave the motel. (RR48:124-25).

Mendoza had previously arrested Appellant on May 31, 1994. Mendoza and his partner, Officer Ehrman, were dispatched to the scene of a man and woman fighting on the side of the road. (RR48:111-12). Upon arrival, the officers separated Appellant and the woman and ran a check for outstanding warrants. (RR48:112). They seated Appellant in the patrol car. (RR48:113). When Officer Mendoza opened the door to notify Appellant that he would be arrested on a

24

warrant, Appellant "came charging out of the back [of the] squad car, like trying to get away, and we began wrestling with him." (RR48:113). Appellant put up "a pretty good struggle." (RR48:114). He bit Mendoza on the arm. (RR48:114). He bit Ehrman. (RR48:114). He bit Ehrman so hard that he bit through the officer's watch. (RR48:114). Appellant later pleaded guilty to resisting arrest and was sentenced to twelve months' probation. (RR48:115-16; SX#189). His probation was revoked and he was sentenced to 365 days in jail. (RR48:116; SX#189).

Carlton Jenkins was incarcerated with Appellant at the Rudd Unit for two months in 2005. (RR47:201, 203, 238). They were bunkmates. (RR47:202). At first, Appellant and Jenkins had "a decent relationship." (RR47:205). Jenkins testified that Appellant "stopped going to work . . . [and] was confined to the housing unit then." (RR47:207). Several times, Appellant was not able to buy groceries at the commissary. (RR47:210). Jenkins shared some of his food with him. (RR47:211). The bunkmates' relationship began to change. (RR47:214). Jenkins saw Appellant sitting on the head of his bed, which is a sign of disrespect. (RR47:214). Appellant's "demeanor went south." (RR47:215). Appellant "quit school, too." (RR47:216). He "was on confined housing." (RR47:216). Jenkins tried to talk to Appellant but "It went bad." (RR47:219).

25

July 25, 2005 "was GI day." (RR47:220). "[E]verybody cleans the dorm." (RR47:220). Afterwards, Appellant "was sitting on [Jenkins'] bunk." (RR47:222). Jenkins told Appellant that they needed to talk because he wanted Appellant to stop disrespecting him. (RR47:223, 247). The men went to the back of the dorm. (RR47:223, 248). There, "[Appellant] assaulted [Jenkins]. He swung at [him]." (RR47:223). He hit Jenkins in the head. (RR47:224). The men "sort of grabbed each other[.]" (RR47:224). They separated when they thought a guard was approaching. (RR47:225). Then, they "went back and then [they] fought some more." (RR47:225). Appellant grabbed Jenkins below his knees and flipped him, causing Jenkins' head to his the concrete floor. (RR47:226, 233). Jenkins "split [his] head open." (RR47:227). He was bleeding; "[t]here was blood everywhere." (RR47:227-28). Jenkins was transferred to another unit to receive medical treatment. (RR47:230). The injury to his head required nine staples. (RR47:230–231; SX #172). Jenkins also suffered bruising from blows to his face and head. (RR47:232). Appellant was sent to solitary confinement. (RR47:230).

Ashley Villegas worked for a year as a correctional officer with the Texas Department of Criminal Justice ("TDCJ") at the Price Daniel Unit in Snyder, Texas. (RR47:256-57). Villegas worked the overnight shift, from 9:00 p.m. to 5:00 a.m., which required that every two hours she walk the unit and count the

26

inmates. (RR47:260, 262). On February 14, 2006, when she arrived at Appellant's cell during her 1:00 a.m. count, she "noticed the offender having one arm up on his door and the other arm on his penis masturbating and looking at me and smiling like with a grin, I guess as if he thought it was funny." (RR47:263-64). Appellant's pants were down and his penis was visible. (RR47:264). Villegas testified that Appellant was "known as . . . a high profile inmate so that means that all the officers knew who he was, but not in a good way, because they had also written disciplinary reports on him, too." (RR47:271).

Jennifer Pyburn is a detention officer at the Lew Sterrett Jail. (RR48:134). At one time, Appellant was under her supervision. (RR48:137). One time when Pyburn was escorting Appellant to a visit, he turned around "and he was like, I ought to just pull you in here, which is like the visitation door." (RR48:145). Appellant "didn't say it in a mean - - mean way[.]" (RR48:145). He was smiling. (RR48:145). Appellant later apologized. (RR48:155).

On another occasion, Pyburn observed an interaction between Appellant and another detention officer when Appellant was disrespectful. (RR48:147-48). The officer told Appellant the shower he was supposed to be cleaning was not clean enough. (RR48:147). Appellant told her that was the way he cleaned it. (RR48:147-48). When Pyburn instructed Appellant how to clean the shower, he told her that "we do not pay him enough to clean the shower." (RR48:149).

Pyburn testified that although it is against the rules, inmates tattoo themselves while in jail. (RR48:140-41). The tattooing device is usually fashioned using staples or parts from a dismantled intercom and the ink is created using colorful candy. (RR48:140-41).

Melodye Nelson, a 25-year veteran of TDCJ, testified as an expert on the prison system in Texas. (RR48:18). She is the senior warden of the female death row located at the Mountain View Unit in Gatesville, Texas. (RR48:19). She previously served as a major at the male death row located at the Polunsky Unit in Livingston, Texas for over three years. (RR48:18-19). Nelson testified generally about the types of facilities, number of inmates and guards statewide, and how inmates are classified within the system.

When an inmate arrives at TDCJ, he is sent to intake in order to determine his custody level. (RR48:32). Among the factors considered are the inmate's history of incarceration and prior jail conduct, as well as the nature of his current offense and the length of his sentence. (RR48:31-32). General Population 1, or "G1," are those offenders who are the lowest risk. (RR48:32, 34). A G1 may be a trustee, which allows him or her to live and work outside of the facility's perimeter fences. (RR48:34). General Population 2, or "G2," is the largest percentage of the general inmate population. A G2 may live in a dormitory and work in maintenance, food service or laundry. (RR48:41). General Population 3, or "G3,"

28

includes inmates serving 50 years or more. (RR48:32). A G3 is not allowed into public unrestrained and without armed supervision. (RR48:35). A G3 "cannot be assigned anywhere on a facility that they would have access to multiple areas, such as maintenance crews." (RR48:41). G3s are permitted contact visits with their immediate family. (RR48:58). General Population 4, or "G4," are those inmates who are disciplinary problems. (RR48:32). A G4's movement and job assignment are very restricted. (RR48:42). General Population 5, or "G5," are those inmates who are disciplinary problems and exhibit assaultive behaviors. (RR48:32-33). Finally, administrative segregation is reserved for inmates with multiple disciplinary incidents or gang affiliation or inmates who "have posed a threat - - a continuing threat to the safety and security of our institutions." (RR48:44). The inmate's initial classification is then referred to a State Classification Committee. (RR48:33). Based on that classification, the inmate will be assigned to a facility within TDCJ. (RR48:33). Once in that facility the Unit Classification Committee will monitor and adjust the inmate's custody level. (RR48:33).

An inmate convicted of capital murder and sentenced to life without parole is classified as a G3 upon arrival at TDCJ. (RR48:48). A capital murderer sentenced to life without parole will never receive a classification better than G3, although they may be classified as a G4 or G5 or placed in administrative segregation. (RR48:48).

29

With regard to death row inmates, there are three custody levels: 1, 2, and 3. (RR48:46). Nelson described them as follows:

> Death Row 1 meaning no disciplinaries, not a behavior problem; 2 would be the same thing, had a major disciplinary case; and a Death Row 3 would be assaultive death row, or assaultive disciplinary case. And we keep them as a D3 30 days. We review them. If they haven't had another assaultive case, we move them up to a D2. A Death Row 2, Level 2 stays there 90 days. At the 90-day mark, we review them, and if they haven't had some continued disciplinary problems, we - - we bump them back up to a Death Row Level 1, a D1.

(RR48:46). All death row inmates are housed in one-man cells and most are allowed up to two hours of recreation per day. (RR48: 46, 77). They are allowed two hours of visitation once a week as well as a visit from a spiritual advisor. (RR48:77).

TDCJ maintains some records of inmates' disciplinary infractions. (RR48:36). Records of minor infractions are not maintained; they are shredded. (RR48:36). Minor infractions include: being out-of-place; giving things to another inmate; failing to obey a direct order; not going to school, etc. (RR48:38). Often, verbal confrontations between the inmate and a guard do not result in a disciplinary case. (RR48:38). Nelson testified death row inmates have been involved in assaults on other inmates, assaults on staff, sexual misconduct, possession of contraband, possession of weapons, possession of drugs, and possession of cell phones. (RR48:47). For demonstrative purposes, Nelson

brought some weapons she has confiscated from inmates over the years made from materials like cardboard, parts of a typewriter, screws, and pencils. (RR48:59-62).

*Appellant's Case*

Appellant testified regarding his upbringing, drug use and the instant offense. He testified he has been using crack cocaine for "about 14 years[]" and has experimented with alcohol and PCP. (RR49:8). He testified he began smoking marijuana at seven years of age. (RR49:9). He bought it with his allowance money. (RR49:9).

Appellant testified he was released from prison in July 2009 and relapsed in October of 2011. (RR49:11). He started smoking crack and "ice." (RR49:11). At first, it was only on weekends. (RR49:12). He was still paying his bills. (RR49:12). His relapse was "devastating." (RR49:16). It made him lazy and he fell into a deep depression. (RR49:16). "I stayed home in the dark, you know, just was embarrassed, ashamed." (RR49:16).

On the night before the offense, Appellant went by himself to his brother Anthony's wedding reception. (RR49:19). He stayed for about an hour. (RR49:24). Everybody was happy and having a good time, but Appellant felt like he was in his own personal hell. (RR49:19-20). Because he had missed so much work due to his drug use, Appellant had lost his job. (RR49:20). He also felt ashamed of his clothes and hair. (RR49:22).

31

Appellant went home, ate dinner, then walked back to the party. (RR49:25-26). He told his cousin that he messed up his car when he put gas mixed with water in the tank. (RR49:26-28). The cousin gave him $30 and suggested how to fix it. (RR49:27-28). Appellant was drunk, so he used the money "to get high." (RR49:28). For the next several hours, Appellant "[c]ontinued to smoke, sell a little bit, smoke, sell a little bit, smoke." (RR49:28). He also had some Xanax to use when it was time to return home to babysit his daughter. (RR49:29).

At about 6 o'clock in the morning, Appellant walked back to his brother's house. (RR49:30). He found a bottle of wine on the patio and drank the whole thing. (RR49:30). He "wanted money. I wanted to get high on crack." (RR49:30). He saw a plastic water bottle. (RR49:30). He put lighter fluid in it. (RR49:30). He was "[j]ust going to take it and scare the person." (RR49:30). He planned to "[p]our it on her." (RR49:30). It was going to be a "scare tactic." (RR49:31). Although he did not remember having a lighter, he acknowledged he would have had to have one to smoke crack. (RR49:32).

Appellant walked across the street to the Whip-In. (RR49:31). He wanted to get the money and leave. (RR49:32). He did not intend to set Nancy on fire. (RR49:31). Appellant walked inside and "saw a lady." (RR49:33). She was getting the mop bucket ready. (RR49:33). Appellant walked behind the counter. (RR49:33). Nancy followed him and told him he was not supposed to be behind

32

the counter. (RR49:33). When she got close to him "I just poured the fluid over her head. At that time I remember she was - - started trembling." (RR49:33).

Appellant told Nancy to open the cash register because he wanted the money. (RR49:33). While she was opening the register, he took a lighter and some cigarettes. (RR49:33). He did not remember taking Nancy's ring. (RR49:33-34). Nancy opened the register and moved away. (RR49:34). Appellant took the money. (RR49:34). He warned Nancy to stand back because he had a lighter. (RR49:34). She moved toward him and he "flipped [the lighter] once to try to scare her but that didn't stop her." (RR49:34). Nancy reached across him again. (RR49:34). It "spooked" Appellant so he flicked the lighter "again, twice, hoping that she would move back." (RR49:34). That's when Nancy's clothes ignited. (RR49:35). Appellant was not thinking. (RR49:35-36). He was intoxicated; he had smoked nearly $100 worth of crack, consumed alcohol, and had taken a Xanax. (RR49:36). He did not think to help Nancy once she was on fire. (RR49:36).

Appellant "knew [he] had [done] a bad thing, so [he] just - - [he] just ran." (RR49:41). He ran and hid in some bushes and smoked a cigarette. (RR49:41). He "got tired of laying in those bushes, so when [he] came out, that's when [he] saw the police car parked at the end of the street." (RR49:40-41). Appellant

33

started running.  (RR49:41).   When he tired of running, he sat on a porch and waited for the police.  (RR49:41).

Appellant remembered "tussling" with Marecle but did not remember his encounter with Denson.   (RR49:41).  He remembered stealing a bicycle. (RR49:41-42).   He testified he thought the ride to the police station was "very short.  It was like I just closed my eyes and opened my eyes and I was there." (RR49:42).   When he was in the patrol car, he did not understand what he had done.  (RR49:43).

Appellant's testified that his parents were married.  (RR49:46, 90).   His mother worked during the day and his father worked at night.  (RR49:46).   They took him to church and taught him right from wrong.  (RR49:90).  Appellant has two brothers, Anthony and Timothy.  (RR49:47).  Anthony went into the military. (RR49:47).  Timothy "has been in prison half his life."  (RR49:47).

When Appellant was five years old, a cousin "put his penis in my mouth, [and] peed in my mouth."[8]  (RR49:50).   Appellant's cousins and uncle laughed at him.  (RR49:50).  When he was eight, the family friend he bought drugs from, fondled him.  (RR49:48).   "He pulled my penis out and wanted to suck it." (RR49:48).   Appellant "let him do it for a little while, but then [he] knew that

_____

[8] Appellant testified he never said anything about childhood sexual abuse prior to counsel on the instant offense.  (RR49:91).  He never mentioned it during previous incarcerations or when he was hospitalized because he thought it "was irrelevant at the time."  (RR49:91).

34

wasn't right." (RR49:48). He told him to stop. (RR49:48). Appellant still bought drugs from him. (RR49:48-49). Appellant used the fondling incident "to hold over [the friend's] head." (RR49:49). Appellant threatened to tell about the abuse and the man "gave [him] what [he] wanted." (RR49:49).

Appellant testified that when he dated Amy Armstrong they fought and argued. (RR49:53-54). He admitted that he hit Armstrong, but "I didn't just hit her enough just to really hurt her, but just enough to make her stop hitting me[.]" (RR49:53). He testified he threw the burning log on her patio "to get her to come outside, get her to let me in. I had nowhere to go." (RR49:54).

Appellant is married to Daphne Johnson. They have three daughters. Appellant and Daphne started dating when he was fifteen years old and married when they were eighteen. (RR49:52, 55). Appellant admitted that he used to hit Daphne. (RR49:55). He never hit her "enough to just hurt her, just enough to back her off." (RR49:57).

Appellant dropped out of school when he was in eleventh grade. (RR49:46). He was never placed in special education classes, but he was in "basic classes." (RR49:91). He took courses in auto body technology at Richland College. (RR49:91). Appellant testified he "learn[s] at a slow pace[,]" but he does not have a learning disability. (RR49:92).

Appellant worked at a company called Sanden for about five years, from 1997 until 2002. (RR49:58). He started on the assembly line, but was promoted four times, all the way to repairman. (RR49:59). He was eventually fired because he missed too many days of work. (RR49:58-59). At the time, he was using drugs on the weekends and "it carried on until the Mondays and Tuesdays[.]" (RR49:59). After he was fired, Appellant checked himself into Green Oaks Hospital to be treated for drug abuse. (RR49:59). He was there for a week and was diagnosed with depression. (RR49:60). After Green Oaks, he was sent to Summer Sky in Stephenville for further inpatient treatment. (RR49:60). Appellant spent 35 days at Summer Sky. (RR49:60). He "wasn't ready [to leave], but [his] insurance ran out." (RR49:61). He spent a week in a halfway house, then returned home to his wife. (RR49:61). Upon his return home, he stayed sober for a few weeks, then went back to using crack and marijuana and drinking alcohol. (RR49:61-62).

Appellant testified he was "under the influence[]" when he stole Salmeron's truck and "coming down off of [drugs]" during the theft of the Kwik Kar's money and inspection books. (RR49:62, 75). Appellant testified he did not remember the incident with Pinzon. (RR49:118). Every time he has been in trouble, it was because of the drugs and depression. (RR49:99-100). He was depressed "because I couldn't do more for my family and myself." (RR49:99). He testified the first

36

time he spoke with Daphne after the instant offense, he "couldn't remember what [he] had done." (RR49:80).   Appellant confirmed his criminal history:

- September 15, 1991:  At 15, Appellant was arrested driving a stolen car. (RR49:100).

- February 4, 1992:  He was arrested for pushing a police officer. (RR49:100).

- December 9, 1992:  He was arrested for theft.  (RR49:100).

- August 13, 1993:  He was arrested for assaulting Armstrong. (RR49:100-01).

- September 8, 1993: He was arrested after he threw the burning object onto Armstrong's patio.  (RR49:101).

- September 9, 1993: He was arrested for possession of marijuana. (RR49:102).  This is the only drug charge Appellant has ever had. (RR49:102).

- February 8, 1994: Appellant was arrested for outstanding warrants. (RR49:102).

- April 16, 1994: He was arrested for an outstanding warrant on the marijuana charge.  (RR49:102).

- May 31, 1994:  He was arrested for assault warrants.  (RR49:103).  This is when he bit Officers Mendoza and Ehrman.  (RR49:103).

- July 23, 1994:  Appellant directed Daphne not to stop the car when the police were trying to pull her over.  (RR49:103).

- August 7, 1995:  He was arrested for aggravated assault against Daphne's sister, Courtney Johnson.  (RR49:104).

- June 9, 2002:  He was issued a Class C assault citation for hitting Daphne.  (RR49:105).

- October 9, 2002: He was arrested for evading arrest. (RR49:105).

- November 15, 2002: He was arrested for assaulting Daphne. (RR49:105).

- July 3, 2003: Appellant did not remember walking up and hitting Daphne as she sat in the drive though at Braum's. (RR49:106). But, he did not deny that the incident happened. (RR49:47).

- September 7, 2003: He was arrested for assaulting Daphne. (RR49:107).

- January 5, 2004: He was arrested for theft. (RR49:107)

- June 19, 2004: He was arrested for robbing Salmeron. (RR49:107).

- September 13, 2004: He violated Daphne's protective order. (RR49:108).

Appellant testified the reason he set Nancy on fire was because she was coming at him. (RR49:120). Appellant acknowledged that when he was arrested, he only told police that he had consumed cocaine and two beers prior to the offense. (RR49:120). He did not mention the bottle of wine or the Xanax. (RR49:120). "It was irrelevant. I was intoxicated." (RR49:120).

Photographs of Appellant's tattoos were admitted into evidence. (RR49:130-33; SX#179-186). Appellant testified he got several of them while he was in prison. He acknowledged that he was never caught for those rule violations. (RR49:132). Recently, while incarcerated for the instant offense,

Appellant had "Gift from God" tattooed around his collarbone.  (RR49:132, 133).  He did not get caught for this rule violation.  (RR49:132).

Appellant's supervisor from Sanden testified that Appellant was a good worker.  (RR49:137-38, 141).  His only problem was his attendance.  (RR49:142).  Several co-workers testified Appellant was polite and friendly.  (RR49:149-50, 157, 162).  They testified this offense was out-of-character.  (RR49:153, 158-59, 166).

Daphne Johnson testified she is Appellant's wife.  (RR49:184).  She testified when they married, they were immature.  (RR49:186).  They struggled financially, they did not communicate well, and their arguments got physical.  (RR49:186).  They hit each other.  (RR49:217).  Daphne did not remember reporting to police that Appellant had made threatening phone calls.  (RR49:219).  She did not remember her sister filing an aggravated assault charge against Appellant.  (RR49:220).

In an application for protective order, Daphne alleged that on December 9, 2003, Appellant "became angry and punched [her] in the face."  (RR49:223; SX#193).  She also wrote that Appellant "very frequently" did the following: called her names and criticized her; tried to keep her from doing something; going out with friends; gave her angry looks or stares; prevented her from having money for her own use; threatened to hit or throw something at her; pushed, grabbed, or

39

shoved her; put down her family or friends; and, slapped, hit or punched her. (RR49:222; SX#193). In the affidavit, Daphne also detailed Appellant's prior assaults. (RR49:223-24; SX#193). In November of 2003, Daphne locked Appellant out when he came home very late. (RR49:224). He beat and banged on the door. (RR49:224). When Daphne finally let him in, he pushed her. (RR49:224). In October of 2003, Daphne again locked the door when Appellant went out. (RR49:224). Appellant kicked in the door and punched her in the face and chest. (RR49:224). She suffered a black eye, scratches on her face and neck, and soreness and pain. (RR49:224). She was unable to work for two weeks. (RR49:224). Daphne wrote:

> Over the last nine years, Matthew has been physically violent and abusive to me. He has hit me, punched me, slapped me, kicked me once, strangled me, pushed and shoved me, and thrown me around. I've had bruises, black eyes, a bloody nose, a busted lip, scratches; soreness, swelling and pain.

(SX#193).

Daphne first became aware of Appellant's drug use after his grandmother died. (RR49:187). He "would go off on binges" and disappear for a day or two. (RR49:188). Appellant would get physical with Daphne when he was high. (RR49:198). Daphne kicked him out of the house four to six times. (RR49:190). She tried to talk to him about his drug use. (RR49:195). He tried to stop using on his own. (RR49:195). Appellant also suffers from depression. (RR49:209). The

40

depression became more frequent after the Kwik Kar incident. (RR49:210). In Daphne's opinion, Appellant was high at the time of the offense. (RR49:243). She testified that Appellant "was an awesome father" to their three daughters. (RR49:192).

Pharmacologist Dr. John Roache testified as an expert regarding illegal drugs and addiction. (RR50:27). Roache testified addiction is "a learning process that happens with repeated use of drugs of abuse." (RR50:30-31).

Cocaine is a stimulant. (RR50:33). It increases wakefulness and vigilance and produces feelings of intense euphoria and motivation. (RR50:34). Marijuana is a plant and a mild hallucinogen. (RR50:34). Phencyclidine or, PCP, is a hallucinogen. (RR50:35). A user feels "superhuman empowered." (RR50:35). It can also produce "psychotic like effects, where you can have hallucinations, paranoia, and extreme agitation." (RR50:35). Methamphetamine or "ice," is a stimulant, which produces effects similar to cocaine. (RR50:35). Xanax is a benzodiazepine. (RR50:36). It is a sedative and used to treat anxiety. (RR50:36).

Commonly, an addict will use multiple chemical substances. (RR50:37). This is referred to as poly-substance dependence or poly-substance abuse. (RR50:37). When an individual is under the influence, he may be more impulsive. (RR50:37). "[T]he addict becomes more driven for the immediate consequences of the drug experience and less thoughtful or conscientious or cognitively decisive

41

about longer term consequences." (RR50:37-38). Often, addicts have relapses after periods of sobriety. (RR50:43).

Roache conceded that when Appellant checked himself into the hospital in 2002, he was depressed because he was unable to quit using drugs. (RR50:44). Indeed, the discharge instructions indicate "The patient was profoundly depressed because of his inability to stop doing drugs, and having observed his many losses, including job, family, financial, and clearly self esteem." (RR50:53; DX#22). Roache conceded that while incarcerated prior to trial, Appellant was not diagnosed with depression, but with poly-substance abuse and substance-induced mood disorder. (RR50:45).

Although Roache did not review the surveillance video of this offense, he opined Appellant was intoxicated at the time he committed the offense. (RR50:45). Roache did not think it was "necessary[]" to review the surveillance video. (RR50:45-46).

Frank AuBuchon testified as an expert on the Texas prison system. He described the various classification levels and the types of housing available. (RR50:146-47, 151, 158, 160-61). AuBuchon reviewed Appellant's entire classification file, records of Appellant's incarceration at the Dallas County Jail, a summary of Appellant's extraneous offenses, and a summary of the instant offense.

(RR50:145-46). AuBuchon testified Appellant will go into TDCJ as a G3 and will be placed in a high security unit. (RR50:157).

Dr. Jonathan Sorensen testified that he conducted an actuarial analysis to determine the probability that Appellant will be violent in prison. (RR51:22, 27; DX#25). Sorensen opined that Appellant "will fare better than the average incoming capital offender." (RR51:30; DX#26). The factors that decreased Appellant's risk of violence include: his age; his educational level; a lack of a disruptive group or gang affiliation; his prior prison behavior and classification level; and, the fact that he would be serving life without the possibility of parole. (RR51:30-31, 38, 42, 44). The factors that increased Appellant's level of risk include: his prior incarceration; his prior assaults while incarcerated; and, the fact that his capital murder involved a contemporaneous robbery. (RR51:45-46, 20-51).

James Aiken, a prison consultant who has never worked in a Texas prison, testified that Appellant "fares low on the factors of providing unusual risk to staff, inmates, or the general public." (RR51:58, 60, 61; DX#27).

Appellant's older brother Timothy[9] testified about their family and their history of drug use. All three brothers used drugs. (RR50:74). Timothy was aware that Appellant used drugs at a young age. (RR50:73). Twice, he took away

---

[9] At the time of trial, Timothy was serving a 40-year sentence for a 2004 conviction for theft of a person and assault on a public servant. (RR50:67).

Appellant's marijuana. (RR50:75). Then, Timothy went to prison when Appellant was 15 years old and was gone for eleven years. (RR50:85). Timothy returned home for a couple of years, then went back to prison on two 40-year sentences. (RR50:85).

Timothy was present during one fight between Appellant and Daphne. (RR50: 80-81). Appellant tried to slap Daphne. (RR50:81). Timothy intervened and he and Appellant "had a fight - - a tussle." (RR50:81). In Timothy's opinion, Appellant was intoxicated at the time because "he was big and I'm smaller and I handled him - - I mean, real easy." (RR50:82).

Appellant's mother-in-law, Hazel Johnson, testified that Appellant is a good person and a good father. (RR50:88, 90, 92). In the month before the offense, Appellant was stressed and depressed. (RR50:93-94). Daphne's aunt, Frances Wilson, testified she learned that Appellant had a drug problem about five years after he and Daphne were married. (RR50:100). She started talking to him about it in 2011. (RR50:101-02). Appellant was depressed and Wilson worried that he would harm himself. (RR50:103). Wilson was not aware of any physical abuse between Appellant and Daphne. (RR50:100). Daphne's sister Courtney Johnson testified Appellant and Daphne's relationship was "a normal relationship, just like any other married couple would have." (RR50:111-12). She never saw Appellant physically abuse Daphne, but she would "hear stuff from [her] sister."

(RR50:112). Courtney was aware of Appellant's drug problem and has seen him under the influence. (RR50:113). She did not recall the incident on August 7, 1995 when Garland police were called to her apartment. (RR50:126-27). She did not recall telling police that Appellant pointed a gun at her. (RR50:128). She did not recall trying to drop charges with the district attorney's office. (RR50:128). She has no recollection of the fact that Appellant pleaded guilty to that offense and served out a probation. (RR50:126-27).

A week before this instant offense, Courtney went with Appellant to the Garland Police Station when he asked them to "lock him up" because he was on drugs and wanted to avoid getting into trouble. (RR50:123). Without any active warrants, the police did not arrest him. (RR50:124).

Valerie Braziel is Appellant's daughter Matduxx's godmother. (RR50:166, 169). They met in 2009 after Appellant's release from prison. (RR50:169-70). Since that time, they have become friends. (RR50:170). In the time leading up to this offense, Appellant was withdrawn and Braziel felt as though he was depressed. (RR50:174). Braziel had no idea that he was a drug addict. (RR50:174). She was not aware of any domestic violence between Appellant and Daphne. (RR50:173).

*The State's Case-in-Rebuttal*

Nurse Kelly Nelson treated Nancy in the Burn Intensive Care Unit at Parkland Hospital. (RR51:71-73). Nancy was in pain. (RR51:74). She was

45

unable to speak because she had a breathing tube. (RR51:74). Nelson communicated with Nancy using non-verbal pain scales "based on how the patient is acting or like body language, emotion." (RR51:74). Nelson was able to ask Nancy "yes" or "no" questions and Nancy responded using hand signals and nods. (RR51:74-75). On May 23, Nancy was "in critical condition." (RR51:75). Nancy was concerned about her prognosis. (RR51:75). "She attempted to communicate to me by using her finger and writing in the air, and she spelled out the word die, d-i-e. I clarified that that's what she had spelled out to me, and she nodded, yes. . . . She nodded yes to the question, are you wondering if you are going to die." (RR51:75). When Nelson explained all of the "interventions" that the medical team was performing, Nancy "was shaking her head no." (RR51:76). Nancy "didn't want all the interventions that we were providing for her." (RR51:76).

The State published the recording from Officer Coffey's dashboard camera. (RR51:81; SX#187). On the video, when the officers pull up to the Whip-In, Nancy is standing outside. (SX#187). She is still on fire. (SX#187). She can be heard screaming and pleading for help. (SX#187).

Nancy's daughter-in-law, Elizabeth Harris, testified briefly regarding the effect of Nancy's death on the family. (RR51:82). Elizabeth is married to Chris Harris, Nancy's youngest son. (RR51:82). She was very close to Nancy. (RR51:

46

84).   Elizabeth and Chris have three daughters, Lorelei, Hanna, and Olivia. (RR51:84).   Every Friday Nancy would pick up the girls from school and have a "Mimi day[.]"  (RR51:84).   Nancy was an "amazing" grandmother. (RR51:85).

## SUMMARY OF THE ARGUMENT

*Issue Nos. 1-7*:   The trial court properly denied Appellant's *Batson* challenges to the State's exercise of peremptory challenges against seven minority veniremembers.  Appellant has not met his burden to show that the State's strikes were the product of racial discrimination.

*Issue Nos. 8-19*:   The trial court properly granted the State's challenges for cause against 4 prospective jurors.   These jurors possessed biases against the law the State was entitled to rely upon.   Appellant has failed to show that he was deprived of his right to a fair and impartial jury.

*Issue Nos. 20-27*:  The trial court properly denied Appellant's challenges for cause against 8 prospective jurors.  All of the denials were proper and Appellant has failed to show that he was denied the use of a statutorily provided peremptory challenge.

*Issue Nos. 28-30*:  The trial court properly granted the State's challenges for cause against 3 prospective jurors.  These jurors possessed biases against the law the State was entitled to rely upon.   Appellant has failed to show that he was deprived of his right to a fair and impartial jury.

*Issue Nos. 31-32*: Appellant's argument that he was deprived of a lawfully constituted jury lacks merit. Appellant has failed to prove that any of the trial court's rulings on any of the challenges resulted in the seating of a juror who was biased or prejudiced.

*Issue No. 33*: The evidence is sufficient to support Appellant's conviction for capital murder. Contrary to the assertions in his brief, the record is replete with evidence showing his specific intent to kill Nancy Harris. Further, the evidence also shows that the murder took place during the course of committing or attempting to commit robbery.

*Issue No. 34-35*: The trial court properly admitted the surveillance video of the instant offense as well as the still photographs from that video. While the video is graphic, it simply depicts the reality of Appellant's crime. The probative value of this evidence was not substantially outweighed by its prejudicial effect.

*Issue Nos. 36-37*: The trial court properly admitted the photographs of Nancy at autopsy and at the hospital prior to her death. The photographs helped the medical examiner and her physician in their testimonies, and they depict nothing more than the reality of Appellant's brutal crime.

Issue Nos. 38-40: The trial court properly admitted evidence of statements Nancy made prior to her death. These statements were admissible as excited utterances and/or dying declarations. Alternatively, any error is harmless.

*Issue No. 41*: The trial court properly admitted evidence of Appellant's actions after he fled the Whip-In. This evidence was admissible as same-transaction contextual evidence. Alternatively, any error is harmless.

*Issue No. 42*: The trial court properly instructed the jury regarding voluntary intoxication. Appellant's cross-examination may have led the jury to believe his actions were excused by his intoxication.

*Issue Nos. 43-44*: The trial court properly admitted during the punishment phase, evidence of Appellant's extraneous conduct with former girlfriend, Amy Franks. There is no evidence that the State acted in bad faith and Appellant has failed to show that he was surprised or that his defensive strategy would have changed in any way.

*Issue Nos. 45-48*: The trial court properly admitted during the punishment phase, evidence of Appellant's prior convictions. The State presented evidence tying Appellant to each of the complained-of exhibits.

*Issue No. 49*: The trial court properly admitted the expert testimony of Warden Melodye Nelson as her testimony was relevant and helpful to the jury in deciding the first special issue. Alternatively, any error is harmless.

*Issue No. 50*: The evidence was legally sufficient to support the jury's answer to the future dangerousness special issue. Based upon the facts of the instant offense, as well as the evidence of Appellant's past acts of crime and

violence, a rational jury could find that Appellant would constitute a continuing threat to society.

*Issue Nos. 51-53*:  Appellant's arguments regarding the punishment charge are inadequately briefed and multifarious.  Regardless, the trial court properly denied his requested instructions and properly overruled his objections to the charge.

*Issue Nos. 54-65*:  Appellant's admittedly meritless federal constitutional challenges to the Texas death penalty statute are presented only to preserve the complaints for federal habeas review.  And while Appellant invites this Court to revisit its prior holdings against his position, he provides no new authority for this Court or the State to address.

## ARGUMENT

***STATE'S RESPONSE TO ISSUE NOS. 1 THROUGH 7:  THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S BATSON CHALLENGES.***

In Issues 1 through 7, Appellant contends that the trial court erred in overruling his objection based on *Batson v. Kentucky*, 476 U.S. 79 (1986) to the State's use of peremptory challenges on veniremembers Sheppard Brown, Kimberly Houston, Percy Phillips, Shirley Wilson, Telli White, Dionne Hashaway, and Christylynn Kyles.  (Appellant's Br. at 35-51).  These contentions lack merit and should be overruled.

The Texas Code of Criminal Procedure and the U.S. Constitution prohibit the use of peremptory challenges to exclude prospective jurors on the basis of race. Tex. Code Crim. Proc. Ann. art. 35.261(a) (West 2006); *Batson*, 476 U.S. at 85; *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008).  Under *Batson*, a defendant must first make a prima facie showing that the prosecution exercised its peremptory challenges on the basis of race.  *Reed v. Quarterman*, 555 F.3d 364, 368 (5th Cir. 2009).  If the defendant makes that showing, the burden shifts to the prosecutor to present race-neutral explanations for striking the jurors in question. *Id.*  The court must then determine whether the defendant has carried his burden of proving purposeful discrimination.  *Id.*

At the second step of this process, the proponent of the strike need only tender an explanation that is race-neutral.  *Watkins*, 245 S.W.3d at 447.  The ultimate plausibility of that race-neutral explanation is to be considered as part of the third step of the analysis, in which the trial court determines whether the opponent of the strike (usually the defendant) has satisfied his burden of persuasion to establish by a preponderance of the evidence that the strike was indeed the product of the proponent's racial discrimination.  *Id.*  Whether the opponent satisfies his burden of persuasion to show that the proponent's facially

race-neutral explanation for his strike is pre-textual, not genuine, is a question of fact for the trial court to resolve in the first instance. *Id.*

This Court should not overturn the trial court's resolution of the *Batson* issue unless it determines that the trial court's ruling was clearly erroneous. *See Watkins*, 245 S.W.3d at 447-48. In assaying the record for clear error, *vel non*, this Court should consider the entire record of voir dire; it need not limit itself to arguments or considerations that the parties specifically called to the trial court's attention so long as those arguments or considerations are manifestly grounded in the appellate record. *Id.* at 448. But this Court should examine a trial court's conclusion that a facially race-neutral explanation for a peremptory challenge is genuine, rather than a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, erroneous. *Id.*

## *Analysis*

### I. Appellant failed to establish a prima facie case of discrimination, but the issue is moot.

After the parties exercised their peremptory strikes, Appellant asserted that he "would have Batson objections to some of the State's strikes." (RR43:19). Appellant identified seven African-Americans veniremembers that the State struck. (RR43:19-20). The State argued that Appellant failed to establish a prima facie case. (RR43:20). Without ruling on the State's objection, the trial court stated that it "would prefer that the State explain their strikes." (RR43:20). The State did

not object to the trial court's failure to rule. Consequently, this Court must assume that Appellant satisfied his step-one obligation to make a prima facie case of purposeful discrimination and address only the second and third steps. *See Watkins*, 245 S.W.3d at 448; *see also Chambers v. State*, 866 S.W.2d 9, 23 (Tex. Crim. App. 1993) (where the State fails at trial to object to the trial court's failure to rule on the defendant's prima facie case, that issue becomes moot and it cannot be raised on appeal).

## II.    The State's race-neutral explanations

At the second step of the *Batson* process, the prosecutor need only tender an explanation that is race-neutral on its face. *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (indicating the State has a burden of production in the second step merely to present a facially valid explanation for its strike); *Watkins*, 245 S.W.3d at 447.

### *Brown, Phillips, White, Hashaway, and Kyles*

At the *Batson* hearing, the State explained that it stuck all qualified prospective jurors who ranked themselves as a "3" on their questionnaire. (RR43:20-21). Question No. 2 on the questionnaire asked: "With reference to the death penalty, which of the following statements best represents your feelings?" (RR4-RR34; RR36-RR42; Q. p. 1). A ranking of "3" indicates the following opinion: "Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of

53

circumstances." (RR4-RR34; RR36-RR42; Q. p. 1). The State explained that it struck every person on the qualified-juror panel that selected number "3," including Sheppard Brown (Juror 2A, an African-American male), Percy Phillips[10] (Juror 60A, an African-American male), Telli White (Juror 329A, an African-American female), Dionne Hashaway (Juror 911A, an African-American female), and Christylynn Kyles (Juror 1133A, an African-American female), Christina Moore (Juror 271A, a Caucasian female), Laura Luna (Juror 340A, a Caucasian female), Ronald Drake (Juror 759A, a Caucasian male), and Scot McComas (Juror 1331A, a Caucasian male). (RR43:20-21; Brown, Juror 2A, Q. p.1; Phillips, Juror 60A, Q. p.1; White, Juror 329A, Q. p.1; Hashaway, Juror 911A, Q. p.1; Kyles, Juror 1133A, Q. p.1; Moore, Juror 271A, Q. p.1; Luna, Juror 340A, Q. p.1; Drake, Juror 759A, Q. p.1; McComas, Juror 1331A, Q. p.1). The State also intended to strike Jerry Matlock, (Juror 1500A, a Caucasian male), the last juror in the alternate pool, on the same grounds. (RR43:21; Matlock, Juror 1500A, Q. p.1).

The State's reason was grounded in these jurors' opinion about the death penalty and is race-neutral. Courts have found similar grounds as facially neutral. *See, e.g., Mathis v. State*, 67 S.W.3d 918, 924-25 (Tex. Crim. App. 2002) (holding prosecutor's explanations—that he struck a juror because she was in favor of the

---

[10] Percy Phillips ranked himself as a three and a five on this question. (RR43:20-21; Phillips, Juror 60A, Q. p.1).

death penalty only in two specified circumstances and she felt the death penalty was imposed too frequently—were facially race-neutral).

## *Kimberly Houston*

At the *Batson* hearing, the State explained that it exercised a peremptory challenge against Houston because "she's an attorney and we don't think that attorneys are generally good on jury panels." (RR43:21). When the State indicates that it challenged a prospective juror based on that person's type of employment and that the State has had poor success with that type of worker, the reason is a race-neutral explanation for exercising the peremptory strike. *Middleton v. State,* 187 S.W.3d 134, 142 (Tex. App.—Texarkana 2006, no pet.) (citing *Barnes v. State,* 855 S.W.2d 173, 174 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd)).

## *Shirley Wilson*

At the *Batson* hearing, the State explained that it exercised a peremptory challenge against Wilson because the State did not believe that Wilson was qualified. (RR43:20). Indeed, during individual voir dire, the State challenged Wilson for cause because Wilson vacillated on Special Issue No. One. (RR8:225-26). The State questioned Wilson at length on this issue. (RR8:205-09). She testified that she could never answer Special Issue No. 1 "yes" because she believes there is no way to predict an individual's future actions. (RR8:205-09). When questioned by the defense, Wilson initially repeated her earlier position,

stating "I can't see what you can really show to me [to prove] what the future is going to hold. I'm not for sure if I could answer that yes[.]" (RR8:220). Then, in contradiction, she said she could answer the first special issue in the affirmative. (RR8:221). The State's challenge for cause was denied. (RR8:227). Given Wilson's vacillation regarding Special Issue No. One, the State chose to peremptorily strike Wilson. Vacillating is a race-neutral reason for exercising a peremptory strike. *See Cook v. State*, 858 S.W.2d 467, 472 (Tex. Crim. App. 1993) (finding no clear error in trial judge's conclusion that the State's peremptory strike of a vacillating juror was a satisfactory race-neutral reason).

### *Conclusion*

The record supports all of the State's proffered race-neutral explanations for exercising peremptory strikes against the seven prospective minority jurors. Therefore, the trial court did not clearly err in finding that the State satisfied its step-two burden of production to tender facially race-neutral explanations for its peremptory strikes. *See Watkins*, 245 S.W.3d at 451.

### III. Appellant has not established by a preponderance of the evidence that the strikes were the product of racial discrimination

Appellant has not shown purposeful discrimination by the State. Here, the defendant has the burden to persuade the trial court that the prosecutor's explanations for the State's strikes were incredible or disingenuous. *Watkins*, 245 S.W.3d at 457. The focus of the *Batson* inquiry in this stage is on the genuineness,

not reasonableness, of the asserted non-racial motive. *Nieto v. State*, 365 S.W.3d 673, 676 (Tex. Crim. App. 2012). The question of pretext is a question of fact for the trial court to resolve, subject to reversal on appeal only for clear error. *Watkins*, 245 S.W.3d at 457.

Appellant primarily contends that the State's strikes must have been racially motivated because these jurors were qualified jurors and had some characteristics potentially favorable to the State's position on the death penalty. (Appellant's Br. at 36, 38, 39, 41, 42, 43, 45, 47). The jurors' qualifications for jury service are irrelevant to the analysis, however. Factors relevant to determining whether purposeful discrimination has been proven include the following:

1. whether the State utilized its option to shuffle the jury panels in a manner that supported an inference of race discrimination;
2. whether the prosecutor's office trying the case followed a formal policy to exclude minority venire members from jury service which was known to at least one of the prosecutors at trial;
3. whether the State exercised its peremptory challenges to eliminate a far greater proportion of minority venire members than non-minority venire members;
4. whether the reasons the State asserted for eliminating the minority venire members in question appeared to apply equally well to many non-minority venire members whom the State did not challenge; and
5. whether the State directed questions expressly designed to elicit grounds for peremptory challenges disproportionately, in a manner that suggested an intent to single out minority venire members for elimination.

*Watkins*, 245 S.W.3d at 448-49 (relying on *Miller-El v. Dretke*, 545 U.S. 231, 240-64, 266 (2005)). This Court looks to the collective and cumulative impact of these non–exclusive factors in determining whether an inference of racial discrimination is so powerful that it overcomes the deference given to trial courts. *See id.* at 449, 457.

An analysis of these factors demonstrates that Appellant's claim of purposeful discrimination lacks merit.

### 1. Jury Shuffle

There is no evidence of jury shuffling in this case. The parties selected the group of qualified jurors from a June 21, 2013 special venire. (RR4). Appellant does not assert or demonstrate that the venire was shuffled or otherwise arranged in a manner to decrease the possibility of a minority member.

### 2. Formal Policy Prohibits Discrimination

The Dallas County District Attorney's office's notorious formal policy of excluding minorities is a relic of a bygone era. It is common knowledge that the office policy of the last several years not only forbids such discrimination, it requires an investigation into sustained *Batson* challenges and authorizes discipline ranging from reprimand to termination. The State asks this Court to take judicial notice of this well-known fact. Tex. R. Evid. 201.

### 3.  Proportionality of Strikes

Appellant argues that even one racially motivated peremptory strike violates *Batson* and he makes no effort to demonstrate a pattern of discriminatory strikes. He does not identify the size or racial makeup of the pool of qualified venire members.  Nor does he analyze the number of strikes used by either side or how they were used.  He merely argues that the State used 7 of its 12 peremptory strikes to eliminate 60% of the African-Americans on the qualified prospective jury panel, a statistic with which the State disagrees.[11]  (Appellant's Br. at 50).

For statistical evidence to be relevant, data concerning the entire pool is necessary.  *See Medellin v. Dretke*, 378 F.3d 270, 278 (5th Cir. 2004).  By itself, the number of African Americans struck is an irrelevant statistic.  *Woodward v. Epps*, 580 F.3d 318, 339 (5th Cir. 2009) (holding that the State's striking 100% of the black jurors alone does not support a finding of discrimination and does not show any disparity in relation to the non-minority jurors).

The data evinces no discriminatory intent by the State. The panel of qualified venire members consisted of 44 people.  Of these, 12 (27%) were African-American, 27 (61%) were Caucasian, 4 (9%) were Hispanic, and 1 (2%) declined to indicate his race.    The State exercised 15 peremptory strikes.

---

[11] Appellant states in his brief that the State "used 7 of its 12 peremptory strikes to eliminate 60% of the African-Americans on the qualified prospective jury panel."  (Appellant's Br. p. 50).  In fact, the State exercised all 15 of its statutorily authorized peremptory strikes.   The State presumes that Appellant's reference to the State's use of 12 strikes is a clerical error.

(RR43:8-19). Seven of those 15 strikes (47%) were used on African-Americans, 7 (47%) were used on Caucasians, and 1 (6%) was used on a Hispanic juror. (RR43:8-19). Appellant exercised 17 peremptory strikes. (RR43:8-19). Of his 17 strikes, 2 were used on African-American jurors, 11 were used on Caucasian jurors, and 3 were used on Hispanic jurors. (RR43:8-19). The result was a 12-member jury consisting of 3 African-American jurors and 9 Caucasian jurors, with 2 Caucasian alternate jurors.

The State's use of 7 strikes on African-American venire members is not definitive of the inquiry in *Batson*'s third step; instead, a reviewing court must look at all relevant factors. *See Watkins*, 245 S.W.3d at 452 (upholding the trial court, despite the State's disproportionate use of 6 of its 11 peremptory challenges against a racial group making up only 22% of the venire). Of the 44 venire members who could conceivably be chosen for the jury, 12 (27%), were African-American. A random selection would yield either 3 or 4 African-American jurors in the 14 jurors selected (12 plus 2 alternates) (or 27% of fourteen, equaling 3.78 jurors). *See Watkins*, 245 S.W.3d at 451-52 (holding a random selection from a 22% African-American venire would yield 2 or 3 black jurors because 22% of 12 jurors, plus 1 alternate, was 2.86). This jury panel had 3 African-American jurors. Thus, 27% of the qualified jurors were African-American and 25% of the 12-person jury was African-American. This jury had the expected amount of African-

American members as would be expected from a *random selection* of the 44 qualified jurors. Statistical analysis simply fails to show any racial discrimination.

### 4. Comparative Analysis

Appellant contends on appeal that the prosecutor's stated reasons are a pretext for racial discrimination because non-minority jurors with similar responses or characteristics were not struck by the State. (Appellant's Br. at 50). At the *Batson* hearing, however, defense counsel failed to provide a comparative analysis on the jurors. (RR43:21-22). Counsel did not cross-examine the prosecutor about her reasons for not striking any similarly situated venire members. (RR43:20-23). As such, the prosecutor had no opportunity to respond to counsel's allegations. Appellant should not be permitted to raise claims of disparate treatment for the first time on appeal. By failing to properly present this claim at trial, he denied the prosecutor the opportunity to create a record on the prosecutor's strategy, and he denied the trial court an opportunity to rule on the claim.

Whether a prosecutor intended to discriminate on the basis of race is a question of historical fact properly decided in the trial courts. *See Hernandez v. New York*, 500 U.S. 352, 367-69 (1991). State procedural rules demand that allegations of disparate treatment by the prosecutor be raised in the trial court, so that they can be properly answered by the State and decided by that court. *See* Tex. R. App. P. 33.1(a); *Watkins*, 245 S.W.3d at 457-58 (Keller, P.J., concurring);

61

*Young v. State*, 826 S.W.2d 141, 147-49 (Tex. Crim. App. 1991) (Campbell, J., dissenting).

The State acknowledges this Court's majority opinion in *Young* that a non-capital defendant is not required to raise a comparative analysis in the trial court to have evidence of such considered on appeal. *Young*, 826 S.W.2d at 145-46. The Fifth Circuit has applied *Young* to a capital case and criticized this Court's inconsistency in its application of the contemporaneous objection rule to *Batson* claims in capital cases. *Reed*, 555 F.3d at 370.

This Court should explicitly overrule *Young*. *See generally Watkins*, 245 S.W.3d at 457-58 (Keller, P.J., concurring); *Young*, 826 S.W.2d at 147-49 (Campbell, J., dissenting). Its majority—and the courts that rely on it—view the comparative analysis as merely an appellate argument that can be fairly addressed for the first time on appeal. *Young*, 826 S.W.2d at 146. In truth, it is a factual allegation of unfair treatment between jurors. If properly raised in the trial court, the prosecution's response may provide additional facts for the appellate court to consider when reviewing the *Batson* ruling. If raised at trial successfully, the trial court can cure the error before trial even begins. If not raised at trial, the prosecutor's mental process and the trial judge's credibility decision concerning the non-strikes are simply omitted from the record. Jurors are not products of a set of cookie cutters, and the *unexplained* decision not to strike a non-minority juror

who shares one trait in common with a minority juror is held against the State on appellate review. *See, e.g., Miller-El*, 545 U.S. at 244 (stating, "If, indeed, Fields's thoughts on rehabilitation did make the prosecutor uneasy, he should have worried about a number of white panel members he accepted with no *evident* reservations.") (emphasis added). The prosecutor's explanation of her voir dire strategy and the trial court's ruling on the strategy is critical to a fair appellate review.

At the very least, a prosecutor should enjoy favor on appeal when the matter is not raised at trial, much like the presumption against a finding of ineffective assistance of defense counsel. In claims regarding violations of a client's constitutional right to counsel, this Court has stated that "counsel should ordinarily be accorded an opportunity to explain her actions before being condemned as unprofessional and incompetent." *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). A prosecutor's credibility is the heart of *Batson* review, and she should be accorded no less of an opportunity to explain her actions.

This Court should conclude that the comparative analysis is not preserved for review or, alternatively, presume that the comparative analysis favors the prosecutor absent affirmative evidence on the record.

In any event, Appellant has wholly failed to establish that the potential jurors who are the focus of his *Batson* challenge were similarly situated to non-minority

potential jurors who were not struck.

*Brown, Phillips, White, Hashaway, and Kyles*

As argued above, the State struck each and every qualified prospective juror regardless of race who ranked him/herself as a "3," indicating a belief that, "Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances." (RRR43:20-21). The State struck all 9 "3s" on the qualified prospective juror panel. (RR43:20-21). Appellant points to no evidence to the contrary. He cannot show disparate treatment of Brown, Phillips, White, Hashaway, and Kyles compared to accepted non-minority veniremembers. As such, Appellant has failed to show that the prosecutor's explanation was a pretext for discrimination.

*Kimberly Houston*

The State explained that it struck Houston because she is an attorney[12] and because "we don't think that attorneys are generally good on jury panels." (RR43:21; Houston, Juror 27A, Q. p.1). Houston was the only attorney on the qualified-juror panel. (RR43:21). As such, this rationale was a unique explanation for the strike, which applied to no other prospective juror. Importantly, during

---

[12] The State expressed this same opinion during the voir dire of another juror, Sheppard Brown. In explaining the terms used in the special issues, the prosecutor commented that "That's a whole lot of legal words. I'm going to try to talk to you about it in terms that - - that anybody would get, because we're - - we're not putting lawyers on this jury." (RR5:30). She also stated that, "We're going to put air conditioning techs and people who don't know the law [on the jury]. And there's a good reason for that, by the way. Lawyers are not always the smartest people in town." (RR5:30).

64

the *Batson* hearing, defense counsel did not challenge the prosecutor's stated reason. Whether Appellant's counsel personally felt such information should be the basis for a strike, is irrelevant; nothing indicates this was a pretext for discrimination. He cannot show that Houston was treated differently from non-minority venire members who the State accepted.

*Shirley Wilson*

The State struck Wilson because it did not believe that she was a qualified juror. During the State's questioning, Wilson stated repeatedly that she did not believe that the State could ever present proof beyond a reasonable doubt that a defendant would be a future danger. The following exchange took place:

> [Prosecutor]: Now we're talking about punishment, and that Special Issue Number 1, about what he's going to do in the future, because you can see how that's asking the jury to decide if this person is going to continue to constitute a continuing threat, if he's going to continue to commit criminal acts of violence. Do you see that?
>
> [Wilson]: Yes, I see it.
>
> [Prosecutor]: I mean, basically we're asking you to look into the future and decide whether it's more likely than not he's going to be a continuing threat to society. How are you going to decide that?
>
> [Wilson]: I can't decide that.
>
> [Prosecutor]: You can't decide that?
>
> [Wilson]: Huh-uh.
>
> [Prosecutor]: Is there anything that I could do to prove to you beyond a reasonable doubt - -

65

[Wilson]:  No.

[Prosecutor]:  - - that a person is going to do something in the future?

[Wilson]:  No.

[Prosecutor]:  Or is more likely than not going to do something in the future?

[Wilson]:  You can't.

[Prosecutor]:  And why is that?

[Wilson]:  Because we just can't determine what the future going [sic] to be and what that person is going to do.

[Prosecutor]:  Okay.  So there's - - there's nothing that I could do, no evidence I could bring to you - -

[Wilson]:  No.

[Prosecutor]:  - - that would get you to answer Special Issue Number 1 yes?

[Wilson]:  No.  I don't think there's any - - you know, we just don't know.  We don't know what a person would do, whether it's good or bad in the future.

[Prosecutor]:  Sure.  I mean, people can change?

[Wilson]:  Yes, they can.

[Prosecutor]:  But you don't know 100 percent, but you're telling me you - - there's no way I'm going to be able to tell you - - or bring to you proof to convince you that it's more likely than not that a person is going to do something in the future?

[Wilson]:  I just don't - - no, I don't think there's any evidence just - - you can bring and just - - to tell me what the future hold for that

66

person, if that person going to be able to do it or not, no.

[Prosecutor]: Okay. And you understand that - - that the law would - - well, let me rephrase that. I guess - - I mean, I totally see where you're coming from. We don't have a crystal ball.

[Wilson]: Huh-uh.

[Prosecutor]: But in a trial situation there's not - - no evidence, there's nothing I could present to you to convince you of what the future is going to hold for somebody?

[Wilson]: No.

[Prosecutor]: So you're automatically going to answer that Special Issue Number 1 no because there's nothing I can do. You're always going to say no to Special Issue Number 1? Do you see what that question is asking?

[Wilson]: Let me just read it again. Maybe I'm - - I mean, maybe I'm - - I'm just saying I just don't see how you can - - how - - I'm not saying you, but who can present what a person is going to do in the future when it come [sic] down to criminal acts.

[Prosecutor]: Sure. And I'm not arguing with you. Please don't - - please don't think that.

[Wilson]: So I guess I have to answer no.

[. . . ]

[Prosecutor]: Okay. And there's nothing I assume that I could say to change your mind about that?

[Wilson]: Probably not.

(RR8:205-08). The prosecutor questioned Wilson at length on this issue and Wilson maintained her stance. (RR8:205-08).

67

During questioning by the defense, counsel asked Wilson whether she could "keep an open mind to Special Issue Number 1 and wait until you hear all the evidence before you decide what the appropriate answer is[.]" (RR8:219). Wilson responded that, now that she understood that special issue, she would "have to just wait before I could just say this person is no good to nothing, anymore, period, there's no chance." (RR8:219). But that line of questioning did not ask whether she could ever find a defendant to be a future danger. This question simply asked whether she could keep an "open mind." When defense counsel specifically asked whether she could answer Special Issue No. 1 "yes," Wilson maintained, as she did under questioning by the State, that she could not say that she would do so. (RR8:220). She stated that "I can't see what you can really show to me what the future is going to hold. I'm not for sure if I could answer that yes[.]" (RR8:220). Very shortly thereafter, however, she gave a response that seemed to indicate that she changed her mind and could answer Special Issue No. 1 in the affirmative: "Yes, I guess, if I'm presented with the evidence and here it is [. . .] then I would have to say yes, now that I understand the question better." (RR8:221).

Importantly, a review of Wilson's testimony under questioning by the defense indicates that Wilson may have been confused about the fact that in order for the death penalty to be assessed, she would have to answer the first special issue "yes." And, that in order to answer special issue No. 1 "yes," she would

have to find a defendant to be a future danger. Defense counsel asked Wilson whether she understood that life without the possibility of parole and death are the only two possible punishments. (RR8:215). She did. (RR8:215). Then, he asked whether she understood that "in order for someone to receive the death sentence, you would have to answer Special Issue Number 1 yes?" (RR8;216-17). Wilson said, "No. I read that over and over, but I didn't know I needed to answer yes in order for a person to receive the death penalty[.]" (RR8:217). They discuss the terms "probability" and "criminal acts of violence." (RR8:217-20). Then, she reiterates the position she took when under questioning by the State, "I can't see what you can really show to me [to prove] what the future is going to hold." (RR8:220).

Wilson's responses indicate that she was either unwilling or unable to answer Special Issue No. 1 in the affirmative or that she was a vacillating juror. Since the trial court denied the State's challenge, the State exercised a peremptory challenge. Indeed, the State struck all jurors that it had unsuccessfully challenged for cause. Of the 44 qualified jurors, the State unsuccessfully challenged for cause 4 potential jurors: Wilson (Juror 196A, an African-American female), Chad Davis (Juror 265A, a Caucasian male), Ronald Drake (Juror 759A, a Caucasian male), and Wanda Benjamin (Juror 1369A, an African-American female). Davis was later excused (RR31:5) as was Benjamin (RR41:28). The State struck Drake.

69

(RR43:12). Appellant has failed to show Wilson was treated differently from accepted non-minority venire members.

*Conclusion*

Appellant has wholly failed to show that Jurors Brown, Phillips, White, Hashaway, Kyles, Houston, or Wilson were similarly-situated to non-minority jurors that were not struck by the State.

### 5. Disparate Questioning

Appellant points to no instances of disparate questioning by the State. *Cf. Miller-El*, 545 U.S. at 256-57 (prosecutors used a graphic script when describing the death penalty to African-American jurors who were ambivalent to the death penalty more often than with white jurors who also were ambivalent). Nor is any disparate questioning apparent in the record.

*Conclusion*

Appellant has not established by a preponderance of the evidence that the State's exercise of its peremptory challenges against 7 African-Americans was the product of racial discrimination. Appellant has not shown that the State's explanations did not apply equally to non-minority venire members that the State did not challenge, that the State directed questions expressly designed to elicit grounds for peremptory challenges disproportionately, or that a formal policy excludes minorities from jury service. The record before this Court supports the

trial court's resolution of the fact question of pretext. Consequently, the trial court did not err in denying Appellant's *Batson* challenges. *See Watkins*, 245 S.W.3d at 456-57.

Issues 1 through 7 should be overruled.

***STATE'S RESPONSE TO ISSUE NOS. 8 THROUGH 19: THE TRIAL COURT DID NOT ERR IN GRANTING THE STATE'S CHALLENGES FOR CAUSE.***

In Issues 8 through 19, Appellant contends that the trial court erred in granting the State's challenges for cause against potential jurors Mary Boulos, Judith McDaniel, Terry Plank, and Floyd Stanmore. (Appellant's Br. pp.51-64). He contends the exclusion of these jurors and the failure of the trial court to allow him to voir dire these jurors violated article 35.16 of the Code of Criminal Procedure as well as his right to counsel under the federal and state constitutions. See U.S. CONST. amends VI & XIV; Tex. Const. art. I, § 10; Tex. Code Crim. Proc. Ann. art. 35.16 (West 2006). Appellant's contentions lack merit and should be overruled.

*Applicable Law*

Article 35.16(b) of the Texas Code of Criminal Procedure provides as follows:

A challenge for cause may be made by the State for any of the following reasons:

1. That the juror has conscientious scruples in regard to the infliction of the punishment of death for crime, in a capital case, where the

71

State is seeking the death penalty.

2. That he is related within the third degree of consanguinity or affinity as determined under Chapter 573, Government Code, to the defendant; and

3. That he has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment.

Tex. Code Crim. Proc. Ann. art. 35.16(b). A "bias against the law" is the refusal to consider or apply the relevant law. *Sadler v. State*, 977 S.W.2d 140, 142 (Tex. Crim. App. 1998). The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with the law. *Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Crim. App. 2004).

On appeal, a reviewing court will overturn the trial court's ruling on a challenge for cause only if it clearly abused its discretion. *Gonzales v. State*, 353 S.W.3d 826, 831 (Tex. Crim. App. 2011). The reviewing court gives great deference to the trial court's decision on a challenge for cause because the trial judge was in the best position to observe the venire member during voir dire. *Id.* When the record reflects that a venire member vacillated or equivocated on her ability to follow the law, the reviewing court must defer to the trial judge. *Id*; *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009).

## *Analysis*

The trial court did not err in granting the State's challenges for cause against prospective jurors Mary Boulos, Judith McDaniel, Terry Plank, and Floyd Stanmore.

## *Mary Boulos*

On her questionnaire, Mary Boulos wrote that she is in favor of the death penalty but that she does have "moral, religious, or personal beliefs that would prevent [her] from sitting in judgment of another human being[.]" (Boulos, Juror 285A, Q. p. 1). In fact, on that questionnaire, Boulos made statements in four places in which she indicated that she does not believe she has the right to judge another human being: "I don't feel that I have the right to judge someone's future" (RR11:18; Boulos, Juror 285A, Q. p.2); the best argument against the death penalty is "judging whether a person has the right to live or not" (Boulos, Juror 285A, Q. p. 2); "still don't have the right to judge whether someone lives or dies" (Boulos, Juror 285A, Q. p.2); and "I do not feel that I have the right to judge whether or not someone is given the death penalty or life." (Boulos, Juror 285A, Q. p.18).

During voir dire, the prosecutor probed Boulos as to how she felt about sitting in judgment and answering questions in such a way that a death sentence would be imposed. (RR11:17-18). Boulos responded she was not comfortable

because "[she's] not somebody to sit there and judge somebody else[.]" (RR11:18). The prosecutor tried to get a definitive answer regarding Boulos' ability to sit in judgment. The following exchange took place:

> [Prosecutor]: Okay. And like I told you in the beginning, the law is not going to require - - we're not going to require that you sit in judgment of an individual in this situation - -
>
> [Boulos]: Yeah.
>
> [Prosecutor]: - - if it's going to do violence to your conscience.
>
> [Boulos]: Yeah.
>
> [Prosecutor]: If it is something you cannot do because of personal, moral, or religious reasons; is that where you stand?
>
> [Boulos]: Yes.

(RR11:18). The State challenged Boulos for cause. (RR11:19). Appellant objected and stated that Boulos had not said "that her feelings would impair her ability to answer the questions and follow the law." (RR11:19-20). The trial court granted the State's challenge. (RR11:20). The totality of Boulos' voir dire shows Boulos could not sit in judgment of another individual and her statements support the trial court's decision. To the extent, if any, that some of Boulos' other remarks could be interpreted as contradictory, the trial court was the fact finder during voir dire and, thus, free to resolve her conflicting answers in the State's favor. *See King v. State*, 29 S.W.3d 556, 568 (Tex. Crim. App. 2000) (particular deference is given to the trial court's conclusion that venire member cannot follow

74

law when venire member's answers are vacillating, unclear, or contradictory). To conclude otherwise would controvert this Court's policy of encouraging trial court's to liberally grant challenges for cause rather than err by denying a challenge on a close question. *Jones v. State*, 982 S.W.2d 386, 394 (Tex. Crim. App. 1998).

The record reflects that the State challenged Boulos for cause and that the trial court granted the State's challenge. (RR11:19-20). Contrary to the statements in Appellant's brief, there is no evidence that the trial court excused Boulos sua sponte.

Finally, on appeal, Appellant contends that he was denied the opportunity to question Boulos. (Appellant's Br. p. 57). During voir dire when the State challenged this juror, however, Appellant did not request an opportunity to question Boulos. (RR11:20). *See* Tex. Code Crim. Proc. Ann. art. 35.17, § 2 (stating that "In a capital felony case . . . on demand of the State or defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principles propounded by the court."). As a prerequisite to presenting a complaint for appellate review, however, the record must show that the complaint was made to the trial court by a timely request, objection, or motion and that the trial court either (1) ruled on the request, objection, or motion; or (2) refused to rule on the request, objection, or

motion, and the complaining party objected to the refusal. Tex. R. App. P. 33.1 (a). Given Appellant's failure to request the opportunity to question Boulos, he failed to preserve any issue for this Court's review.

## *Judith McDaniel*

On her questionnaire, Judith McDaniel wrote that she is not in favor of the death penalty. (McDaniel, Juror 317A, Q. p.1). Among other reasons, she believes in "the possibility of redemption" and in light of "Craig Watson's [sic] push to find those wrongfully convicted," McDaniel wrote she is against the death penalty. (McDaniel, Juror 317A, Q. p.1). McDaniel ranked herself as a "3," indicating, "Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances." (McDaniel, Juror 317A, Q. p.1). She noted, however, "Maybe I should circle #5[,]" which provides that "I could never, under any circumstances, return a verdict which assessed the death penalty."

Additionally, McDaniel wrote that although it is improving, she does not believe that the death penalty is applied fairly in Dallas County. (McDaniel, Juror 317A, Q. p.4). She wrote that the death penalty is used too often in Texas. (McDaniel, Juror 317A, Q. p.4).

During voir dire, McDaniel reiterated her general opposition to the death penalty and gave answers suggesting considerable discomfort in participating in a

process where an individual may be sentenced to death. McDaniel testified that even though her opinion about the death penalty has wavered over the years, "I really doubt that I - - I could be in favor of the death penalty." (RR11:101). When asked whether she could participate in death penalty decision, she stated, "I don't want to. I don't - - I don't think I can." (RR11:104). The prosecutor explained the death penalty is not automatic. (RR11:105). The prosecutor explained the special issues and asked McDaniel if she could answer them in such a way that would result in a death sentence. (RR11:105-07). McDaniel testified that she "can't honestly say, but I am pretty sure I would not go for the death penalty." (RR11:107). When finally pinned down, McDaniel testified she could not guarantee the ability to set aside her personal feelings. (RR11:121). The following exchange took place:

> [Prosecutor]: I'm going to - - I - - "I don't think" and "maybe" and "probably" are not - - are not words that lawyers are very good at accepting, and I apologize, but the record has to be very clear, so I'm going to ask it a different way. You don't think you could. I'm going to turn that around and ask you, can you guarantee both sides of this, the State and the Defense, that you could set aside your personal feelings and be a juror in this case, even if it resulted in the death sentence?
>
> [McDaniel]: No, I can't guarantee it.
>
> [Prosecutor]: Thank you.

(RR11:121). The State challenged McDaniel for cause, which was granted over Appellant's objection, based on the fact that "she would not be able to make that

77

decision or at minimum could not guarantee us that she could set aside her personal feeling and assess a sentence that may result in execution." (RR11:122).

A venireperson may not be excused for her general opposition to the death penalty. *Witherspoon v. Illinois*, 391 U.S. 510, 522-23 (1968); *Rachal v. State*, 917 S.W.2d 799, 810 (Tex. Crim. App. 1996). A veniremember is challengeable for cause, however, if his beliefs against capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with the court's instructions and the juror's oath. *See Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Crim. App. 1998). A juror must be able to set aside her personal preferences and biases to consider as death eligible all those defined as death eligible by section 19.03 of the penal code and article 37.071 of the criminal procedure code. *Rachal*, 917 S.W.2d at 812.

Clearly, the totality of McDaniel's voir dire testimony demonstrates that her beliefs about capital punishment would prevent or substantially impair the performance of her duties as a juror as required by law. She had a bias against the law governing a defendant's eligibility for the death penalty. The record supports the trial court's decision to grant the State's challenge. *See King*, 29 S.W.3d at 568. To conclude otherwise would controvert this Court's policy as stated earlier. *Jones*, 982 S.W.2d at 394.

Appellant's contention that he was denied the opportunity to question McDaniel lacks merit. (Appellant's Br. p. 59). During voir dire, when the State challenged this juror, Appellant did not request an opportunity to question her. (RR11:122). *See* Tex. Code Crim. Proc. Ann. art. 35.17, § 2. As such, any claim of that nature is not preserved for this Court's review. Tex. R. App. P. 33.1 (a); *Pena v. State*, 285 S.W.3d 459, 463 (Tex. Crim. App. 2009).

### *Terry Plank*

In his questionnaire, Terry Plank wrote he is not in favor of the death penalty. (Plank, Juror 320A, Q. p.1). He wrote, "I feel no one has the right to take the life of another, including the State." (Plank, Juror 320A, Q. p.1). In six separate places, Plank wrote that he does not believe in the death penalty. (Plank, Juror 320A, Q. p.1, 2, 3). In one instance, he described the death penalty as "state sanctioned murder." (Plank, Juror 320A, Q. p.2). In contradiction, Plank ranked himself as a "3," indicating that "Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances." (Plank, Juror 320A, Q. p. 1).

During voir dire, Plank testified he was "ambivalent" about the death penalty. (RR12:24). Ultimately, he conceded that he could not guarantee that he could set aside his personal feelings about the death penalty and follow the law. (RR12:29). The following exchange took place:

79

[Prosecutor]: We've got to have people whose feelings are the death penalty is appropriate in some cases, based on the evidence. And yours is never.

[Plank]: Right.

[Prosecutor]: And so I would - - I would tell you that you'd be a great juror on a case where the punishment range was 5 to 99 or life or even on a capital murder case where we weren't seeking the death penalty. Sounds to me like you could give the State a fair trial in the first part of the case on guilt/innocence, no issues there, but it's the penalty phase that causes you some concerns because of your personal beliefs?

[Plank]: Absolutely.

[Prosecutor]: And if I had to ask you for today for a guarantee those [beliefs] wouldn't interfere, you couldn't guarantee me that?

[Plank]: I don't - - I know I disagree, so it's hard to - - it's hard to say that I would just all of a sudden agree.

[Prosecutor]: Right. And - - and you don't have to - - I'm not trying to change your opinion about the death penalty.

[Plank]: Right.

[Prosecutor]: Just because you don't agree with it, doesn't necessarily disqualify you from the jury pool. But you've got to be able to promise me today and guarantee me today that your feelings against the death penalty would not interfere with your ability to follow the law, listen to the evidence, and base your verdict only on the evidence, even if that meant that the death penalty was imposed. And you've kind of already told me that this isn't - - this isn't really for you, the death penalty; is that right?

[Plank]: I believe so.

[Prosecutor]: This won't be the last jury summons you get, I promise. And hopefully the next one wouldn't be on a case where the death

80

penalty was at issue. And I know it's hard to say what you could or couldn't do in the future because you've never been put in those shoes, but I'm telling you, you don't have to be put in that position, if you can't guarantee me you could - - you could do it.

[Plank]: Right. I don't think I can guarantee anything, not - - not knowing, you know - - not ever having been in that position before.

(RR12:27-29). The State challenged Plank for cause because "he cannot guarantee the State that he would be able to follow the law and base his verdict on the evidence because of his strong opposition to the death penalty." (RR12:29). The totality of Plank's voir dire testimony clearly demonstrates his beliefs about capital punishment would prevent or substantially impair his ability to follow the law. *See Colburn*, 966 S.W.2d at 517. The record supports the trial court's decision to grant the State's challenge. *See King*, 29 S.W.3d at 568. To conclude otherwise would controvert this Court's policy as stated earlier. *Jones*, 982 S.W.2d at 394.

Appellant argues that he was denied the opportunity to question Plank. (Appellant's Br. p. 61-62). After the State challenged Plank for cause, Appellant requested the opportunity to question him. (RR12:30). The judge said that he would "give [the defense] a chance," but that the court "[didn't] think he's qualified." (RR12:30). Then he granted the State's challenge. (RR12:30). Appellant objected. (RR12:30). He did not, however, renew his request to question Plank as the court had previously said it would allow. (RR12:30). Instead, he "object[ed] to not being able to rehabilitate him." (RR12:30).

81

Any error in denying Appellant's request to question Plank is harmless. *See* Tex. R. App. P. 44.2(b); *Jones v. State*, 982 S.W.2d 386, 391-92 (Tex. Crim. App. 1998). With regard to the erroneous excusal of a venire member, reversal is required if the defendant was deprived of a lawfully constituted jury. *See id.* at 394. As argued in detail above, the totality of Plank's voir dire testimony clearly demonstrates his beliefs about capital punishment would prevent or substantially impair his ability to follow the law. *See Simpson v. State*, 119 S.W.3d 262, 266-67 (Tex. Crim. App. 2003) (finding error harmless where "Given the venire member's testimony, it is highly unlikely that the appellant would have been able to convince the juror to say otherwise or that the trial court would have abused its discretion in dismissing her for cause."). Moreover, Appellant did not make a proffer of the questions that he would have asked Plank had he been given the opportunity. (RR12:29-30). As such, it cannot be determined whether he was denied the opportunity to properly question Plank. Appellant has failed to show that he was deprived of a lawfully constituted jury.

### *Floyd Stanmore*

In his questionnaire, Floyd Stanmore ranked himself as a "2," which indicates that he believes the death penalty is appropriate in some murder cases and that he could return a verdict in a proper case which assessed the death penalty. (Stanmore, Juror 1118A, Q. p.1). Stanmore later contradicted this statement,

however, when asked whether there was any reason why he would not want to serve as a juror in this case. He wrote, "I am not sure that I could vote for the death [penalty] [sic]." (Stanmore, Juror 1118A, Q. p18). In his questionnaire, Stanmore stated his concern that the death penalty is applied unfairly to minorities in Texas, including Dallas County. (Stanmore, Juror 1118A, Q. pp.2-3). Beyond the death penalty, Stanmore wrote that the biggest problem in our criminal justice system is that "I do not think that minorities are treated fairly always." (Stanmore, Juror 1118A, Q. p.4).

During voir dire, Stanmore reiterated his concern about whether all defendants receive a fair trial. (RR32:70). He wondered "how many defendants or convicted individuals have actually been executed who were actually innocent." (RR32:70). Stanmore testified as follows:

> I can't [100%] [sic] say that I would be able to sit through the process, look at all the evidence, and listen to the evidence and still be able to come to a conclusion that the death penalty is warranted in this case.

(RR32:72). The following exchange took place:

> [Prosecutor]: So just from what you're telling me, it kind of sounds like, Mr. Stanmore, that you kind of did come in, you know, not knowing - - most people, when we say the word you come in with a bias or already come in with a preconceived notion, people think of that negatively. I'm not saying it in a negative way. But I'm saying it in such a way that as you sit here right now, you already kind of know, based on your reservation, how you'd feel or how you would lean toward, you know, a certain outcome of the trial. Like I said, maybe this particular case isn't the one for you. You know, maybe another type of case that you don't know as much information about

or another type of case that the death penalty is nowhere near it. Would you say that's a true statement?

[Stanmore]: That's pretty close to the truth, yes. I would say, yes.

[Prosecutor]: And that as you sit here right now, and you said you can't guarantee, let's say the State, [100%] that you could base all of you[r] information on the facts and evidence that come in this case, that you're still going to bring with you some of these reservations because you didn't leave those at the door, did you?

[Stanmore]: Not at all.

[Prosecutor]: All right.

[Stanmore]: That reservation is about the death penalty itself, not about conviction.

(RR32:73-74). The prosecutor explained the procedure involved in a capital case and that the State believed that it had the type, quality, and quantity of evidence that would require the jury to answer the first special issue in the affirmative and the second special issue in the negative. (RR32:76-77). Stanmore stated that "it would bother [him] as an individual" to participate in the process. (RR32:78). At that point, the State successfully challenged Stanmore for cause. (RR32:78). Appellant argued that Stanmore's "reservations" and his reluctance to participate were insufficient to sustain the State's challenge. (RR32:79).

The totality of Stanmore's voir dire testimony clearly shows his beliefs about the criminal justice system and capital punishment would prevent or substantially impair his ability to carry out his obligations as a juror. At a

84

minimum, Stanmore vacillated. Where the venire member either vacillates or equivocates on his ability to follow the law, the Court should defer to the trial court's judgment on the challenge for cause. *Granados v. State*, 85 S.W.3d 217, 231 (Tex. Crim. App. 2002). The record supports the trial court's decision to grant the State's challenge. *See Segundo v. State*, 270 S.W.3d 79, 94 (Tex. Crim. App. 2008) ("We therefore defer to the trial judge, who can best determine, based upon the [venire member's] tone and tenor, whether that person could follow the applicable law despite his views about the death penalty."). To conclude otherwise would controvert this Court's policy as stated earlier. *Jones*, 982 S.W.2d at 394.

Appellant also contends that he was denied the opportunity to question Stanmore. (Appellant's Br. p. 63-64). After the State challenged Stanmore for cause, Appellant objected to Stanmore being excused without the opportunity to question him. (RR32:79). Any error in denying Appellant's request is harmless. *See* Tex. R. App. P. 44.2(b); *Jones*, 982 S.W.2d at 391-92. As argued in detail above, the totality of Stanmore's voir dire testimony clearly shows his beliefs about the criminal justice system and capital punishment would prevent or substantially impair his ability to carry out his obligations as a juror. He was also a vacillating juror. *See Simpson*, 119 S.W.3d at 266-67. As above, Appellant did not make a proffer of the questions that he would have asked Stanmore had he been given the opportunity. (RR32:78-79). As such, it cannot be determined

whether he was denied the opportunity to properly question Stanmore. Appellant has failed to show that he was deprived of a lawfully constituted jury.

*Conclusion*

The trial court did not abuse its discretion in granting the State's challenges for cause regarding Boulos, McDaniel, Plank, and Stanmore. Even assuming their excusal was erroneous, it was harmless. The erroneous excusal of a venireperson warrants reversal only if the record shows that the error deprived the defendant of a lawfully constituted jury. *Jones*, 982 S.W.2d at 393. Appellant makes no such showing. Moreover, no evidence indicates that the jurors who served on Appellant's jury were in any way biased, interested, or otherwise disqualified from serving. As a result, reversal is unwarranted. *See Feldman v. State*, 71 S.W.3d 738, 749 (Tex. Crim. App. 2002) (holding any error in excusing venireperson was harmless absent any showing that she was excused based on general opposition to death penalty or that any juror was unfit for jury duty).

Issues 8 through 19 should be overruled.

**STATE'S RESPONSE TO ISSUE NOS. 20 TO 27: THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S CHALLENGES FOR CAUSE.**

In Issues 20 through 27, Appellant contends that the trial court erred in denying his challenges to 8 prospective jurors. In so doing, Appellant argues, the trial court violated his right to a fair and unbiased jury under the United States Constitution and article 35.16(c)(2) of the Texas Code of Criminal Procedure.

*Applicable Law*

A prospective juror may be challenged for cause if, among other reasons, he possesses a bias or prejudice in favor of or against the defendant or he possesses a bias against an aspect of the law upon which the State or the defendant is entitled to rely. *See* Tex. Code Crim. Proc. Ann. arts. 35.16(a)(9), (c)(2); *Threadgill*, 146 S.W.3d at 667.

Appellant has the burden of establishing that his challenge for cause is proper. *See Feldman*, 71 S.W.3d at 747. Before a venire member can be excused for bias, the law must be explained to him and he must be asked whether he can follow that law regardless of his personal views. *Threadgill*, 146 S.W.3d at 667. Appellant does not meet his burden of establishing that his challenge for cause is proper until he has shown that the prospective juror understood the requirement of the law and could not overcome his prejudice well enough to follow it. *See Feldman*, 71 S.W.3d at 747.

When reviewing a trial court's decision to deny a challenge for cause, the appellate court looks at the entire record to determine if there is sufficient evidence to support the ruling. *Feldman*, 71 S.W.3d at 744. The appellate court reviews a trial court's ruling with "considerable" or "great" deference because the trial judge is in the best position to evaluate the prospective juror's demeanor and was present to observe the juror and listen to his tone of voice. *Threadgill*, 146 S.W.3d at 667;

*Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007). Particular deference is given when the venire member's answers are vacillating, unclear, or contradictory. *Threadgill*, 146 S.W.3d at 667. When the venire member is persistently uncertain about having the ability to follow the law, the reviewing court does not second guess the trial court and must defer to its decision. *Gardner*, 306 S.W.3d at 295-96; *Colburn*, 966 S.W.2d at 517. The appellate court reverses a trial court's ruling on a challenge for cause "only if a clear abuse of discretion is evident." *Colburn*, 966 S.W.2d at 517.

Harm from the erroneous denial of a defense challenge for cause occurs under the following circumstances: (1) a defendant exercises a peremptory challenge on a prospective juror whom the trial court erroneously failed to excuse for cause at the defendant's request, (2) the defendant uses all of his statutorily-allotted peremptory challenges, and (3) the trial court denies the defendant's request for an additional peremptory challenge to use on another prospective juror whom the defendant identifies as "objectionable" and who actually sits on the jury. *Saldano*, 232 S.W.3d at 91. When all of these conditions are met, the defendant has been wrongfully deprived of one of his statutory peremptory challenges in that he was forced to use a peremptory challenge to remove a prospective juror who should have been removed for cause. *See id.* If the defendant received additional peremptory challenges beyond the fifteen allotted by statute, he must show harm

88

by proving that the trial court erroneously denied a number of defense challenges for cause equal to at least one more than the number of additional peremptory challenges granted. *Escamilla v. State*, 143 S.W.3d 814, 821 (Tex. Crim. App. 2004).

*Analysis*

After the trial court qualified a panel of 44 prospective jurors, the parties asserted their peremptory challenges at a hearing, which was conducted on October 15, 2013. (RR43). During this hearing, Appellant exhausted all 15 of his statutory peremptory strikes as well as 2 additional strikes granted by the court. (RR43:9-18). He struck James Couch (Juror 80A), Craig Matthews (Juror 154A), Kevin Powell (Juror 179A), Kimberly Turvan (Juror 295A), Laura Carroll (Juror 433A), Molli Elliston (Juror 532A), Jerry Mace (Juror 615A), Rudy Ochoa (Juror 617A), Holly Sanders (Juror 636A), Debra Filler (Juror 701A), Sandra Gromacki (Juror 756A), Sabastian Coleman (Juror 1023A), Jessica Magee (Juror 1149A), Sarah Wagler (Juror 1168A), Deemie Naugle (Juror 1196A), Raul Ibarra-Avila (Juror 1351A), and Christina Salazar (Juror 1365A). (RR43:8-17). Appellant requested a third additional strike. (RR43:17). That request was denied and the next qualified prospective juror, Shonquidria Jenkins (Juror 1368A), was seated on the jury. (RR43:17-18). Appellant identified Jenkins as an "objectionable juror" and

again requested an additional strike.[13]  (RR43:17-18).   That request was denied. (RR43:18).   After Jenkins, the next qualified prospective juror, Jerri Adams (Juror 1393A), was seated on the jury.  (RR43:18).   Appellant did not identify Adams as an "objectionable juror."  (RR43:18).

At trial, Appellant did not identify Powell, Matthews, Carroll, Elliston, Mace, Gromacki, Wagler, or Adams as "objectionable jurors."  (RR43:9, 10, 11, 12, 15-16).   The only juror he identified as objectionable was Jenkins.  (RR43:17-18, 23).   And, of the pool of jurors identified in Issues 20 through 27, the only juror Appellant was forced to accept who actually sat on the jury and deliberated was Jerri Adams.

Since Appellant received 2 extra peremptory challenges in addition to the 15 allotted by statute for use on the pool in selecting 12 jurors, he must show that the trial court erroneously denied at least three of his challenges for cause.  *See, e.g., Saldano*, 232 S.W.3d at 93 (noting that Saldano would have to show 3 erroneous denials because he received two extra peremptory strikes).   Appellant has not met his burden.

*Issue #20:  Kevin Powell*

During voir dire, Appellant challenged Kevin Powell for cause because Powell answered in his questionnaire that he would give more credibility to police

---

[13] Later in the hearing, Appellant explained that Jenkins was objectionable "primarily because she had indicated that she was a victim of family violence or domestic violence[.]"  (RR43:23).

90

officers. (RR8:56). Powell also answered "yes" to a question asking whether he believed that police officers are more likely to tell the truth than the average person. (Powell, Juror 179A, Q. p. 5). Appellant's challenge was denied. (RR8:60).

A defendant may insist on jurors who will impartially judge the credibility of witnesses. *Hernandez v. State*, 563 S.W.2d 947, 950 (Tex. Crim. App. 1978). A venire member who believes a police officer would never lie under oath has an impermissible bias against the defendant under article 35.16(a)(9) of the Code of Criminal Procedure. Tex. Code Crim. Proc. Ann. art. 35.16(a)(9); *Lane v. State*, 822 S.W.2d 35, 42 (Tex. Crim. App. 1991).

During voir dire, the prosecutor questioned Powell regarding his view of police officer credibility. (RR8:15-16). Powell affirmed he could wait until a witness testifies before he judges their credibility. (RR8:15-16). Under questioning by defense counsel, Powell affirmed his belief that police officers are more likely to tell the truth than the average person. (RR8:41-42). Defense counsel explained the law required that "you have to start all witnesses off the same, that just because of a person's occupation, they are not deemed more credible than anyone else." (RR8:42). Powell affirmed he understood the law. (RR8:42). Counsel asked whether Powell would agree that the opinion expressed in his questionnaire is different than his testimony in court. (RR8:42). Powell

91

responded, "Well, you asked me about my feelings, and that's what I responded to." (RR8:42). Apparently, Powell was attempting to distinguish that the opinions expressed in his questionnaire were his "feelings" as opposed to the law. The following exchange took place:

> [Defense Counsel]: Okay. And are your feelings that even knowing what the law says, that you give police officers more credibility than you do the average citizen? And as I said, there's no such thing as a right answer or wrong answer. I just want to know how you feel.
>
> [Powell]: Right. Again, I understand, you know, what you're saying to me, and - - and I base this on, you know, my feelings, but I can be, you know, fair with every witness that - - if I heard that testimony.

(RR8:42-43). Later, defense counsel returned to the subject and asked whether, if he served on the jury and understood the law, Powell would give police officers more credibility. (RR8:44). Powell testified he "would look at everything that has been given and all the testimony that, you know, I hear and I believe I can give a good and fair response to it." (RR8:44).

The totality of Powell's testimony indicates he would wait to hear a witness's testimony before judging that witness's credibility. To the extent that any of his responses may be interpreted as contradictory, this Court should defer to the trial court's resolution of his responses. *See Feldman*, 71 S.W.3d at 744. The reviewing court must give great deference to the trial court's decision on a challenge for cause based on the trial judge's opportunity to observe the venire member during voir dire. *Id*. When the record reflects that a prospective juror

92

vacillated or equivocated on her ability to follow the law, the reviewing court must defer to the trial judge. *Gardner*, 306 S.W.3d at 295. Given Powell's assurances that he could follow the law, the trial court could have reasonably concluded that Powell was not biased against Appellant. *See Lane*, 822 S.W.2d at 45 (holding that the trial court did not abuse its discretion in denying a challenge for cause where, venire member said she would "evaluate a police officer['s credibility] as she would any other [witness]").

Appellant also challenged Powell on the basis that he would automatically assess the death penalty after finding a guilty verdict on capital murder. In his questionnaire, Powell wrote he is in favor of the death penalty and "If a person is proven guilty of taking someones [sic] life in commission of a crime their life should be taken." (Powell, Juror 179A, Q. p.2.). On its face, Powell's response suggests he believed that all murders warrant a death sentence. The remainder of Powell's questionnaire and voir dire indicates otherwise, however.

During voir dire, the prosecutor explained that a verdict of guilty as to capital murder does not automatically lead to the death penalty. (RR8:25, 29, 34-35). The jurors would then have to consider the special issues. (RR8:25-26, 29-35). Powell affirmed that he understood. (RR8:25-26, 29-353). He affirmed that he would hold the State to its burden of proof on the first special issue. (RR8:37-38). Importantly, Powell wrote in his questionnaire and affirmed during voir dire

93

that in some circumstances, a life sentence is appropriate. (RR8:17; Powell, Juror 179A, Q. p.2). Thus, although Powell believed that the death penalty was an appropriate punishment for murder he did not believe the death penalty should be automatic for every murder. His answer to the first special issue would be determined by an examination of all the evidence, rather than solely the guilty verdict.

Lastly, Appellant contends that Powell should have been excused based on his belief that the death penalty is appropriate in circumstances involving robbery, sexual assault, torture, or abuse of children and the elderly. (Appellant's Br. at 65). This complaint was not asserted at trial and is not properly preserved for this Court's review. *See* Tex. R. App. P. 33.1(a). Regardless, Appellant's contention lacks merit. During voir dire, Appellant briefly questioned Powell about his belief that other offenses should be eligible for the death penalty. (RR8:48-49). Powell affirmed his belief that the death penalty should be available for sexual assault, torture, or abuse of children or the elderly. (RR8:49). Defense counsel did not ask Powell whether this belief would interfere with his ability to follow the law in this case. (RR8:48-49). Indeed, counsel simply moved on to a different line of questioning. (RR8:49). As such, he failed to show that Powell was challengeable for cause on this basis.

Based on the totality of the voir dire testimony, sufficient evidence supports the trial court's ruling, and the court did not abuse its discretion in denying Appellant's challenge for cause against Powell. No evidence sustains that Powell was biased in any way against Appellant or the law. During voir dire, Powell affirmed he would afford Appellant the presumption of innocence; he would hold the State to its burden of proof; he would not require the defense to present any evidence; he would not consider Appellant's silence as evidence; he would wait to hear a witness's testimony before determining credibility; and, he understood that the death penalty is not automatic for capital murder. (RR8:12-18, 25-26, 29, 34, 37-38). Accordingly, Issue 20 should be overrruled.

*Issue #21: Craig Matthews*

Appellant challenged Craig Matthews for cause on the basis that he would be "predisposed or leaning toward answering Special Issue Number 1 yes" if he found Appellant guilty of capital murder. (RR9:111). The trial court stated:

> I don't think a disqualifying question was asked him on that matter.
> And I think after hearing all of his testimony, I think he can follow the
> law and be a fair juror, so I'm going to deny your challenge.

(RR9:111). The record supports the trial court's determination.

During voir dire, the prosecutor explained, "There are no automatics in this process." (RR9:54). She further explained that after a verdict of guilt, jurors do not vote whether the defendant should receive a life or death sentence; the jurors

95

would have to answer the special issues. (RR9:55). Matthews affirmed his understanding. (RR9:55-56). The following exchange took place:

> [Prosecutor]: Absolutely. And, you know, we ask you all these things before the law has been explained to you, and that's why I just want to make sure that even though this is your personal belief that you are completely entitled to at all times, that you would then be able to - - and you're not going to have to memorize this. You'll see it again in the jury's charge, the special issues. I just want to make sure that if the law is given to you by the Court, you would then be able to render your verdict based on the law and the evidence and not have any automatics. No automatic response because somebody is found guilty of the offense of capital murder and no matter how cold, horrible, and heinous, that you will be able to deliberate with regards to Special Issue Number 1 and make the State prove that to you beyond a reasonable doubt before answering it yes.

> [Matthews]: Yeah.

(RR9:71). Matthews repeatedly affirmed his understanding that the verdict must be based on the law and the evidence and with no automatic answers. (RR9:56, 58, 59, 60, 67, 68, 74, 81). When defense counsel asked Matthews what his "feelings on the death penalty" would be after he (on a hypothetical jury) found a defendant guilty of capital murder, Matthews responded:

> I don't know. My understanding of the law as it's been presented to me is that - - if those causes and consequences are proven, then - - then it's an option relative to the two special issues.

(RR9:85). Matthews accepted that the appropriate punishment for someone found guilty of capital murder could be life without parole. (RR9:85). The record reflects that Matthews' examination of the law and evidence as related to the two

96

special issues would control his answers rather than the verdict. As such, the trial court did not abuse its discretion by denying Appellant's challenge for cause against Matthews.

Issue 21 should be overruled.

*Issue #22: Laura Carroll*

At trial, Appellant challenged Laura Carroll for cause because she was "mitigation impaired" and because "someone would have to convince her that life was the more appropriate verdict." (RR15:74). The trial court denied this challenge. (RR15:74). The record reflects no bias against the law governing the mitigation special issue and, thus, supports the trial court's ruling.

During voir dire, Carroll affirmed that if she were to find someone guilty of capital murder, she would not "be leaning toward the death penalty[.]" (RR15:49). She testified, "No. It would depend on the circumstances throughout the entire trial. I can't make a presumption like that without having any kind of evidence to say that, yes, I would go either way." (RR15:49). Carroll testified that Special Issue No. 2 "always matters." (RR15:57). "There could be" evidence that would convince her that life is the appropriate punishment. (RR15:57). She testified she would "lean more closely toward the death penalty" (after having found someone guilty of capital murder and found him a future danger), "but [she] would have no problem listening to others and discussing why we should go with a life sentence

97

instead." (RR15:57-58). *See Coleman v. State*, 881 S.W.2d 344, 352 (Tex. Crim. App. 1994) (holding that the trial court did not err in denying a challenge for cause for an inability to consider mitigating evidence where the record showed that the prospective juror could listen to the evidence with an open mind).

In *Saldano*, this Court stated that a veniremember is not challengeable for cause simply because he would place the burden of proof on the defense regarding mitigation. *Saldano*, 232 S.W.3d at 92 (citing *Ladd v. State*, 3 S.W.3d 547, 559 (Tex. Crim. App. 1999)). Nevertheless, Carroll testified she would not require the defense to present such evidence. (RR15:58). The following exchange took place:

> [Defense counsel]: If you - - if - - on your hypothetical jury, you found somebody guilty of capital murder, you found beyond a reasonable doubt that they are going to be a threat in the future, is the Defense going to have to bring you some kind of evidence to convince you that life is appropriate at that point?
>
> [Carroll]: You would think that they would. I would think that they would.
>
> [Defense Counsel]: Would you require that?
>
> [Carroll]: No.

(RR15:58). Defense counsel later returned to the topic and asked whether Carroll's personal feeling, after having found someone a future danger, would be that the death penalty is appropriate. (RR15:71). Carroll testified, "It would be, yes." (RR15:71). Counsel asked whether her feeling would remain unless "somebody

can convince you otherwise[.]" (RR15:71). Carroll testified, "I would be, yes." (RR15:71). Carroll never testified the defense must bring any evidence to convince her that life was the appropriate sentence. (RR15:71). The totality of Carroll's testimony indicates she would be fair and impartial and would listen to all evidence in order to answer the two special issues. This Court should defer to the trial court's resolution of any of her possible conflicting responses. *See Feldman*, 71 S.W.3d at 744.

Issue 22 should be overrruled.

### *Issue #23: Molli Elliston*

At trial, Appellant challenged Molli Elliston for cause because, as to Special Issue No. 1, Elliston would only require one criminal act of violence. (RR16:56). The trial court denied Appellant's challenge for cause. (RR16:56).

During voir dire, defense counsel questioned Elliston regarding Special Issue No. 1. When discussed "criminal acts of violence," he asked Elliston whether she would require a single act of violence or multiple and instructed her that the term had no definition. (RR16:44). Elliston testified she would "have to think about that, if that truly means acts plural and not a singular act." (RR16:44). She testified that it "seems a little bit like splitting hairs to whether it would be just one or multiple." (RR16:45). The following exchange took place:

> [Defense counsel]: But that seems to be a hair that the legislature has split.

99

[Elliston]:  Okay.  Well, I'd have to think about that.

[. . .]

[Defense counsel]:  Well, do you want me to - - to - - to come back to it?  Do you - - or - - because it's - - it's an important question, and it's - - it's what the legislature requires, that you would have to believe that the Defendant would commit criminal acts, plural, of violence.

[Elliston]:  I'm thinking.  Criminal acts of violence - - If - - I - - if you think a person is - - is likely to commit another act of violence which would constitute a threat to society, then I'm having trouble distinguishing it it's - - if you have - - if anybody can be so specific as saying, one - - they can do one future act of violence but not five.  I don't know how - - I don't know how you ever - - I'm not sure they did intend that.  I think it's maybe - - I don't know.  I don't know.  If I - - if I thought - - if that act of violence is to kill somebody else, that's a continuing threat to society.  One person being killed is a threat, whether it's a prison - -

[. . .]

[Defense Counsel]:  And hopefully we can - - we can figure this out.  Are you saying that if you thought there's a probability that the Defendant would commit a criminal act, singular, that would be sufficient for you to answer Special Issue Number 1 yes, as opposed to criminal acts, plural?

[Elliston]:  Yeah, I think so.  I think when you've already got a strike against you and if you - - if some - - I just don't - - you're - - you're - - you're speculating anyway at best whether or not they will commit future acts.  It's - - no one really knows that.  So I do not see how you can break it down and say I think they'll possibly commit one other act, but that would certainly be their limit.  I just don't think you can do that.  If that's what the legislature intended, I'm a believer in following the law, regardless of my beliefs, but I just got to - - I don't - - I'd love to - -

100

(RR16:46-47). Importantly, Elliston testified that she would have to "think about that." (RR16:45). Elliston vacillated on this issue. (RR16:45-47). When the record reflects that a prospective juror vacillated or equivocated on her ability to follow the law, the reviewing court must defer to the trial judge. *Gardner*, 306 S.W.3d at 295.

Issue 23 should be overruled.

### *Issue #24: Jerry Mace*

At trial, Appellant challenged Jerry Mace for cause for the following reasons: (1) he would presume future danger if the individual is guilty of capital murder; and (2) he is "mitigation impaired." (RR18:68). Appellant's challenge was denied. (RR18:68). The record supports the trial court's ruling.

The State must prove the future dangerousness special issue beyond a reasonable doubt. Tex. Code Crim. Proc. Ann. art. 37.071, § 2(c). Any venire member who would automatically answer the future dangerousness special issue in the affirmative or who would place the burden of proof on the defense is challengeable for cause under article 35.16(c)(2) for having a bias or prejudice against a law applicable to the case upon which the defense is entitled to rely. *Feldman*, 71 S.W.3d at 745.

Mace's voir dire testimony shows he held no bias against the law governing the first special issue. During voir dire, the prosecutor explained the various

101

aspects of the first special issue, particularly that the State must prove that the answer to that question is "yes." (RR18:26-31, 30). She explained that while the jury could consider the facts of the case in answering the question, "it's not an automatic answer. In other words, just because you're convicted of capital murder doesn't always mean that Special Issue Number 1 is yes." (RR18:30). Mace indicated he understood. (RR18:31). He testified, "Well, you have to be concerned about [the facts of the offense], but you've got to listen to everything that went down and just determine then was it - - or is he going to do it again or more than likely will he do it again[.]" (RR18:31). Moreover, when he was questioned by the defense, Mace denied that a robbery indicates a person is a continuing threat to society. (RR18:57). Clearly, Mace understood the State had to prove future danger and he would hold the State to its burden.

Appellant's complaint that Mace is "mitigation impaired" is also refuted by the record. On his questionnaire, Mace was asked what he thought about the fact that "[s]ome people feel genetics, circumstances of birth, upbringing and environment should be considered when determining the proper punishment of someone convicted of a crime." Mace wrote, "B.S.! I'm not concerned about how they were raised. Only that a horrific crime was committed." (Mace, Juror 615A, Q. p.6). Notably, this answer was given before Mace was instructed on the

applicable law.   During voir dire, defense counsel questioned Mace about his answer.   The following exchange took place:

> [Defense Counsel]:   You don't have to use the - - use the word, but does the B.S. represent the way you feel?
>
> [Mace]:  To bring it in as - - yes, in a sense.  The - - the act itself was the individual's - - at that moment, what transpired growing up and - - and such, probably got him to that point or got her to that point or helped to get to that point, but that didn't - - that doesn't come into play when it's the act itself.
>
> [Defense Counsel]:  Okay.  And does it come into play when you're considering punishment?
>
> [Mace]:   It may, depending on Special Issue Number 2 and the mitigation circumstances.  I don't know.  You know, if certain circumstances say that - - I'd have to - - I'd have to hear it.  I don't know.  You know, I mean, I would be open to listening to it, and I definitely wouldn't be qualified to say that, well, background and generics [sic] - - genetics have a lot of pull on this.  I wouldn't know that.  I would expect you all to tell me what is going on here."

(RR18: 58-59).   Mace testified he could consider mitigating circumstances, which could warrant a life sentence. (RR18:60).   His testimony shows that he would consider the evidence but that he might not regard it as mitigating.  His testimony does not show that he would not consider the evidence at all.  That Mace could consider mitigating evidence is all that is constitutionally required.  *See Cordova v. State*, 733 S.W.2d 175, 189 (Tex. Crim. App. 1987); *see also Coleman*, 881 S.W.2d at 352 (holding that the trial court did not err in denying a challenge for

cause for an inability to consider mitigating evidence where the record showed that the venire member could "listen with an open mind").

Issue 24 should be overruled.

*Issue #25:  Sandra Gromacki*

At trial, Appellant challenged Sandra Gromacki for cause because Gromacki could not presume a life sentence is the proper punishment and "she leaned toward the death penalty."  (RR20:103-04).  He also complained that "she would consider it if the Defendant failed to testify during the penalty phase in consideration of Special Issue Number 2."  (RR20:104).  Appellant's challenge was denied.  (RR20:104).  The record supports the trial court's ruling.

The law does not require that a juror presume a life sentence is the proper punishment.  *See Gardner*, 306 S.W.3d at 303.  Nevertheless, the record shows Gromacki would apply such a presumption.   During voir dire, defense counsel asked whether, if Gromacki found someone guilty of capital murder, she would "lean heavily toward the death penalty?"  (RR20:81).  Gromacki admitted that she would but testified that "[her] answer for that, though, would not be like [100%][.]"   (RR20:81).  Defense counsel later returned to this subject and Gromacki affirmed her previous stance.  (RR20:94).  Defense counsel asked whether Gromacki was "telling us that you could not follow the presumption that life without parole would be the appropriate punishment[.]"  (RR20:95).  Gromacki

104

responded, "No[,]" that while she might lean toward the death penalty, she would still follow the presumption regarding life without parole.   (RR20:95).

Next, Gromacki was asked whether she agreed that she would have to hear from Appellant in order to answer Special Issue No. 2 "yes."   (RR20:88). Gromacki testified, "Not - - not necessarily, no." (RR20:88).  Then, the following exchange took place:

> [Defense Counsel]:  Well, there are people that come in and say, you know what, I could never find something sufficiently mitigating unless - - without hearing from him, without hearing if he was sorry or how he felt about it.  Do you know what I mean?
>
> [Gromacki]:  Uh-huh, yes.
>
> [Defense Counsel]:  How do you feel about that?
>
> [Gromacki]:   I could see that playing a part in the mitigating circumstances.
>
> [Defense Counsel]:  So it is something that you would consider?
>
> [Gromacki]:  Yes.
>
> [Defense Counsel]:   If the Defendant didn't testify in the penalty phase with regard to Special Issue Number 2, that is something you would take into consideration?
>
> [Gromacki]:  Yes.
>
> [Defense Counsel]:  Despite the fact that the law says he doesn't have to testify?
>
> [Gromacki]:  Yes.

(RR20:89). The trial court later rehabilitated Gromacki. The judge explained the law and asked whether Gromacki could follow the law. (RR20:103). Gromacki said she could. (RR20:103). The judge then asked whether Gromacki, knowing the law, would require Appellant to testify as to Special Issue No. 2. (RR20:103). Gromacki said "no." (RR20:103).

The totality of Gromacki's testimony indicates that she would be fair and impartial and would listen to all evidence to answer the two special issues. This Court should defer to the trial court's resolution of any possible contradictory responses. *See Feldman*, 71 S.W.3d at 744.

Issue 25 should be overruled.

*Issue #26: Sarah Wagler*

At trial, Appellant challenged Sarah Wagler for cause on the basis that she could not fairly apply the presumption of innocence and that she "would require the Defense to do something." (RR34:83). Appellant's challenge was denied. (RR34:83). The record reflects that Wagler had no bias against the presumption of innocence. Although she would expect Appellant to present evidence in his defense, she would not require him to.

During voir dire, the prosecutor asked Wagler whether she was familiar with the Fifth Amendment. (RR34:17). Wagler responded, "That's not to incriminate yourself, correct?" (RR34:17). The prosecutor explained a defendant cannot be

106

compelled to testify. (RR34:17). Wagler affirmed she understood. (RR34:17). The prosecutor asked what Wagler's verdict would be if the State failed to prove its case and Wagler responded she "would have to acquit." (RR34:17). The record is clear that Wagler could fairly apply the presumption of innocence.

Then, defense counsel questioned Wagler regarding the fact that the defense has no burden of proof:

> [Defense counsel]: You understand that this table has absolutely no burden to present any evidence to the jury at all.
>
> [Wagler]: Right.
>
> [Defense counsel]: And you can't require that.
>
> [Wagler]: Right.
>
> [. . .]
>
> [Defense Counsel]: But under the law, we don't have to prove a thing to you.
>
> [Wagler]: Right.
>
> [Defense Counsel]: We don't have to prove that Matthew Johnson is not guilty. We don't have to prove that Matthew Johnson would not be a continuing threat to society.
>
> [Wagler]: Uh-huh.
>
> [Defense Counsel]: And we don't have to prove any kind of mitigation to you.
>
> [Wagler]: Right. My reasonable expectation would be that if the State presented X, Y, and Z, that the Defense would come back and counter why X, Y, and Z did not exist or what made changes to X, Y,

107

and Z, not just sit there and let them make a statement and not say anything back. That's what I meant by both good and bad - -

[Defense Counsel]: Okay.

[Wagler]: - - in play.

[Defense Counsel]: But you understand the State has got the burden of proving it. We don't have - - we don't have to prove why the State's wrong or that the State's wrong or - - or anything like that.

[Wagler]: Right.

(RR34:60-61). Later, however, when defense counsel asked whether she would require the defense to "counter" the State's evidence, Wagler testified, "[I]f there's no counter, then to me, you're accepting what's being said." (RR34:62). Essentially, Wagler would require the defense to "counter what is being said or what is being presented[.]" (RR34:62-63). Defense counsel explained the law did not place any burden on the defense. (RR34:64). Wagler testified she "would have an expectation that [the defense] would want to counter something that was negative." (RR34:64). Without that "counter," Wagler testified that "then it's just my personal belief as to whether or not I happen to feel whichever person is speaking for the State is saying the truth or not the truth." (RR34:65). Wagler testified she would require the defense to counter the State's evidence or "assume the responsibility that I'm going to make a personal judgment on my own as to whether or not I believe what the State is presenting or not presenting." (RR34:65).

108

The trial court interjected and instructed Wagler regarding the presumption of innocence and the fact that a defendant has no burden of proof. (RR34:66). Wagler affirmed she understood. (RR34:66). Wagler testified she could presume innocence and return a verdict of not guilty even if the defense did not present any evidence. (RR34:67). She also testified she could answer Special Issue No. 1 "no" without hearing anything from the defense. (RR34:72).

The totality of Wagler's testimony shows that she could apply the presumption of innocence and that she would not require the defense to present any evidence. This Court should defer to the trial court's resolution of any possible contradictory responses. *See Feldman*, 71 S.W.3d at 744.

Issue 26 should be overruled.

### *Issue #27: Jerri Adams*

At trial, Appellant challenged Jerri Adams for cause for the following reasons: (1) she would disregard trial court instructions that conflicted with Scripture; (2) she would extend more credibility to police officers; and, (3) she is "mitigation challenged based on her answers in her questionnaire and her answers to the Court." (RR39:99). The trial court denied Appellant's challenge, and with good cause. (RR39:99).

Adams testified that she attends church regularly and that her faith is very important to her. (RR39:61-62). She testified her religious beliefs do not conflict

109

with the death penalty. (RR39:16). On her questionnaire, in response to a question asking if the death penalty should be available for murder in the course of robbery, Adams wrote that she agreed and that the "laws of the land should be followed as long as there is no contradiction with Scripture – the Bible gives several reasons/examples in both the old and new testaments where death was the punishment." (Adams, Juror 1393A, Q. p.2). Defense counsel questioned Adams at length about this subject. (RR39:61-68). Adams clarified when she wrote the aforementioned statement in her questionnaire, she "meant in the bigger picture[.]" (RR39:62). She testified, "If the law says you can do it, I still don't think you can do it, because I believe it is against [S]cripture." (RR39:62). She mentioned abortion as an example. (RR39:62, 64). Adams "didn't mean that [she was] not going to obey whatever the law is in the court for determining [a legal outcome]." (RR39:62).

Defense counsel again pursued the subject and at one point, Adams conceded if the instructed law conflicted with Scripture, Adams would follow Scripture. (RR39:64-65). Adams noted, however, she had never encountered such a situation and she could not imagine one. (RR39:65, 67). She testified, "There's not any - - there's not a law that I - - that I know of that's going to not allow me to follow." (RR39:66). Ultimately, Adams testified that she would follow the law applicable in a death penalty case. (RR39:68).

110

In *Gardner,* a prospective juror testified, like Adams, that if the law violated Scripture, he would follow Scripture. *Gardner*, 306 S.W.3d at 298. Also like Adams, the juror testified he had never encountered such a situation. *Id.* This Court held the trial judge did not abuse its discretion in denying Gardner's challenge for cause because the existence of "some unknown, hypothetical situation in which man's law was in conflict with [the juror's] understanding of Scripture does not mean that he was unable or unwilling to follow the law in a death-penalty case." *Id*. at 299. The same logic applies here. Adams testified some unknown situation may cause the law to conflict with Scripture. (RR39:65-66). Even so, she testified she would follow the law in a death penalty case. (RR39:68). The trial judge was in the best position to evaluate Adams' responses regarding her ability to follow the law, and he found them credible.

On her questionnaire, Adams wrote police officers are more likely to tell the truth "because they are a group that has been culled from all that apply & they likely better understand the repurcussions [sic] of not telling the truth." (Adams, Juror 1393A, Q. p. 5). During voir dire, she affirmed she would wait to hear what a witness had to say and would not automatically assume credibility based on one's position as a police officer. (RR39:29-30). Defense counsel posed the question to Adams again later. (RR39:95). Adams reiterated that she would not give the officer more credibility. (RR39:95). She "would expect them to be telling the

truth on things, but [. . .] I don't think anybody else stepping up here would be any less credible than the officer just because he had a uniform." (RR39:95-96). The totality of Adams' testimony indicates she would wait to hear a witness's testimony before passing judgment on credibility. Given her assurances to follow the law, the trial court reasonably concluded that Adams held no bias. *See Lane*, 822 S.W.2d at 45.

Finally, Appellant's complaint that Adams was "mitigation challenged" lacks merit. Adams affirmed that if she heard evidence that was sufficiently mitigating, she would answer "yes" to Special Issue No. 2. (RR39:44, 46-47). She could not envision a situation in which she would answer that issue "yes," but she could imagine the possibility. (RR39:46-47). She affirmed she would keep an open mind as to Special Issue No. 2. (RR39:53). In short, the record reflects no bias against Appellant on the mitigation issue, and Appellant fails to articulate one.

At trial, Appellant did not specify how Adams was "mitigation challenged" except by "her answers in her questionnaire." (RR39:99). Appellant failed to identify, however, which answers on Adams' 19-page questionnaire indicated a bias.

In his brief, Appellant argues Adams' emotional state during voir dire shows a lack of objectivity to consider some of the evidence presented at trial. This

complaint was not asserted at trial and was not properly preserved. *See* Tex. R. App. P. 33.1(a).

Issue 27 should be overruled.

### *Conclusion*

Appellant has not shown even one erroneous ruling on his challenges for cause, much less three erroneous rulings. *See Gonzales*, 353 S.W.3d at 837. Therefore, he has not shown this Court that he was denied the use of a statutorily provided peremptory strike. Issues 20 through 27 should be overruled.

***STATE'S RESPONSE TO ISSUE NOS. 28 THROUGH 30: THE TRIAL COURT DID NOT ERR IN GRANTING THE STATE'S CHALLENGES FOR CAUSE.***

In Issues 28, 29, and 30, Appellant contends the trial court erred in granting three of the State's challenges for cause over his objection against venire members Alan Avidon, John Cavner, and Douglas Green. (Appellant's Br. pp.87-91). He contends the trial court abused its discretion in excusing these jurors. Appellant's contentions lack merit and should be overruled.

### *Issue #28: Alan Avidon*

Prior to voir dire, the State notified the trial court that Avidon had not answered a question on his questionnaire truthfully. (RR13:4). Avidon checked "no" in response to a question asking "Have you . . . ever been accused, arrested or convicted (including probation, deferred adjudication, conditional discharge, fine, etc.) of a crime *above* the level of a traffic ticket." (Avidon, Juror 247A, Q. p. 8)

113

(emphasis in original). The State ran Avidon's criminal history and discovered Avidon had "received deferred [adjudication] in Dallas County for a DWI back in 1980, as well as an arrest in New York for possession of a dangerous drug." (RR13:4-5). Given Avidon's lack of candor, the State challenged Avidon for cause. (RR13:5). Appellant objected. (RR13:5). The trial court brought Avidon into the courtroom to inquire about his criminal history. (RR13:7). Avidon admitted to the two arrests. (RR13:9). He testified he "didn't indicate it on the questionnaire thinking that it was, you know, so long that the statute of limitation passed." (RR13:9). The court excused the juror and granted the State's challenge. (RR13:10).

A challenge for cause may properly be asserted on grounds not specifically enumerated in article 35.16 if the challenge is based on facts that show the prospective juror would be "incapable or unfit to serve on the jury." *See Mason v. State*, 905 S.W.2d 570, 577 (Tex. Crim. App. 1995). These challenges are addressed to the trial court's discretion. *See id.* Avidon withheld critical information when he failed to truthfully answer the question regarding his criminal history. Importantly, Avidon did not simply forget the arrests. (RR13:9). Instead, he claimed he thought the statute of limitations had passed. (RR13:9). Avidon placed his veracity – and, therefore, his fitness to serve – in question. The trial court did not abuse its discretion by granting the State's challenge for cause against

114

Avidon. To conclude otherwise would controvert this Court's policy as stated in connection with the State's response to Issues 8-19. *Jones*, 982 S.W.2d at 394.

Regardless, even if this Court finds that the trial court erred in granting the State's challenge for cause against Avidon (which the State does not concede), any alleged error is harmless. The erroneous excusing of a venire member will call for a reversal only if the record shows that the error deprived the defendant of a lawfully constituted jury. *Jones,* 982 S.W.2d at 394. Appellant has made no such showing.

Issue 28 should be overruled.

### *Issue #29: John Cavner*

During voir dire, the prosecutor explained the phases of a death penalty trial and asked Cavner whether he would be more inclined to answer the special issues in such a way that a life sentence would result. (RR17:122). Cavner responded, "I think there is - - that I would be constantly trying to prove to myself that is not the right answer. In other words, that would be my - - my - - my leaning, my bias probably." (RR17:122). When asked whether he could guarantee he would set aside his personal feelings and beliefs and decide the case based on the facts and evidence, Cavner testified that he could not make that guarantee. (RR17:124-25).

On the other hand, when questioned by the defense, Cavner testified he "can keep an open mind." (RR17:127). He testified he could listen to the evidence but

115

"I - - as I've said before, I know I'm going to have a, going in, bias[.]" (RR17:130). At one point, he finally said that if he "could find nothing mitigating, then [he could assess the death sentence]." (RR17:130). Apparently recognizing Cavner's inconsistent answers, the trial court attempted to clarify Cavner's responses. The following exchange took place:

> [Trial Court]: All I want you to do is tell me, and I know you will, how - - exactly how you feel and believe. Would - - will you always find mitigating evidence regardless of the evidence?
>
> [Cavner]: Well, I answered his question the way I did because I think it will be very difficult for there not to be mitigating evidence.
>
> [Trial Court]: Well, that's all right, too. Can there ever be - - with your opinion about the death penalty and your opposition to it, again, if you want to look at Special Issue Number 2, can you - - will you ever be - - regardless of the evidence, will you ever be able to answer that issue yes, knowing death - - I'm sorry, no, knowing that the death penalty will result? Whatever you say that's it.
>
> [Cavner]: I don't believe I could do it.
>
> [Trial Court]: Well - -
>
> [Cavner]: I can't do it.
>
> [Trial Court]: Any doubt in your mind?
>
> [Cavner]: No doubt.

(RR17:132-33). The State challenged Cavner for cause because "he would never ever be able to answer Special Issue Number 2 in such a way that would result in

116

the death sentence." (RR17:134). The trial court granted the State's challenge over Appellant's claim that Cavner was qualified. (RR17:134).

The totality of Cavner's voir dire testimony clearly shows his beliefs about capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with the court's instructions and his oath. *See Colburn*, 966 S.W.2d at 517. At a minimum, he was a vacillating juror and the Court should defer to the trial court's judgment on the challenge for cause. *Granados*, 85 S.W.3d at 231. To conclude otherwise would controvert this Court's policy as stated earlier. *Jones*, 982 S.W.2d at 394.

Issue 29 should be overruled.

### *Issue #30: Douglas Green*

Douglas Green gave multiple contradictory answers during voir dire. The State challenged him for cause and that challenge was granted. (RR21:122-23).

In his questionnaire, in response to convictions based on circumstantial evidence, Green wrote that he agreed, "If DNA or forensic evidence to 100% conclusion." (Green, Juror 597A, Q. p.3). When questioned by the prosecutor, Green affirmed that "[u]nder the circumstances with a death penalty, yes[,]" he would require the State to prove its case beyond all doubt. (RR21:98). He understood that this would be holding the State to a higher burden of proof than required. (RR21:97-98). When questioned by the defense, Green testified he

117

would "follow the law" and affirmed he would not hold the State to a higher burden of proof. (RR21:115). Jurors may be challenged and removed for bias against the law, which includes the burden of proof. *See Bodde v. State*, 568 S.W.2d 344, 349 (Tex. Crim. App. 1978) (finding juror properly excluded where juror insisted she would hold the state to a more stringent standard of proof than "beyond a reasonable doubt").

Next, the prosecutor explained that at trial, the State is required to prove certain elements for a conviction of capital murder. (RR21:75-77). She gave a hypothetical in which the State alleged a murder committed during the course of a sexual assault. (RR21:75, 77). In the hypothetical, the State proved the murder, but instead of sexual assault, proved a robbery. (RR21:74-76). Green testified that he "might" still convict of capital murder even though the State did not prove the offense as alleged. (RR21:78). The defense attempted to rehabilitate Green on this issue, but Green testified that "if [he] knew someone had committed murder, [he] would have a hard time[.]" (RR21:107-08). Then, he testified he would follow the law. (RR21:108).

Finally, in his questionnaire, in response to a question asking what would be important to him in deciding whether a person should receive a life or death sentence, Green wrote, "Does the person have an evil heart." (Green, Juror 597A, Q. p.3). When questioned by the prosecutor, he testified he would "rather hear the

118

person tell me why than someone else speak for them." (RR21:95). He testified, "I can't imagine if I was in that - - in the other position that I wouldn't want to tell my story." (RR21:95). When defense counsel asked whether Green could follow an instruction on the Fifth Amendment right to silence, Green testified, "I could. I would feel it's strange, but I - - I could." (RR21:119).

Green gave contradictory answers regarding several critical issues: (1) his ability to apply the proper standard of proof; (2) his ability to require that the State prove each and every element; and, (3) a defendant's right to remain silent. The State challenged him on all three of these bases, and the trial court acted well within its discretion in granting the challenge. (RR21:122-23). Green was a classic vacillating juror. The Court should defer to the trial court's judgment on the challenge for cause. *Granados v. State*, 85 S.W.3d 217, 231 (Tex. Crim. App. 2002).

Issue 30 should be overruled.

***STATE'S RESPONSE TO ISSUE NOS. 31 AND 32: APPELLANT WAS NOT DEPRIVED OF A LAWFULLY CONSTITUTED JURY.***

In Issues 31 and 32, Appellant contends the trial court's rulings "in relation to overruling Appellant's objections to the trial court's actions in reference to each juror complained about previously" deprived him of a lawfully constituted jury resulting in violations of his rights under the state and federal constitutions, and under article 35.16 of the Code of Criminal Procedure. (*See* Appellant's Br. pp.

119

92-93). He fails to specify, however, whether he is referring to the trial court's denial of his challenges for cause or the granting of the State's challenges for cause.

In any event, Appellant has failed to show he was deprived of a lawfully constituted jury. He has failed to show the trial court's rulings on any of the challenges resulted in the seating of a juror who was biased or prejudiced. If an appellant does not present record evidence demonstrating that the trial court's error deprived him of a jury comprised of legally qualified jurors, he has suffered no harm and the reviewing court should presume the jurors are qualified. *See Gray v. State*, 233 S.W.3d 295, 301 (Tex. Crim. App. 2007).

Issues 31 and 32 should be overruled.

***STATE'S RESPONSE TO ISSUE NO. 33: THE EVIDENCE IS LEGALLY SUFFICIENT TO SUPPORT APPELLANT'S CONVICTION FOR CAPITAL MURDER.***

In Issue 33, Appellant contends that the evidence is insufficient to support his conviction for capital murder. Specifically, Appellant contends that he lacked the specific intent to kill Nancy and that the State failed to show a nexus between the murder and the theft. (Appellant's Br. p. 94). Appellant's contentions lack merit and should be overruled.

### *Standard of Review*

When reviewing a challenge to the sufficiency of the evidence, an appellate court considers all the evidence in the light most favorable to the verdict to

determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. The appellate court does not reweigh the evidence or substitute its judgment for that of the factfinder. *King*, 29 S.W.3d at 562.

### *Applicable Law*

A person commits the offense of capital murder if he intentionally commits murder in the course of committing or attempting to commit robbery. Tex. Penal Code Ann. § 19.03 (a)(2). A person commits robbery if, in the course of committing theft, he intentionally, knowingly, or recklessly causes bodily injury to another, or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. *Id.* § 29.02(a). A person commits theft if he unlawfully appropriates property with intent to deprive the owner of the property. *Id.* § 31.03(a).

The State must prove a nexus between the murder and the theft, *i.e.,* that the murder was committed in order to facilitate the taking of the property. *See Cooper v. State*, 67 S.W.3d 221, 222-23 (Tex. Crim. App. 2002); *Hooper v. State*, 214

121

S.W.3d 9, 13 (Tex. Crim. App. 2007) (in reviewing the sufficiency of the evidence, the appellate court should look at events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act).

*Analysis*

The following evidence proves that Appellant intended to kill Nancy Harris and that the murder occurred to facilitate the taking of property:

- Appellant walked into the Whip-In carrying a lighter and a plastic bottle filled with a flammable liquid.

- He walked straight to the sales counter, then around and behind into the area reserved for employees.

- When Nancy attempted to push him back, Appellant poured the contents of the plastic bottle, the flammable liquid, over Nancy's upper body.

- Appellant stood directly behind Nancy as she tried to open the register. He took two lighters from a display to the right of the register. He took two packages of cigarettes from an overhead dispenser. He took the ring Nancy was wearing on her right hand. When Nancy opened the register, Appellant took all of the cash and some of the coins.

- After Appellant took the money from the register he flicked his lighter and the flame ignited the liquid on Nancy.

- While Nancy, engulfed in flames from her shoulders up, ran out from behind the counter, Appellant calmly walked out of the store with his plastic bottle and the stolen property. On his way out, he stopped to take some candy and stuff it in his pocket.

- Appellant made no effort to help Nancy extinguish the flames.

122

- Appellant fled the store and hid from police in the neighborhood behind the Whip In.

- Nancy told police that "a black male, heavy-set, short dark hair, and a chubby face, came into the store and demanded money from her. She advised he took the money and then he poured something on her. She didn't know what - - what it was, and then he lit her on fire." (RR45:82).

- Nancy was rushed to the hospital. She suffered second-, third-, and fourth-degree burns over forty percent of her body.

- Five days after Appellant set her on fire, life support was discontinued. Nancy died as a result of her burns.

- Appellant was arrested shortly after the offense in the neighborhood behind the Whip-In. When he was handcuffed, he asked the officers what had taken them so long. He commented that they were "getting slow." (RR44:186).

- Three lighters, Nancy's ring, coins, and cash were recovered from Appellant's pocket after his arrest.

- A plastic bottle was found in the grass behind the Whip-In. DNA on the plastic water bottle was identified as Appellant's.

- Testing of the contents of the plastic water bottle and Nancy's clothing showed a medium petroleum distillate of the primary recovery and a lower level of isopropyl alcohol. A medium petroleum distillate is an ignitable fluid, which is found in charcoal starter fluid, paint thinner, and mineral spirits.

Despite the aforementioned evidence, Appellant nevertheless contends that no evidence proves he went to the Whip-In "to murder the Complainant in order to rob her[,]" and that, as such, no evidence shows his specific intent to kill. In support of his contention, he cites his own testimony from the punishment phase that he had no intent to murder Nancy. (Appellant's Br. p. 96). In a bifurcated

123

trial before a jury on a plea of not guilty, however, "consideration of the evidence is necessarily limited to the evidence before the jury at the time it rendered its verdict of guilt." *Barfield v. State*, 63 S.W.3d 446, 450 (Tex. Crim. App. 2001). Absent a judicial confession, evidence from the punishment phase of a trial will not be considered in determining the sufficiency of the evidence to support a conviction. *Munoz v. State*, 853 S.W.2d 558, 560 n.3 (Tex. Crim. App. 1993). Accordingly, because Appellant's punishment-phase testimony was not before the jury when it found Appellant guilty of capital murder, it should not be considered in determining the sufficiency of the evidence to support his conviction.

Regardless, the evidence overwhelmingly contradicts Appellant's punishment testimony and argument that he lacked the specific intent to kill. "Intent can be inferred from the acts, words, and conduct of the accused." *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995) (citing *Beltran v. State*, 593 S.W.2d 688, 689 (Tex. Crim. App. 1980)). Appellant walked in to the Whip-In armed with his plastic bottle of flammable liquid and his lighter. The first thing that he did when he walked behind the counter was pour that liquid over Nancy's upper body. Immediately after he robbed her, he flicked his lighter and ignited the fluid on her body. That Appellant actually poured the lighter fluid over Nancy and later ignited it supports a conclusion of specific intent. Notably, he made no effort to call an ambulance or extinguish the flames. He simply left by walking casually

124

out of the store as his elderly victim was left to contend with the flames now engulfing her entire upper body. Based on this evidence, a rational jury could have found Appellant intended to kill Nancy. *See Patrick*, 906 S.W.2d at 487 (finding evidence legally sufficient to prove intent to kill in light of the extent of the complainant's injuries, how the injuries were inflicted, and the relative size and strength of the parties).

Moreover, the evidence was sufficient to prove the murder took place during the course of committing or attempting to commit robbery. Appellant argues the theft was unrelated to the murder and was an afterthought, and thus is insufficient to prove capital murder. (Appellant's Br. at 97). Appellant's argument is once again contradicted by the surveillance video. The video shows that Appellant went into the Whip-In that morning with his plastic bottle of flammable liquid and his lighter. He was fully prepared to commit robbery. Once inside the store, he poured the fluid over Nancy. Then he took the lighters, the cigarettes, Nancy's ring, and the money. After he had what he wanted and had no further need for Nancy, he flicked his lighter and the flame ignited the fluid on her body. This gave him the opportunity to flee the scene. In short, the murder and the robbery are closely intertwined. Appellant poured the lighter fluid over Nancy so that she would cooperate and open the register. He waited to set her on fire until after she opened the register and he had a chance to take all that he wanted. Once he had

125

what he wanted, he set Nancy on fire and left. The robbery was anything but an afterthought.

Considering all the evidence in the light most favorable to the jury's verdict, a rational trier of fact could have found the essential elements of capital murder beyond a reasonable doubt. As such, the evidence is legally sufficient to support the conviction.

Issue 33 should be overruled.

**STATE'S RESPONSE TO ISSUE NOS. *34* AND *35*: THE TRIAL COURT PROPERLY ADMITTED THE SURVEILLANCE VIDEO OF THE INSTANT OFFENSE AS WELL AS STILL PHOTOGRAPHS FROM THAT VIDEO. ALTERNATIVELY, ANY ERROR IS HARMLESS.**

In his Issue 34, Appellant contends that the trial court erred in overruling his objection to 24 still photographs from the surveillance video of the instant offense. In Issue 35, Appellant contends that the trial court erred in admitting the surveillance video over his Rule 403 objection. Appellant's contentions lack merit and should be overruled.

### *Pertinent Facts*

During a hearing outside the presence of the jury, Appellant objected that the surveillance video of the instant offense was unfairly prejudicial and asked the trial court to conduct "a 403 balancing test." (RR44:33). The trial court overruled Appellant's objection and stated that "the evidence about to be presented by the

126

State is more probative than prejudicial." (RR44:33). The surveillance video was offered and admitted and published to the jury.[14] (RR44:48-49; SX#16-17).

Later, the State moved to admit State's Exhibits 79-102, which are still photographs taken from the surveillance video. (RR44:229). The following exchange took place:

> [Prosecutor]: I'm going to show you State's Exhibits 79 through 102, and ask you if those are screen shots or still shots from this surveillance video that showed some of the significant things that occurred in the video?
>
> [Detective Tooke]: Yes, they are.
>
> . . .
>
> [Prosecutor]: I would offer State's Exhibit 79 through 102.
>
> (State's Exhibits 79 through 102 offered.)
>
> [Defense Counsel]: Your Honor, we're going to object to 79 through 102 due to their cumulative nature and also the previous objections that were set out in Pretrial Motion Number 57.
>
> [Trial Court]: Any response?
>
> [Prosecutor]: Judge, I can show the video multiple times and stop and freeze this, but I believe that this is more expedient. The fact is that the content contained in these photographs is already in evidence through the video, and this just allows the State to show this and point out the - - the specific - - the specific aspects of the video without playing it again.

---

[14] Two copies of the surveillance video were admitted. (RR44:49; SX#16, 17). State's Exhibit #16 is the unedited version, which contains footage from all three surveillance cameras. (RR44:47; SX#16). State's Exhibit #17 is the compilation version, which combines the footage from the cameras for ease of the viewer. (RR44:47-49; SX#17). State's Exhibit #17 is the version that was shown to the jury. (RR44:49; SX#17).

[Trial Court]: All right. Defense's objection is overruled.

(RR44:229). The photographs were published to the jury. (RR44:229-234).

## *Applicable Law*

### *Standard of Review*

A trial court's ruling on the admissibility of evidence is reviewed under an abuse of discretion standard. *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). The trial court's ruling should be upheld if it is within the zone of reasonable disagreement. *Id.* And, it will be upheld if it is correct on any theory of law applicable to the case. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

### *Photograph and Videotape Evidence*

The admissibility of a photograph falls within the sound discretion of the trial judge. *Paredes v. State*, 129 S.W.3d 530, 539 (Tex. Crim. App. 2004). Generally, if testimony about the matters that are depicted in the photograph is admissible, then the photograph will also be admissible. *Id.* at 539. Videotapes are considered in the same manner. *See* Tex. R. Evid. 1001(b).

### *Rule 403*

The admissibility of photographic evidence alleged to be unduly prejudicial is governed by Texas Rule of Evidence 403. Tex. R. Evid. 403; *Emery v. State,* 881 S.W.2d 702, 710 (Tex. Crim. App. 1994). Under Rule 403, all relevant

128

evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403. In performing a Rule 403 analysis, "the trial court must consider the host of factors affecting probativeness . . . and balance those factors against the tendency, if any, that the photographs have to encourage resolution of material issues on an inappropriate emotional basis." *Ladd v. State*, 3 S.W.3d 547, 568 (Tex. Crim. App. 1999). Relevant factors a court may consider in making this determination include the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black-and-white or color, whether they are close-up, whether the body is naked or clothed, the availability of other means of proof, and other circumstances unique to the individual case. *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999).

All probative evidence proffered by an adverse party will be prejudicial, but only *unfair* prejudice warrants exclusion of the evidence. *See Montgomery v. State*, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990) (citing *United States v. Figueroa*, 618 F.2d 934, 943 (2nd Cir. 1980).

*Analysis*

*Issue #35: The Surveillance Video*

The trial court did not err in admitting the surveillance video depicting the instant offense. The footage from the surveillance video is in black-and-white and is 4 minutes and 44 seconds long. (SX#17). Given the relative positions of the cameras, at times, some angles offer a closer view of Nancy and Appellant behind the sales counter as she opens the register and as he takes lighters, cigarettes, money, and her ring. (SX#17). The later portion of the video is graphic as it shows an elderly woman on fire and the removal of her shirt in an attempt to put out the flames engulfing her upper body. (SX#17). The video is without a doubt, both graphic and disturbing. Yet, the video simply shows the offense as it occurred. It depicts nothing more than the reality of the brutal crime that Appellant committed.

Furthermore, the video aided the jury in understanding how the crime occurred. In *Gordon v. State*, this Court described the utility of video recordings as follows:

> Video recordings in general may be more helpful to a jury than still photographs. While still photographs offer to the jury an isolated and fixed content, a video recording allows a more panoramic representation of the physical and forensic evidence.

*Gordon v. State*, 784 S.W.2d 410, 412 (Tex. Crim. App. 1990). Beyond the depiction of the offense itself, the video helped the jury understand the testimony

130

regarding the crime scene, including the layout of the sales counter at the Whip-In and Appellant and Nancy's position during the offense.

Appellant correctly states "There was no question for the jury as to how the victim died." (Appellant's Br. p. 104). It was undisputed that Nancy died as a result of thermal injuries. What was disputed, however, was Appellant's intent. At no time did Appellant concede his guilt for the offense of capital murder. Indeed, during voir dire, defense counsel told many of the potential jurors that in counsel's opinion, the jury would never reach the punishment phase because they would not find Appellant guilty. (RR5-RR42). The State was obligated to prove each and every element of the offense, including Nancy's identity and all of the circumstances surrounding her robbery and murder. The video of the offense is relevant because it shows the offense as it happened. It establishes not only that Appellant committed the instant offense, but also the way in which he committed it. And, the way in which Appellant committed the offense – walked into the Whip-In with a flammable liquid, went straight to the sales counter, poured the liquid over the elderly female clerk's head and upper body, robbed her, set her on fire, then walked casually out of the store leaving his victim engulfed in flames – is highly probative of his intent. In sum, the video of the offense is highly probative of Appellant's specific intent to kill Nancy Harris, and is in no way unfairly

131

prejudicial to Appellant. Therefore, the trial court did not abuse its discretion in admitting it.

*Issue #34: Still Photographs*

The trial court did not err in admitting the still photographs as they are not cumulative of the video. This Court has held that "a still photograph is not cumulative of a videotape." *Matamoros v. State*, 901 S.W.2d 470, 476 (Tex. Crim. App. 1995). A still photograph allows the jury to examine the scene in detail. *Id*. Like the video, the twenty-four still photographs are in black-and-white. (SX#79-102). These photographs were used by Detective Tooke as he described the details of the offense. (RR44:229-34). While it is true that the jury had already seen the surveillance video, a single viewing of a 5 minute video is hardly sufficient time for the jury to take in all of the details. Rather than play the video multiple times during Detective Tooke's testimony, the prosecutor used the photographs to describe the critical details from the offense.

For example, State's Exhibits #79-82 shows Appellant as he enters the Whip-In. (SX#79-82). State's Exhibit #83 shows Appellant carrying the plastic bottle in his right hand. (SX#83). State's Exhibit #84 shows Appellant as he starts to walk behind the sales counter. (SX#84). State's Exhibit #85 shows Appellant behind the sales counter with Nancy. (SX#85). He has a lighter in his hand and is taking lighters from a display. (RR44:230; SX#85). State's Exhibit

#86 is another view of Appellant and Nancy behind the counter. (SX#86). State's Exhibits #87 and 88 show Appellant taking cigarettes. (RR44:231; SX#87, 88). State's Exhibit #89 shows Appellant's hand on Nancy's hand. (RR44:231; SX#89). State's Exhibits #90 and 91 show Appellant licking his fingers. (RR44:232; SX#90, 91). State's Exhibits #92 again shows Appellant's hand on Nancy's hand. (RR44:232; SX#92). State's Exhibit #93 shows Appellant's hand on the counter. (RR44:232; SX#93). State's Exhibits #94 and 95 show the register drawer open. (RR44:232; SX#94, 95). State's Exhibit #96 shows Appellant's hand going from the register drawer. (RR44:232-33; SX#96). State's Exhibit #97 shows the fire as it is reflected on the register monitor. (SX#97). State's Exhibits #98-102 show Nancy on fire and Appellant as he walks out of the store. (SX#98-102).

Each photograph provided an additional detail critical to the jury's understanding of the offense and the crime scene. Notably, the prosecutor's questioning of Detective Tooke regarding the photographs was very brief, comprising only six pages of an otherwise lengthy record. (RR44:229-34).

Appellant argues that State's Exhibits #98, 99, and 100 "are exceptionally prejudicial in that they depict Ms. Harris on fire. . . . The jury did not need to see still photographs of a burning woman to discern what had taken place." (Appellant's Br. p. 99). The State acknowledges that State's Exhibits #98, 99, and

133

100 are graphic in that these photographs show Nancy on fire. (SX#98, 99, 100).

Nevertheless, these photographs are not overly gruesome, and they provided the jury with the means to focus on some highly relevant details of the offense.

State's Exhibit #98 shows Nancy from the chest down, as she runs out from behind the counter and Appellant walks out behind her. (SX#98). State's Exhibit #99 shows Nancy on fire, and provides another view of Appellant casually leaving the store. (SX#99). State's Exhibit #100 shows Nancy on fire as she walks toward the sink. (SX#100). Importantly, the left side of the photograph shows Appellant walking out of the store carrying the plastic bottle. (SX#100). The complained-of exhibits helped the jury to understand not only what Appellant did to Nancy but also how, afterward, he fled the scene, taking his bottle of flammable liquid with him.

The probative value of all 24 photographs was not substantially outweighed by their prejudicial effect. *See* Tex. R. Evid. 403. The trial court did not abuse its discretion in admitting them. *See Matamoros*, 901 S.W.2d at 476 (finding no abuse of discretion in admitting crime scene photographs over Matamoros' objection that they were cumulative of a crime scene video previously admitted as the photographs provided different vantage points, which might enhance the jury's understanding of the crime scene and they permitted the jurors to examine the

134

scene in detail). At a minimum, its decision falls within the zone of reasonable disagreement. *See Weatherred*, 15 S.W.3d at 542.

*Any Alleged Error is Harmless*

Even if the trial court erred in admitting the video and the still photographs, Appellant was not harmed. The erroneous admission of photographs is non-constitutional error governed by Rule of Appellate Procedure 44.2(b). *See* Tex. R. App. P. 44.2(b). Nonconstitutional error that does not affect the substantial rights of the defendant is disregarded by the appellate court. *See* Tex. R. App. P. 44.2(b). A substantial right is affected when the error has a "substantial and injurious effect or influence in determining the jury's verdict." *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). In making this determination, this Court may consider the entire record, including the nature of the evidence supporting the verdict, and the character of the error and its relationship to other evidence. *See Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000).

Here, overwhelming evidence supported the jury's verdict. When officers arrived at the Whip-In, Nancy told them that a man had robbed her and poured something on her. (RR44:69). She described her attacker as a "heavy-set black male with blue jeans . . . and a T-shirt." (RR44:70). At the hospital, she told Wilson that "a black male, heavy-set, short dark hair, and a chubby face, came into the store and demanded money from her. She advised he took the money and then

135

he poured something on her. She didn't know what - - what it was, and then he lit her on fire." (RR45:82).

When Perez searched the neighborhood behind the Whip-In, he saw a man matching Nancy's description. (RR44:178, 181-82). After a foot chase, Perez arrested the man, Appellant. (RR44:181-86). Appellant asked police, "What took you so long[?] Y'all are getting slow." (RR44:186). From Appellant's pockets, police collected a used lighter, a red lighter, a purple lighter, a gold ring, a car key, coins, and cash. (RR44:75-78; SX#6, 26, 28-30, 59, 60).

Investigators collected pooled liquid underneath the floor mat behind the sales counter as well as a plastic drinking bottle found in the grass behind the store. (RR44:111-12; RR45:50-51, 60-62; SX#35, 36, 114, 115, 117, 118, 129). Testing of contents of the plastic bottle and Nancy's clothing showed "a medium petroleum distillate of the primary recovery, and . . . a lower level of isopropyl alcohol." (RR45:113-14; SX#137). The pooled liquid from under the floor mat also contained medium petroleum distillate as did Appellant's t-shirt, pants, belt, left shoe and sock, and his right shoe. (RR45:116-17; SX#138). A medium petroleum distillate is an ignitable liquid often encountered as charcoal starter fluid, paint thinner or mineral spirits. (RR45:114).

Appellant's DNA was found on the exterior of the plastic bottle and he was included as a possible contributor of a DNA profile from the interior and exterior

opening of the bottle. (RR45:154-55; SX#142). Appellant was included as a possible contributor of a low level sample of DNA from the cash drawer. (RR45:156; SX#142). And, a partial DNA profile from the cigarette package matched Appellant. (RR45:156; SX#142). Finally, the jury heard medical testimony regarding the severity and extent of Nancy's injuries.

Accordingly, taking the entire record into consideration, Appellant was not harmed by the admission of the surveillance video or the still photographs taken from the video. Issues 34 and 35 should be overruled.

***STATE'S RESPONSE TO ISSUE NOS. 36 AND 37: THE TRIAL COURT PROPERLY ADMITTED THE AUTOPSY PHOTOGRAPHS AND THE PHOTOGRAPHS OF THE VICTIM IN THE HOSPITAL. ALTERNATIVELY, ANY ERROR IS HARMLESS.***

In Issue 36, Appellant contends the trial court erred in admitting, over his Rule 403 objection, nine photographs taken during Nancy's autopsy. In Issue 37, Appellant contends the trial court erred in admitting, over his Rule 403 objection, seven photographs of Nancy taken at the hospital prior to her death. Appellant's contentions lack merit and should be overruled.

*Pertinent Facts*

During trial, in a hearing outside the presence of the jury, the State offered into evidence nine autopsy photographs: State's Exhibit Nos. 9, 151, 152, 153,

154, 155, 156, 157, and 158.[15] (RR45:182). An additional 34 photographs taken during the autopsy were not offered. (RR45:183). The State also offered seven photographs taken of Nancy at the hospital prior to her death: State's Exhibit Nos. 144, 145, 146, 147, 148, 149, 150. (RR45:182). An additional 22 photographs taken at the hospital were not offered. (RR45:183-84).

Appellant objected to all sixteen photographs on the basis of his previously filed Pretrial Motion #57 as well as Rule 403. (RR45:183). The trial court affirmed it had reviewed all of the photographs, including those not offered into evidence, and overruled Appellant's objection. (RR45:184-85). The nine autopsy photographs were admitted through Dr. Dyer, the medical examiner. (RR46:30). The seven hospital photographs were admitted through Dr. Hunt, the physician who treated Nancy at the Burn Unit at Parkland Hospital. (RR46:16).

## Analysis

### Issue #36: Autopsy Photographs

The trial court did not err in admitting nine photographs taken during Nancy's autopsy. All 9 photographs of Nancy's deceased body were displayed to the jury in color. (RR45:182; SX#9, 151-58). Although Nancy is not clothed, most of the photographs are close-ups of specific parts of her body. And, the

---

[15] Prior to trial, the State offered into evidence State's Pretrial Exhibit #2, which contains copies of all photographs taken during Nancy's autopsy and all photographs taken of Nancy at the hospital prior to her death. (RR41:25; State's Pretrial Exhibit #2).

photographs are not repetitious; each depicts a different area of injury. For example, State's Exhibit #9, the autopsy identification photograph, is a close up of Nancy's face. (RR46:37; SX#9). State's Exhibit #152 shows the back of Nancy's head and top of her shoulders. (RR46:35; SX#152). State's Exhibit #153 shows Nancy's back. (RR46:36; SX#153). State's Exhibit #154 shows the back of Nancy's left leg. (RR46:36; SX#154). State's Exhibit #155 shows the top of Nancy's left hand. (RR46:36; SX#155). State's Exhibit #156 shows the underside of Nancy's left hand. (RR46:36-37; SX#156). State's Exhibit #157 shows the top of Nancy's right hand. (RR46:37; SX#157). State's Exhibit #158 shows Nancy's left foot. (RR46:37; SX#158).

State's Exhibit #151 is not a close-up photograph. It shows Nancy's unclothed body from the waist down. (RR46:33; SX#151). Her private area is covered on the photograph by what appears to be a white box. (RR46:33; SX#151). A photograph, which is used to describe the complainant's injuries, is not inadmissible simply because it depicts an unclothed body. *See Santellan v. State*, 939 S.W.2d 155, 172-73 (Tex. Crim. App. 1997) (finding no error in admitting photographs of victim's naked body during autopsy where the photographs show damage done to victim's body by Sanetellan and no damage attributable to the autopsy is apparent).

The 9 complained-of photographs are not unfairly prejudicial under Rule 403. All 9 autopsy photographs were probative of Nancy's injuries; they show the external injuries – burns, swelling, skin slippage and necrosis – that Nancy suffered as a result of the instant offense. (RR46:33-38; SX#9, 151-158). The photographs were used by the medical examiner, Dr. Dyer, to explain those injuries. (RR46:33-38). This Court has held that a trial court does not abuse its discretion in admitting autopsy photographs over a Rule 403 objection where they help to explain the medical examiner's testimony describing the victim's various wounds for which appellant is responsible. *See Escamilla*, 143 S.W.3d at 826. Given the nature of Nancy's injuries – thermal injury – the photographs were especially important to help the jury understand how and why she died. The photographs are also probative of Appellant's intent. The location and severity of Nancy's injuries show Appellant intended to kill her. *See Rojas v. State*, 986 S.W.2d 241, 249-50 (Tex. Crim. App. 1998) (finding no abuse of discretion in admitting autopsy photo because, among other reasons, it was probative of Rojas mental state at the time of the murder). Notably, Dr. Dyer's testimony regarding the photographs consisted of only five pages in an otherwise lengthy record. (RR46:33-38).

Appellant argues that the photographs are "extremely gruesome[.]" (Appellant's Br. p.107). The photographs are gruesome, but they depict nothing

140

more than the injuries that Appellant inflicted on Nancy. *See Ladd*, 3 S.W.3d at 568 (holding that the trial court did not abuse its discretion in admitting 10 photographs of the victim's body, including autopsy photos, because the photographs depicted the manner of death and were no more gruesome than the crime).

The trial court did not abuse its discretion when it admitted the nine autopsy photographs. At a minimum, its decision falls within the zone of reasonable disagreement. *See Weatherred*, 15 S.W.3d at 542.

*Issue #37: Hospital Photographs*

The trial court did not err in admitting 7 photographs of Nancy taken in the hospital prior to her death. Like the autopsy photographs, Nancy is not clothed but most of the photographs are close-ups of specific body parts. The photographs are not repetitious; each depicts a different area of injury. State's Exhibit #144 shows Nancy's badly burned left leg next to her unburned right leg. (RR46:16-17; SX#144). Her private area is covered by a towel. (SX#144). State's Exhibit #145 is a close-up of Nancy's left leg. (SX#145). State's Exhibit #146 shows Nancy's severely burned upper body. (SX#146). She is attached to a ventilator. (RR46:18; SX#146). She is unclothed, but because she is so severely burned, her breasts are not easily discerned. (SX#146). State's Exhibit #147 shows the underside of Nancy's left arm. (RR46:18-19; SX#147). State's Exhibit #148 shows the top of

141

Nancy's right arm and a small part of her unclothed right side. (RR46:19; SX#148). State's Exhibit #149 is a close-up of the top of Nancy's severely burned head and face. (RR46:19-20; SX#149). State's Exhibit #150 shows Nancy's unclothed lower back. (RR46:20; SX#150).

The seven complained-of photographs are not unfairly prejudicial under Rule 403. These photographs, like the autopsy photographs, were probative of the injuries Nancy suffered as a result of the instant offense. (RR46:16-20; SX#144-150). They were used by Dr. Hunt to explain those injuries. (RR46:16-20). Dr. Hunt testified Nancy was burned over 40% of her body. (RR46:10). He used the photographs to identify Nancy's second-, third-, and fourth-degree burns. (RR46:16-20; SX#144-150). It would have been impossible for the jury to understand the nature and extent of her injuries without seeing photographs of them.

Moreover, the photographs are probative of Appellant's intent. Appellant poured a flammable liquid over the upper body of an elderly woman and lit her on fire. The location and severity of Nancy's injuries show Appellant intended to kill her. *See Rojas*, 986 S.W.2d at 249-50. At a minimum, the trial court's decision to admit the photographs falls within the zone of reasonable disagreement. *See Weatherred*, 15 S.W.3d at 542; *see also Long v. State*, 823 S.W.2d 259, 273 (Tex. Crim. App. 1991) (holding that the trial court did not abuse its discretion in

142

admitting thirteen photographs of the victims' bodies at the crime scene because the photographs were limited in number, reflected the manner of death, and had to be viewed together to get an accurate assessment of the injuries sustained by the victims).

*Any Alleged Error is Harmless*

Even if the trial court erred in admitting the 16 complained-of photographs, Appellant was not harmed. As previously argued, there was overwhelming evidence supported the jury's verdict regardless of the photographs of Nancy. Accordingly, taking the entire record into consideration, it is clear that any alleged error in admitting the complained-of photographs clearly did not affect Appellant's substantial rights and should be disregarded. *See* Tex. R. App. P. 44.2(b).

Issues 36 and 37 should be overruled.

**STATE'S RESPONSE TO ISSUE NOS. *38, 39,* AND *40:* THE TRIAL COURT PROPERLY ADMITTED EVIDENCE OF STATEMENTS MADE BY THE COMPLAINANT PRIOR TO HER DEATH.**

In Issue 38, Appellant contends the trial court erred in admitting during the guilt/innocence phase of trial, evidence of statements Nancy made to police at the Whip-In. In Issue 39, Appellant contends that the trial court erred in admitting evidence of statements Nancy made to police when she was at the hospital. In Issue 40, Appellant contends the trial court erred in admitting during the

punishment phase, evidence of statements Nancy made to police at the Whip In. Appellant's contentions lack merit and should be overruled.

## *Pertinent Facts*

*Issue #38: Nancy's Statements at the Whip-In (Guilt/Innocence Phase)*

During the guilt/innocence phase of trial, Officer Coffey testified that when he drove into the parking lot of the Whip-In, Nancy was stepping out the front door, "still on fire." (RR44: 67-68). Officer Coffey grabbed his fire extinguisher and put out the flames. (RR44:68). Nancy was "screaming for help." (RR44:69). The following exchange then took place:

> [Prosecutor]: Was she able to give Officer Simon a description of the person that had done this to her?
>
> [Coffey]: Yes. She said a black male came into the store - -
>
> [Defense Counsel]: Your Honor, I'm going to object to hearsay and confrontation.

(RR44:69). The prosecutor noted that the statement was an excited utterance and that it was nontestimonial. (RR44:69). Appellant's objection was overruled. (RR44:69). Officer Coffey testified Nancy "told officer Simon and then he repeated it to me, that - - she said there was a black male that came into the store and he robbed her and poured something on her." (RR44:69).

144

*Issue #39: Nancy's Statements at the Hospital*

Later, Officer Wilson testified about the conversation he had with Nancy at the hospital while she was still conscious and able to speak. (RR45:81). She was about to be intubated and placed on a ventilator. (RR45:81). Appellant objected when the prosecutor asked what Nancy told him. (RR45:81). The following exchange took place:

[Prosecutor]: Was she able to describe to you what happened to her?

[Wilson]: Yes, she was.

[Prosecutor]: What did she tell you?

[Defense Counsel]: Your Honor, I'm going to object to hearsay.

[Prosecutor]: It's an exception, dying declaration.

(RR45:81). Appellant objected "under the confrontation clause." (RR45:82). That objection was overruled. (RR45:82). Wilson testified Nancy told him that "a black male, heavy-set, short dark hair, and a chubby face, came into the store and demanded money from her. She advised he took the money and then he poured something on her. She didn't know what - - what it was, and then he lit her on fire." (RR45:82).

*Issue #40: Nancy's Statements at the Whip-In (Punishment Phase)*

After the defense rested and before the State's case-in-rebuttal during the punishment phase of trial, the trial court conducted a hearing on the admissibility

145

of the in-car video of one of the patrol officers who drove up to the Whip-In on the morning of the offense. Appellant objected as follows:

> [Defense Counsel]: Your Honor, we would object to that as - - first off, it's not in rebuttal to anything that we have presented in our case-in-chief, so we would argue it's improper rebuttal.
>
> We would further argue that her statements are hearsay and violate the right to confrontation. We would object to the relevance of it at this point. And furthermore, under Rule 403, we would object.
>
> [Trial Court]: Ms. Moseley.
>
> [Prosecutor]: Your Honor, this is proper rebuttal. There has been at least a day and a half of testimony from the Defendant and his family about the impact this crime and the potential sentence will have on him and his family. And I believe under the law, we're entitled to present victim impact testimony so that the jury has something to weigh as it relates to Special Issue 2 and the mitigation. The question is, is it sufficiently mitigating, and the impact on the victim is certainly relevant to that.
>
> I would also argue as to the hearsay objection that it is a dying declaration, and that by the Defendant setting her on fire and causing her death, he's waived a confrontation argument.
>
> And, as to 403, I think the Court should watch the video, but it would be - - certainly before making the ruling, we would ask the Judge to watch the video to make that determination, but there's nothing more probative as to the impact of this crime on the victim than the jury being able to see it themselves.

(RR51:69). The trial court watched the video and overruled Appellant's objection. (RR51:70; SX#187).

State's Exhibit #187 was offered and admitted over Appellant's objection through the testimony of Officer Simon. (RR51:81; SX#187). On the video,

146

Nancy can be heard shouting repeatedly, "Help me," "Oh God, help me," "Help me, please." (SX#187). Nancy provides her name, date of birth, address, and telephone number. (SX#187). She says that she is "going to faint." (SX#187). She says, "guy tried to rob me." (SX#187). When she is asked whether the man threw something on her, she says that the man threw Chlorox and fire. (SX#187). Nancy described the man as a young Black male, short and heavy set with a round face. (SX#187).

### *Applicable Law*

#### *Hearsay*

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d). The matter asserted is defined as "any matter explicitly asserted, and any matter implied by a statement, if the probative value of the statement as offered flows from declarant's belief as to the matter." Tex. R. Evid. 801(c).

#### *Excited Utterance*

An excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tex. R. Evid. 803(2). Excited utterances are not

excluded by the hearsay rule. *Id.* In *Zuliani v. State*, this court described the basis for this exception as follows:

> [It is] a psychological one, namely, the fact that when a man is in the instant grip of violent emotion, excitement or pain, he ordinarily loses the capacity for reflection necessary to the fabrication of a falsehood and the truth will come out. In other words, the statement is trustworthy because it represents an event speaking through the person rather than the person speaking about the event.

*Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003) (internal quotations omitted). "The critical determination is whether the declarant was still dominated by the emotions, excitement, fear or pain of the event or condition at the time of the statement." *Salazar v. State*, 38 S.W.3d 141, 154 (Tex. Crim. App. 2001) (internal quotations omitted).

## *Dying Declaration*

A dying declaration is a "statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death." Tex. R. Evid. 804(b)(2). "All that the rule requires is sufficient evidence, direct or circumstantial, that demonstrates that the declarant must have realized that he was at death's door at the time that he spoke." *Gardner*, 306 S.W.3d at 288 n.20.

It is well settled that the dying declaration exception to the hearsay rule does not violate a defendant's right of confrontation under the federal or Texas Constitution. *See id.* at 288 n.20.

148

## *Analysis*

As a threshold matter, it is the State's position that Appellant failed to properly brief Issues 38, 39, and 40. *See* Tex. R. App. P. 38.1(h). Appellant cites the complained-of testimony and generally asserts that it is hearsay, but he fails to offer any specific argument or authority in support of his contentions. This Court is not required to make Appellant's case for him. *Garcia v. State*, 887 S.W.2d 862, 882 (Tex. Crim. App. 1994) (stating that a reviewing court "will not brief appellant's case for him"). Appellant's thirty-eighth, thirty-ninth, and fortieth issues should be overrruled on this basis.

Should this Court nevertheless find that Appellant has properly briefed these issues, the State offers the following response:

### *Issue #38: Nancy's Statements at the Whip-In (Guilt/Innocence Phase)*

The trial court did not err in admitting Officer Coffey's testimony regarding Nancy's description of her attacker. Nancy's statements were admissible as an excited utterance. *See* Tex. R. Evid. 803(2). When Nancy made the complained-of statements, she had just experienced a startling event: she was robbed and set on fire. Indeed, the flames on her body were extinguished only seconds before she made the complained-of statements. She was screaming for help. She was clearly still under the stress or excitement caused by the offense and her statements concerned the startling event. *See* Tex. R. Evid. 803(2).

149

Furthermore, the statements' admission had no impact on Appellant's confrontation rights because they were non-testimonial in nature. Statements are non-testimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. *Davis v. Washington*, 547 U.S. 813, 822 (2006); *see Vinson v. State*, 252 S.W.3d 336, 339-40 (Tex. Crim. App. 2008). When the police arrived at the Whip-In, Nancy was still on fire. She made the complained-of statements shortly after the flames were extinguished. At the time, police were trying to help Nancy and determine what had happened; they had not yet received notification regarding the store's panic alarm. (RR44:68-69). It was clearly an ongoing emergency situation.

The trial court did not abuse its discretion in admitting the complained-of statements. At a minimum, the decision falls within the zone of reasonable disagreement. *See Weatherred*, 15 S.W.3d at 542.

*Issue #39: Nancy's Statements at the Hospital*

The trial court did not err in admitting Officer Wilson's testimony regarding Nancy's statements to him at the hospital. Nancy's statements were admissible as a dying declaration. *See* Tex. R. Evid. 804(b)(2). Nancy made the complained-of statements to Officer Wilson minutes after she arrived in the hospital emergency room to be treated for severe burns. (RR45:80). Shortly before she arrived at the

hospital, Nancy, a 76-year-old woman with a pacemaker and diabetes, had been doused with a flammable liquid and set on fire. She was about to be intubated. Given the fact that she was in the emergency room and considering the nature and extent of her injuries as well as her own medical history, the trial court could have reasonably concluded that Nancy believed she was dying when she made the statements regarding the cause or circumstances of her impending death. *See Gardner*, 306 S.W.3d at 291-92 (finding no abuse of discretion in admitting complainant's statements to 911 operator that her husband shot her even though complainant did not expressly state that she was dying and no one explicitly told her that she was dying). Because the complained-of statements were admissible as a dying declaration, Appellant's confrontation right was not violated. *See Gardner*, 306 S.W.3d at 288 n.20.

The complained-of statements were also admissible as an excited utterance. *Zuliani*, 97 S.W.3d at 595. Nancy was still under the stress of the startling event described above. The fact that some time had passed between the event and her statements is merely a factor to be considered in the analysis. *Id.* at 596 (noting that whether time has elapsed since the startling event is only one factor to be considered in determining whether a statement is an excited utterance). As stated, Nancy made the statements shortly after she arrived in the emergency room and

151

while she was being treated for her burns. She was still under the pain and stress of the startling event and her statements concerned that startling event.

The trial court did not abuse its discretion in admitting the complained-of statements. At a minimum, the decision falls within the zone of reasonable disagreement. *See Weatherred*, 15 S.W.3d at 542.

*Issue #40: Nancy's Statements at the Whip-In (Punishment Phase)*

The trial court did not err in admitting during the punishment phase of trial, the in-car police video containing Nancy's statements to police regarding the instant offense. As previously argued in response to Issue 38, Nancy's statements to police when they arrived at the Whip-In were admissible as excited utterances and because they were non-testimonial in nature. Since the testimony of the two officers was admissible, the video is therefore admissible. *See Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997) (stating that "a photograph is admissible if verbal testimony as to matters depicted in the photographs is also admissible."). State's Exhibit #187, the in-car video, simply allows the jury to hear the statements from Nancy in her own voice.

The trial court did not abuse its discretion in admitting the complained-of statements. At a minimum, the decision falls within the zone of reasonable disagreement. *See Weatherred*, 15 S.W.3d at 542.

152

*Any Error is Harmless*

Even if this Court finds that the trial court erred, any alleged error is harmless. Nancy's descriptions of the man who attacked her did not have a substantial and injurious effect or influence in determining the jury's verdicts. Before any of the officers testified about Nancy's statements to them, the jury saw the surveillance video. (RR44:49; SX#17). The jury saw with their own eyes, how on May 20, 2012, Appellant walked in to the Whip-In, robbed Nancy, and set her on fire. (SX#17). Nancy's descriptions to police regarding the person who robbed her and set her on fire only confirmed what the jury had already seen.

Issues 38, 39, and 40 should be overruled.

**STATE'S RESPONSE TO ISSUE NO. *41*: THE TRIAL COURT PROPERLY ADMITTED EVIDENCE OF APPELLANT'S ACTIONS AFTER HE FLED THE WHIP-IN.**

In Issue 41, Appellant contends that, during the guilt phase, the trial court erred under Rule 404(b) in admitting evidence of the bad acts and offenses he committed after he fled the Whip-In. Appellant's contentions lack merit and should be overruled.

*Pertinent Facts*

During the guilt/innocence phase, Appellant objected to testimony from three of the residents from the neighborhood behind the Whip-In, where Appellant hid after the instant offense: Jim Medley, Ken Marecle, and Lawrence Denson. Prior to their testimony, Appellant objected, arguing that their testimony involved

153

extraneous offenses which were "not necessary to the jury's understanding[.]" (RR44:140). Appellant's objection was overruled. (RR44:141).

### *Standard of Review*

A ruling on the admissibility of extraneous offenses is reviewed for abuse of discretion. *See Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011).

### *Applicable Law*

Rule 404(b) provides, in pertinent part, as follows:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may however be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Tex. R. Evid. 404(b). Evidence of extraneous offenses may be admissible, however, if it has relevance apart from character conformity. *See Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003).

### *Analysis*

Appellant has failed to properly brief this issue. He recites trial counsel's objection and the law, but does not actually identify whose testimony he contends was improperly admitted. Importantly, in the cited exchange, wherein trial counsel lodged her objection, only two of the three neighborhood residents are identified by name, Medley and Marecle. (Appellant's Br. p. 113). As such, any alleged error as to the third neighborhood resident, Lawrence Denson, was not

154

preserved. *See* Tex. R. App. P. 33.1(a). As to Medley and Marecle, the issue is inadequately briefed. Rule 38.1(h) of the Texas Rules of Appellate Procedure requires that a brief contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record. Tex. R. App. P. 38.1(h); *see, e.g., Walder v. State*, 85 S.W.3d 824, 827 (Tex. App.—Waco 2002, no pet.) (setting forth the elements necessary to satisfy the mandatory requirement of a "clear and concise argument" pursuant to Rule 38.1).

Nevertheless, testimony from all three of the neighborhood residents – Medley, Marecle, and Denson – was admissible as same transaction contextual evidence. Same transaction contextual evidence is admissible to impart information to the jury that is essential to understanding the context and circumstances of events which, although legally separate offenses, are blended or interwoven. *See Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993) (finding evidence of kidnapping and murder of complainant's wife and son admissible as same transaction contextual evidence as it was necessary to understand the charged offense). "[E]vents do not occur in a vacuum, and the jury has a right to hear what occurred immediately prior to and subsequent to the commission of the act so that it may realistically evaluate the evidence." *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000) (citing *Archer v. State*, 607 S.W.2d 539, 542 (Tex. Crim. App. 1980)).

The three neighborhood residents' testimony provide context to the offense and show Appellant's consciousness of guilt. Medley's testimony helped the jury to understand where Appellant went when he fled the Whip-In and how he tried to get rid of the t-shirt he wore while he committed the offense. Evidence of flight and attempts to conceal incriminating evidence are admissible as circumstances showing consciousness of guilt. *See Wells v. State*, 578 S.W.2d 118, 119 (Tex. Crim. App. 1979). Medley testified that on the morning of the offense, he found a pack of cigarettes in his driveway. (RR44:146; SX#48, 78). Inside the garbage can, he found a t-shirt. (RR44:147; SX#77). DNA on the t-shirt matched Appellant. (RR44:206-07; RR45:134; SX#77, 135, 141, 142). A medium petroleum distillate was also detected on the t-shirt. (RR44:206-07; RR45:117; SX#77, 135, 138).

Marecle and Denson's testimony informed the jury of Appellant's attempts to try to avoid detection and apprehension. Marecle testified that Appellant appeared on his porch, asking for help. (RR44:157, 159, 166-67; SX#55). His "eyes were really wide and big." (RR44:169). He was wearing pants and black-rim glasses, but no shirt. (RR44:162). He tried to push his way into Marecle's home. (RR44:159-60). Marecle pushed Appellant outside. (RR44:160, 169). There, Appellant pushed Marecle to the ground. (RR44:161, 169). When Marecle stood up, Appellant took the glasses off of Marecle's face and fled. (RR44:162-63,

156

170).  At Denson's house, Appellant tried to get inside the gate.  (RR45:9).  When Denson confronted him, Appellant approached him saying "man, I'm in a bad way."  (RR45:9, 11-12; SX#51-53).

The trial court did not abuse it's discretion in admitting the testimony of the three neighborhood residents.  At a minimum, the decision falls within the zone of reasonable disagreement.  *See Weatherred*, 15 S.W.3d at 542.  Even if this Court finds that the trial court erred, however, any alleged error is harmless. As argued in detail above, the State presented overwhelming evidence of Appellant's guilt.

Issue 41 should be overruled.

*STATE'S RESPONSE TO ISSUE NO. 42:  THE TRIAL COURT PROPERLY INSTRUCTED THE JURY ON VOLUNTARY INTOXICATION.*

In Issue 42, Appellant contends that the trial court erred in overruling his objection to the jury instruction regarding voluntary intoxication.  Appellant's contentions lack merit and should be overruled.

### *Pertinent Facts*

The court's charge during the guilt/innocence phase of trial included the following instruction:

> Voluntary intoxication does not constitute a defense to the commission of a crime.  "Intoxication" means the disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

157

(CR14:4508). Appellant objected to this instruction. (RR45:187-88). His objection was overruled. (RR45:188).

### *Standard of Review*

A reviewing court examines the trial court's submission of jury instructions under an abuse of discretion standard. *Wesbrook*, 29 S.W.3d at 122.

### *Applicable Law*

Texas Penal Code § 8.04(a) provides that voluntary intoxication does not constitute a defense to the commission of a crime. Tex. Penal Code Ann. § 8.04(a). It is appropriate to include an § 8.04(a) instruction in the guilt/innocence charge if there is evidence from any source that might lead a jury to conclude that the defendant's intoxication somehow excused his actions. *Sakil v. State*, 287 S.W.3d 23, 26 (Tex. Crim. App. 2009). It is not necessary that the defendant assert intoxication as a defense for the § 8.04(a) instruction to be included in the charge. *Id*. at 26 fn. 8. It is not necessary that the evidence conclusively establish the defendant's intoxication for the instruction to be included in the charge. *See id.* at 27-28.

### *Analysis*

The trial court did not err when it included the complained-of instruction during guilt/innocence as there was evidence that might have led the jury to believe that Appellant was intoxicated and that his intoxication excused his actions.

Appellant cross-examined Officer Coffey regarding his opinion of whether Appellant was intoxicated after he was arrested and was being transported to jail. (RR44:87). Coffey testified he did not "smell anything on [Appellant.]" (RR44:87). Appellant asked whether someone can be intoxicated "from a substance that didn't have a smell[.]" (RR44:87). Coffey conceded that possibility. (RR44:87). He also conceded that Appellant appeared "erratic" on the transport video. (RR44:87). Appellant also cross-examined Marecle about whether Appellant appeared intoxicated at the time of their encounter. (RR44:168-69). Indeed, Marecle testified "It had to be something because he didn't look - - his eyes were really wide and big." (RR44:169). Finally, the State notes that during closing argument, defense counsel argued that "any person with common sense can tell [Appellant] is under the influence" when he is in the patrol car. (RR46:54-55).

Because there was some evidence that Appellant may have been intoxicated, the trial court did not abuse its discretion when it included a § 8.04 instruction in the charge during guilt/innocence. *See Sakil*, 287 S.W.3d at 24, 27-28 (finding no error in including § 8.04(a) instruction where evidence of Sakil's intoxication was equivocal: the complainant told the 911 operator that Sakil was not intoxicated, but that he was behaving "oddly" during their fight; psychiatrist testified to Sakil's history of poly-substance abuse).

159

Issue 42 should be overruled.

**STATE'S RESPONSE TO ISSUE NOS. *43* AND *44*: THE TRIAL COURT PROPERLY ADMITTED EVIDENCE DURING THE PUNISHMENT PHASE OF APPELLANT'S EXTRANEOUS OFFENSES.**

In Issues 43 and 44, Appellant contends that, during punishment, the trial court erred in admitting over his objection, evidence of his extraneous bad acts. He contends that the State's notice of its intent to present the evidence was inadequate under article 37.07 of the Texas Code of Criminal Procedure in that it failed to include the date of the acts and county in which they occurred. Appellant's contentions lack merit and should be overruled.

### *Pertinent Facts*

On September 27, 2013, thirty days prior to trial, the State filed and served Appellant with its notice of extraneous offenses. (CR14:4461-69). Included in that notice were four specific assaults Appellant committed against his former girlfriend Amy Armstrong Franks.[16] (CR14:4461-62). Also included was the following:

- During the defendant's relationship with Amy Armstrong, in or about the year 1993, the defendant was physically abusive. The defendant was jealous and would get violent if he thought she was with someone else. She said he punched her, pushed her, and choked her. He drank alcohol a lot and smoked marijuana. He threatened Ms. Armstrong, saying, "Nobody's gonna have you if I can't have you." These incidents all occurred in Dallas County, Texas.

---

[16] At the time of trial, Amy Armstrong had married and gave her name as Amy Franks. (RR47:29-30).

160

(CR14:4468). During the punishment phase of trial, Appellant objected to the State presenting evidence of ongoing abuse between Appellant and Amy Armstrong. (RR47:9). Appellant argued that the State's notice "lacks detail with regard to specific dates." (RR47:10). He objected that there was no date or time associated with the claim regarding Appellant's threat, "Nobody's gonna have you if I can't have you." (RR47:10). He objected that the claims regarding drugs and alcohol were "very general and vague." (RR47:10). Finally, he objected that the "offenses or transactions" were not relevant to Appellant's death worthiness because they occurred 20 years ago and are "highly prejudicial." (RR47:12). Appellant's objection was overruled. (RR47:12).

### *Applicable Law*

The introduction of extraneous conduct evidence in the punishment phase of a capital murder trial is governed by the notice requirements of Article 37.07, § 3(g) of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(a)(1). Article 37.07, § 3(g) requires the State, on timely request, to give the defendant reasonable notice of extraneous crimes or bad acts that the State intends to use at trial. *See* Tex. Code Crim. Proc. Ann. art. 37.07, § 3(g) (incorporating Texas Rule of Evidence 404(b)'s reasonable notice requirement). This statute also requires the State to give additional notice if it intends to use an extraneous offense that has not resulted in a final conviction. To be reasonable, the

161

notice must include the date on which the offense occurred, the county where it occurred, and the name of the alleged victim. *Id*.

The purpose of article 37.07, § 3(g) is to avoid unfair surprise and to enable the defendant to prepare to answer the extraneous-offense evidence. *See Luna v. State*, 301 S.W.3d 322, 326 (Tex. App.—Waco 2009, no pet.); *Apolinar v. State*, 106 S.W.3d 407, 414-15 (Tex. App.—Houston [1ˢᵗ Dist.] 2003) *aff'd*, 155 S.W.3d 184 (Tex. Crim. App. 2005); *Roethel v. State*, 80 S.W.3d 276, 282 (Tex. App.— Austin 2002, no pet.). To determine harm in light of that purpose, an appellate court should examine the record to determine whether the deficient notice resulted from prosecutorial bad faith or prevented the defendant from preparing for trial. *Roethel*, 80 S.W.3d at 282. In determining whether the defendant was prevented from preparing for trial, appellate courts look at whether the defendant was surprised by the substance of the testimony and whether that affected his ability to prepare cross-examination or mitigating evidence. *Id*.

## *Analysis*

Of the five offenses or acts committed against Amy Franks listed in the State's Notice of Extraneous Offenses, only one does not identify the specific date on which the offense was committed:  the one describing Appellant's abusive behavior and his drug and alcohol use.  (CR14:4468).  Although the notice does not provide the month and day, it does identify the year that the offenses were

162

committed, 1993, and it states that the offenses were committed in Dallas County, Texas. (CR14:4468).

The record contains no indication that the State acted in bad faith when it failed to comply with article 37.07, § 3(g). To the contrary, the record demonstrates that the State provided Appellant notice of the extraneous conduct to the best of its ability and that the only reason the notice did not identify the date more specifically was because more specific information was not known to the State. There is no indication from the record that the omission was intended to mislead Appellant or prevent him from preparing a defense.

Notably, Appellant does not argue that he was surprised by the substance of Franks' testimony. He does not point to anything in the record that would support the notion that his ability to mount an adequate defense was hindered by the lack of notice; nor does he argue on appeal that his ability to prepare cross-examination or mitigating evidence was affected by the lack of adequate notice. Appellant has failed to make any showing of how his defense strategy might have been different had the State identified the exact days and months when the abuse and substance abuse occurred. *See, e.g., Hernandez v. State*, 176 S.W.3d 821, 825-26 (Tex. Crim. App. 2005) (finding any error in admitting evidence of extraneous offense during punishment phase despite failure to provide notice was harmless because Hernandez did not contend that witness's testimony caused him surprise, that

omission from notice prevented him from preparing a defense, or that had he known, his defense strategy would have been different). As such, any error by the trial court in admitting evidence of this offense was harmless.

Appellant also contends that the offenses associated with Franks were too remote to be relevant on the issue of mitigation. However, this Court has specifically declined to fashion a "per se" rule that an extraneous transaction is too remote in time to be introduced into evidence at trial. *See Templin v. State*, 711 S.W.2d 30, 34 (Tex. Crim. App. 1986). Indeed, the fact that Appellant abused Franks and drugs and alcohol in 1993 shows his penchant for violence and addiction to mind-altering substances is long lived, which is most definitely relevant to both future danger and mitigation.

Based on the foregoing, the trial court could have reasonably concluded that the complained-of evidence was relevant and admissible. This decision was not outside of the zone of reasonable disagreement. The trial court did not abuse its discretion in admitting the evidence.

Even if the trial court erred, any alleged error is harmless. Error in admitting evidence with insufficient notice under article 37.07, § 3(g) is non-constitutional error. *See Apolinar*, 106 S.W.3d at 414. The evidence at issue was no more serious and potentially inflammatory than the facts of the offense and the other punishment evidence admitted without objection. There is nothing in the record to

indicate that the jury was not equipped to evaluate the probative force of the evidence. Moreover, the trial court instructed the jury that any testimony regarding extraneous offenses committed by appellant could be considered only if they believed appellant committed the offenses beyond a reasonable doubt and even then only in determining their answers to the special issues.[17] (CR14:4517). This minimized any potential for improper influence on the jury. *See, e.g., Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996).

Issues 43 and 44 should be overruled.

*STATE'S RESPONSE TO ISSUE NOS. 45 THROUGH 48: THE TRIAL COURT PROPERLY ADMITTED EVIDENCE OF APPELLANT'S ARRESTS AND CERTAIN JUDGMENTS AND SENTENCES.*

In Issues 45, 46, 47, and 48, Appellant contends that the trial court erred in admitting, over his objection, evidence of certain prior arrests and convictions. He contends that the evidence was not sufficiently tied to him. Appellant's contentions lack merit and should be overruled.

---

[17] Specifically, the instruction stated: "You are instructed that if there is any evidence before you in this case regarding the defendant having committed an offense or offenses other than the offense alleged against him in the indictment, you cannot consider this evidence for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the answers to the special issues." (CR14:4517).

## *Pertinent Facts*

### *Issue No. 45: State's Exhibit #166*

Lieutenant John Spera testified he responded to "a family disturbance" call at 4263 Rose Hill Road on September 13, 2004. (RR47:78-79). The complainant was Daphne Johnson. (RR47:80). "[T]here was a suspect there attempting to kick the door in and that there was also a protective order on him." (RR47:79). Spera found Appellant and arrested him for the offense of violation of a protective order. (RR47:86-89, 92). The State offered State's Exhibit #166, Appellant's judgment and sentence in Cause No. MA04-28690, convicting him of the offense of violation of a protective order. (RR47:97; SX#166). The judgment recites that the offense was committed on September 13, 2004. (SX#166).

Appellant objected that the information contained in State's Exhibit #166 was not "sufficiently tied to" him. (RR47:93). Appellant's objection was overruled. (RR47:94).

### *Issue No. 46: State's Exhibit #169*

Officer M.G. Clark testified that on August 7, 1995 was dispatched to locate a suspect involved in an earlier aggravated assault, deadly weapon. (RR47:132-33). Appellant was the suspect. (RR47:134-36). Clark located Appellant, arrested him, and booked him for, among other offenses, aggravated assault, deadly weapon. (RR47:136). The State offered State's Exhibit #169, a certified

copy of Appellant's prior conviction for aggravated assault, deadly weapon in Cause No. F95-25906. (RR47:141; SX#169). Appellant objected to this exhibit, arguing that it was not "sufficiently tied to [Appellant]." (RR47:142). His objection was overruled. (RR47:142, 143).

*Issue No. 47: State's Exhibit #171*

Officer St. Clair testified about the events leading to Appellant's arrest for robbery and evading arrest on June 19, 2004. (RR47:165-174). St. Clair recognized Appellant from the car chase and arrest. (RR47:170). During St. Clair's testimony, the State offered State's Exhibit #171, which is a pen packet containing a judgment and sentence for robbery in Cause No. F04-26727. (RR47:175; SX#171). It also contains a judgment and sentence for evading arrest or detention in Cause No. F04-26728. (RR47:175; SX#171). The date of offense on both cases is June 19, 2004. (RR47:175; SX#171). Appellant objected to this exhibit, arguing that there was a lack of sufficient identifying information. (RR47:175). His objection was overruled. (RR47:175).

*Issue No. 48: State's Exhibit #170*

Officer Steadman testified that on October 9, 2002 at about 1:50 a.m., he was dispatched as back up on a hit-and-run call. (RR47:154-55). Steadman located the suspect – Appellant – and, after a foot chase, captured and arrested him for evading arrest. (RR47:155-59). The State offered State's Exhibit #170, a

167

certified copy of Appellant's judgment and sentence for the offense of evading arrest in Cause No. M02-27021. (RR47:160). Appellant objected, arguing that there was not sufficient identifying information to tie the documents to Appellant. (RR47:160-61). Appellant's objection was overruled. (RR47:161).

### *Applicable Law*

To establish a defendant's prior criminal conviction, the State must prove beyond a reasonable doubt the following: (1) that a prior conviction exists, and (2) that the defendant is linked to that conviction. *See Flowers v. State*, 220 S.W.3d 919, 921 (Tex. Crim. App. 2007). Texas law does not require that the prior conviction be proven in any specific manner. *Id.* at 922. "Any type of evidence, documentary or testimonial, might suffice." *Id.*

### *Analysis*

Appellant has failed to properly brief these issues. He recites trial counsel's objections and the law, but he does not provide any specific argument as to why the exhibits are inadmissible. *See* Tex. R. App. P. 33.1(a).

Regardless, all four exhibits were properly admitted as the testimony linked the convictions to Appellant. Spera testified that he arrested Appellant on September 13, 2004 for the offense of violation of a protective order. (RR47:78-79, 86-89, 92). State's Exhibit #166 is a certified copy of a judgment regarding Appellant's prior conviction for violation of a protective order, alleged to have

168

been committed on September 13, 2004. (RR47:97; SX#166). Clark testified that he arrested Appellant on August 7, 1995 for aggravated assault, deadly weapon. (RR47:136). State's Exhibit #169 is a certified copy of a judgment regarding Appellant's prior conviction for aggravated assault, deadly weapon alleged to have been committed on August 7, 1995. (RR47:141; SX#169). St. Clair testified that he participated in Appellant's arrest for robbery and evading arrest on June 19, 2004. (RR47:165-174). State's Exhibit #171 is a penitentiary packet containing a copy of a judgment regarding Appellant's conviction for robbery alleged to have been committed on June 19, 2004. (RR47:175; SX#171). Steadman testified that he arrested Appellant on October 9, 2002 for evading arrest. (RR47:154-59). State's Exhibit #170 is a certified copy of a judgment regarding Appellant's prior conviction for evading arrest alleged to have been committed on October 9, 2002. (SX#170).

Based on the foregoing, there was sufficient evidence for the jury to find beyond a reasonable doubt that Appellant was the individual who committed the aforementioned extraneous offenses. As such, the trial court did not abuse its discretion in admitting them. *See Flowers*, 220 S.W.3d at 922 (noting that there are many ways to prove a prior conviction; "Just as there is more than one way to skin a cat, there is more than one way to prove a prior conviction.").

Issues 45, 46, 47, and 48 should be overruled.

*STATE'S RESPONSE TO ISSUE NO.* ***49:*** *THE TRIAL COURT PROPERLY ADMITTED THE TESTIMONY OF WARDEN MELODYE NELSON.*

In Issue 49, Appellant contends that the trial court erred in allowing testimony from Warden Melodye Nelson regarding prison violence and the nature of weapons found in prison. (Appellant's Br. pp. 122-1240. Appellant contends that Nelson's testimony violated his right to individualized sentencing as her testimony concerned the conduct of individuals other than Appellant. Appellant's contentions lack merit and should be overruled.

## *Pertinent Facts*

In a hearing outside the presence of the jury, Appellant objected to the testimony of Warden Melodye Nelson. (RR48:16-17). Specifically, he objected to "testimony by Warden Nelson, concerning violence and weapons and - - and things done by other inmates." (RR48:16). Appellant's objection was overruled. (RR48:17).

## *Applicable Law*

Rule 702 of the Texas Rules of Evidence provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Tex. R. Evid. 702. "The proponent of scientific evidence must show, by clear and convincing proof, that the evidence is sufficiently relevant and reliable to assist the

170

jury in accurately understanding other evidence or in determining a fact in issue." *Gallo v. State*, 239 S.W.3d 757, 765 (Tex. Crim. App. 2007).

Additionally, the trial court must determine whether the expert "make[s] an effort to tie pertinent facts of the case to the scientific principles which are the subject of his testimony." *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996). The testimony must be "sufficiently tied to the facts" to be helpful to the jury. *Id.*; *see Griffith v. State*, 983 S.W.2d 282, 288 (Tex. Crim. App. 1998) (holding that expert witness "fit" his expert knowledge with the particular facts of the case in his evaluation of appellant's future dangerousness).

### *Analysis*

The trial court did not err in admitting Warden Nelson's testimony because it was relevant to helping the jury determine Special Issue No. 1, whether Appellant would commit criminal acts of violence that would constitute a continuing threat to society. It is well settled that "society" includes the prison population. *See Estrada v. State*, 313 S.W.3d 274, 281 (Tex. Crim. App. 2010). Nelson's testimony described for the jury what Appellant's life would be like if Appellant were sentenced to life in prison and his "society" became prison society. *See Jordan*, 928 S.W.2d at 555-56. Prison society is not something within a juror's common knowledge. Nelson testified regarding staffing, classification, housing, daily routine, discipline and the potential for violence. She did not

171

specifically testify that Appellant would be more or less likely to commit violent acts in prison, only that there is a *potential* for drugs and violence, even in prison. Nelson showed weapons that were found and confiscated in prison over the years in an effort to illustrate her testimony for the jury. Indeed, Nelson testified, "for someone who hasn't worked inside of one of our prisons, [the inmates are] very creative in how they can construct a weapon. I will tell you there's - - we still find weapons and things of that nature that it shocks me." (RR48:59). *See Threadgill*, 146 S.W.3d at 670-671 (finding no abuse of discretion in admitting criminal investigator's testimony regarding the prevalence of violence in prison as well as photographs of weapons made by inmates in prison).

Even if the trial court erred in admitting Nelson's testimony, any alleged error was harmless. *See* Tex. R. App. P. 44.2(b). The jury had already seen and heard evidence regarding the instant capital murder. The jury had already heard about Appellant's violent and threatening behavior with his wife, sister-in-law and ex-girlfriend, his oppositional behavior with police, his prior violent criminal offenses and the assault he committed against Jenkins while he was in prison. The jury would later hear about his failure to obey orders while incarcerated, even while awaiting trial on the instant charges. Furthermore, the prejudicial effect of Nelson's testimony was minimized by its general nature. It was neither graphic nor disturbing in content. That fact, in conjunction with the admission of other

172

more compelling punishment evidence by the State, rendered harmless any error in the admission of Warden Nelson's testimony.

Issue 49 should be overruled.

**STATE'S RESPONSE TO ISSUE NO. 50: *THE EVIDENCE IS LEGALLY SUFFICIENT TO SUPPORT THE JURY'S FINDING THAT APPELLANT IS A FUTURE DANGER.***

In Issue 50, Appellant contends that the evidence is legally insufficient to support the jury's finding that there is a probability that he will commit criminal acts of violence in the future. Appellant contends that he has no prior violent offense convictions and several of his witnesses testified that he was a low risk for future dangerousness.

### *Applicable Law*

The State has the burden of proving the future dangerousness punishment issue beyond a reasonable doubt. Tex. Code Crim. Proc. Ann. art. 37.071, §§ 2(b)(1), 2(c); *Ladd*, 3 S.W.3d at 557. In its determination of the issue, the jury is entitled to consider all of the evidence presented at both the guilt and punishment stages of trial. *See* Tex. Code Crim. Proc. Ann. art. 37.071 § 2(d)(1).

A jury may consider a variety of factors when determining whether a defendant will pose a continuing threat to society: the circumstances of the offense, the defendant's state of mind, whether he was working alone or with other parties, the calculated nature of his acts, the forethought and deliberation exhibited by the crime's execution, the existence of a prior criminal record, the defendant's

173

age and personal circumstances at the time of the offense, whether the defendant was acting under duress or the domination of another at the time of the offense, psychiatric evidence, and character evidence. *See Martinez v. State,* 327 S.W.3d 727, 730 n.4 (Tex. Crim. App. 2010). In reviewing the sufficiency of the evidence, this Court views all of the evidence in the light most favorable to the jury's finding and determines whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found beyond a reasonable doubt that the answer to the future-dangerousness issue was "yes." *Id.* at 730.

### *Analysis*

The evidence from both phases of trial unquestionably demonstrates Appellant's propensity for violence. Indeed, the facts of the offense, standing alone, are sufficient to support a finding of future dangerousness. Appellant poured lighter fluid over the upper body of an elderly woman, robbed her, lit her on fire, and then casually walked away as she tried in vain to extinguish the flames ravaging her upper body.

The State did not rely on the facts of the offense alone, however. The State presented the following additional evidence showing Appellant's future dangerousness:

- In 1993, at the age of 17, Appellant was physically violent with his then-girlfriend, Franks. (RR47:38-40). Over the course of their short relationship, he hit her, grabbed her, and threatened her. (RR47:38-40). One time, he

174

threw a burning piece of wood onto her patio, setting a rug on fire. (RR47:49).

- Also in 1993, Appellant was arrested when an officer saw him walking down the street with a joint. (RR47:101, 104–107). In addition to the joint, Appellant had a bag of marijuana on his person. (RR47:105, 107). He was arrested for the marijuana and an outstanding warrant. (RR47:105, 108).

- The following year, in 1994, Appellant was arrested when officers responding to a call of a man and woman fighting on the side of the road determined that he had outstanding warrants. (RR48:111-12). Appellant struggled with police when he was informed that he would be arrested. (RR48:114). He bit both officers' arms. (RR48:114). He bit one of the officers so hard that he bit through the officer's watch. (RR48:114).

- Also in 1994, Appellant instructed Daphne not to stop when an officer tried to pull them over. (RR47:125). After a slow-speed chase, Appellant jumped out of the vehicle and tried to flee. (RR47:118–23).

- In 1995, Appellant was arrested for aggravated assault with a deadly weapon. (RR47:134-37). He had been making threatening phone calls for hours. (RR47:133-34). When he was booked in, he threatened the arresting officer. (RR47:138-40).

- In 2002, Appellant evaded arrest. (RR47: 150–151, 155–58).

- In 2003, Daphne filed an application for a protective order. (SX#193). In her application, she detailed assaults he committed on her in October, November and December of 2003. She wrote that Appellant punched her, pushed her, and kicked in their door. (SX#193). Daphne wrote, "Over the last nine years [Appellant] . . . hit me, punched me, slapped me, kicked me once, strangled me, pushed and shoved me, and thrown me around. I've had bruises, black eyes, a bloody nose, a busted lip, scratches[,] soreness, swelling, and pain." (SX#193).

- In 2004, Appellant attacked Salmeron in her driveway, threw her out of her truck, and stole it. (RR47:183-86, 191). After a high-speed chase, he

wrecked Salmeron's truck, rendering it inoperable. (RR47:166-68, 170, 188, 197).

- Also in 2004, while Daphne's protective order was still in effect, Appellant went to Daphne's apartment and attempted to kick down her door. (RR47:78-80, 84).

- While in prison in 2005, Appellant refused to attend school or go to work. He fought with his bunkmate, Jenkins. (RR47:223). He grabbed Jenkins below his knees and flipped him, causing Jenkins' head to strike the concrete floor and "split [his] head open." (RR47:226-27, 233). Jenkins' injuries required nine staples. (RR47:230–231; SX#172).

- In 2006, while still in prison, Appellant masturbated at the door of his cell in front of a female guard while leering at her. (RR47:263-64).

- In 2011, Appellant broke into his employer's safe and stole $325 in cash and three state inspection books valued at $2,100. (RR48:158, 172-73). He also stole a computer monitor. (RR48:172-73). He returned the monitor but not the inspection booklets or cash. (RR48:175, 178; SX#174).

- In 2012, Appellant was brought into the emergency room by Dallas police and paramedics. (RR48:190-91; SX#188). He was handcuffed, "highly agitated" and "somewhat combative." (RR48:194). He was in a substance-induced psychosis. (RR48:202-03). It took eight or nine people to hold him to the bed. (RR48:194). A body net bound him to the bed. (RR48:194-95).

- Later in 2012, Appellant approached Pinzon as she cleaned a bathroom at the Express Inn and exposed his erect penis to her. (RR48:101-04, 108).

- While in jail awaiting trial on the instant offense, Appellant violated the rules by disobeying staff orders and tattooing himself. (RR48:147-49; RR49:132-33).

Appellant argues that he has no prior convictions for violent offenses. (Appellant's Br. at 124). Appellant is incorrect. In 1994, he was convicted of resisting arrest after he resisted arrest and bit two police officers. (RR48:114-16;

SX#189).  In 1995, Appellant was convicted of aggravated assault, deadly weapon after he made repeated threatening phone calls to his sister-in-law Courtney Johnson.  (RR47:132-34, 140-41, 143; SX#169).  In 2004, Appellant was convicted of robbery and evading arrest after he robbed Salmeron of her truck in her driveway.  (RR47:175-76; SX#171).  In 2004, Appellant was also convicted of the offense of violation of a protective order when he tried to kick Daphne's door in.  (RR47:79-80, 97; SX#166).

Additionally, the State presented substantial evidence of unadjudicated offenses, many of which involved violence:  the domestic violence between Appellant and Franks, including when he threw a burning piece of wood onto her patio; the domestic violence between Appellant and Daphne; the assault on Jenkins while in prison; and, the time he exposed himself to Pinzon.

The State notes that many of Appellant's most violent offenses, both adjudicated and unadjudicated, involve violence against women:  Franks, Daphne, Salmeron, Pinzon, and Nancy.  Appellant apparently has no trouble threatening, hitting, punching, kicking, strangling or robbing a woman.  He has no problem setting a woman on fire.  His history also demonstrates an inability to follow the rules, whether he is in the free world, whether he is in prison, or whether he is in jail awaiting trial on a charge of capital murder.  *Cf. Reese v. State*, 33 S.W.3d 238, 247 (Tex. Crim. App. 2000) (noting that it was in capital "[defendant's] best

interest to behave well while in jail awaiting trial"). Appellant blames all of his offenses on his drug use and depression. (RR49:99-100). Importantly, multiple witnesses – including Appellant's own experts – testified that drugs are available in prison. (RR47:253, 272; RR48:47, 69, 72; RR50:85-86; RR51:37, 52, 63).

Viewed in the light most favorable to the verdict, the evidence here is more than sufficient to support the jury's finding beyond a reasonable doubt that Appellant would constitute a continuing threat to society. The evidence is sufficient to support the jury's answer to the future dangerousness special issue.

Issue 50 should be overruled.

***STATE'S RESPONSE TO ISSUE NOS. 51 THROUGH 53: THE TRIAL COURT PROPERLY DENIED APPELLANT'S REQUESTED JURY INSTRUCTIONS AND OVERRULED HIS OBJECTIONS TO THE CHARGE.***

In Issues 51, 52, and 53, Appellant contends that the trial court erred in denying his requested instructions and overruling his objections to the court's punishment charge. (Appellant's Br. 129-38). Appellant's contentions lack merit and should be overruled.

### *Pertinent Facts*

Prior to trial, Appellant filed Pre-Trial Motion No. 63, "Defendant's Requested Instructions for Punishment Charge." (CR3:660-73). In that motion, Appellant requested 13 instructions to be included in the court's punishment charge. He also requested 2 additional special verdict forms. (CR3:660-73).

178

Appellant also filed Pre-Trial Motion No. 64, "Defendant's Objections to the Charge at Punishment." (CR3:641-58). In this motion, Appellant raised 61 objections to the trial court's punishment charge. (CR3:641-58).

Both of Appellant's motions were presented during a hearing outside the presence of the jury. (RR51:92-106). Both of Appellant's motions were denied. (RR51:92-106).

### *Analysis*

Issues 51, 52, and 53 are inadequately briefed. Tex. R. App. P. 38.1(h). In three issues, Appellant asserts 76 challenges to the court's punishment charge. The bulk of his briefing on these issues, however, consists of simply a shorthand recitation of the challenges raised in Pre-Trial Motion Nos. 63 and 64. Only 15 of the 76 challenges contain citations to authority. Appellant neither challenges the reasoning of the existing case law nor asserts any novel legal arguments to support his claims. Conclusory assertions of error, unsupported by substantive legal analysis, present nothing for review. *See Rocha v. State*, 16 S.W.3d 1, 20 (Tex. Crim. App. 2000). Moreover, this Court has held that an issue that embraces more than one legal theory is multifarious and risks rejects on that basis alone. *See Davis v. State*, 329 S.W.3d 798, 803 (Tex. Crim. App. 2010). Without adequate briefing, the State cannot respond to Appellant's complaints. Issues 51, 52, and

179

53 should be overruled as multifarious and inadequately briefed. *See Wood v. State*, 18 S.W.3d 642, 649 n.6 (Tex. Crim. App. 2000).

To the extent that the State is able to discern Appellant's objections or requested instruction, the State agrees that with Appellant his claims are foreclosed by well-settled law. (*See* Appellant's Br. p. 129). Where possible, the State has attempted to provide the Court with a citation to the applicable statute or to authority wherein the same or similar issue, instruction, or objection has been addressed and rejected.

*Issue #51: General Punishment Instructions by Defense*

- 51.1: *Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007).

- 51.2: An instruction regarding the burden of proof as to extraneous offenses was included in the charge. (CR14:4517).

- 51.3: *Saldano*, 232 S.W.3d at 105-07.

- 51.4: *Mosley v. State*, 983 S.W.2d 249, 261 n.16 (Tex. Crim. App. 1998).

- 51.5: *Saldano*, 232 S.W.3d at 105-07.

- 51.6: *Estrada v. State*, 313 S.W.3d 274, 306-07 (Tex. Crim. App. 2010).

- 51.7-51.9: *Saldano*, 232 S.W.3d at 105-07.

- 51.10-51.11: Tex. Code Crim. Proc. Ann. art. 37.071, § 2(a); *Cantu v. State*, 939 S.W.2d 627, 644 (Tex. Crim App. 1997).

- 51.12: *Renteria v. State*, 206 S.W.3d 689, 709 (Tex. Crim. App. 2006).

- 51.13: *Duffy v. State*, 567 S.W.2d 197, 208 (Tex. Crim. App. 1978).

- 51.14-51.15: *Green v. State*, 912 S.W.2d 189, 195 (Tex. Crim. App. 1995).

- 51.16: *Narvaiz v. State*, 840 S.W.2d 415, 427 (Tex. Crim. App. 1992).

- 51.17: *Paulson v. State*, 28 S.W.3d 570, 582 (Tex. Crim. App. 2001).

*Issue #52: Instructions Regarding Future Dangerousness*

- 52.1: *Jackson v. State*, 992 S.W.2d 469, 477-79 (Tex. Crim. App. 1999).

- 52.2: *Jackson*, 992 S.W.2d at 479 (citing *Matchett v. State*, 941 S.W.2d 922, 937 (Tex. Crim. App. 1997)).

- 52.3: *Jackson v. State*, 33 S.W.3d 828, 833-34 (Tex. Crim. App. 2000).

- 52.4: *Russeau v. State*, 291 S.W.3d 426, 434 (Tex. Crim. App. 2009).

- 52.5-52.15: *Blue v. State*, 125 S.W.3d 491, 504-05 (Tex. Crim. App. 2003).

- 52.16: *Russeau*, 291 S.W.3d at 436.

- 52.17: *Russeau*, 291 S.W.3d at 436.

- 52.18-52.20: *Saldano*, 232 S.W.3d at 106-07.

- 52.21: *Espada v. State*, No. AP-75,219, 2008 Tex. Crim. App. Unpub. LEXIS 806, at *39-40 (Tex. Crim. App. 2008) (not designated for publication).

- 52.24-52.25: *Saldano*, 232 S.W.3d at 105-07.

- 52.26: *Leza v. State*, 351 S.W.3d 344, 362 (Tex. Crim. App. 2011).

- 52.27: *Espada*, 2008 Tex. Crim. App. Unpub. LEXIS at *50-51.

*Issue #53: Instructions Regarding Mitigation*

- 53.1: *Rhoades v. State*, 934 S.W.2d 113, 128-29 (Tex. Crim. App. 1996).

- 53.2-53.3: *Espada*, 2008 Tex. Crim. App. Unpub. LEXIS at *46-47.

- 53.4-53.5: Tex. Code Crim. Proc. Ann. art. 37.071.

- 53.6: *Soliz v. State*, 432 S.W.3d 895, 904 (Tex. Crim. App. 2014).

- 53.7: *Cantu*, 939 S.W.2d at 627 (citing *Robertson v. State*, 871 S.W.2d 701, 711-12 (Tex. Crim. App. 1993)).

- 53.8-53.9: Tex. Code Crim. Proc. Ann. art. 37.071, § 2(e-f).

- 53.10: *Thuesen v. State*, No. AP-76,375, 2014 Tex. Crim. App. Unpub. LEXIS 191, at *159-60 (Tex. Crim. App. Feb 26, 2014) (not designated for publication).

- 53.11-53.12: *Soliz*, 432 S.W.3d at 904-05.

- 53.13: *Cantu*, 939 S.W.2d at 648-49.

- 53.14-53.16: *Russeau*, 291 S.W.3d 434-36.

- 53.17: *Duffy*, 567 S.W.2d at 204.

- 53.18: *Cantu*, 939 S.W.2d at 648-49.

- 53.19-53.22: Tex. Code Crim. Proc. Ann. art. 37.071, § 2(e-f).

- 53.23: *Russeau*, 291 S.W.3d at 436.

- 53.24-25: *Raby v. State*, 970 S.W.2d 1, 9 (Tex. Crim. App. 1998).

- 53.26: *Mosley*, 983 S.W.2d at 261 n.16.

- 53.27: *Raby*, 970 S.W.2d at 9.

- 53.29: *Saldano*, 232 S.W.3d at 105-07.

- 53.31-53.32: *Saldano*, 232 S.W.3d at 105-07.

The trial court did not abuse its discretion in denying Appellant's requested instructions. The trial court did not abuse its discretion in overruling Appellant's objections to the charge. At a minimum, the rulings fall within the zone of reasonable disagreement. *See Weatherred*, 15 S.W.3d at 542.

Issues 51, 52, and 53 should be overruled.

**STATE'S RESPONSE TO ISSUE NOS. 54 THROUGH 65: THE TRIAL COURT PROPERLY DENIED APPELLANT'S CHALLENGES TO THE DEATH PENALTY STATUTE.**

In Issues 54 through 65, Appellant challenges the constitutionality of the Texas death penalty statute. He acknowledges that these issues have been previously submitted to this Court and overruled, citing *Saldano*, 232 S.W.3d 77, but invites the Court to review its prior stance on these issues. He claims that he asserts these issues not to cause unnecessary litigation but to preserve the issues for federal court review. (Appellant's Br. at 138).

In Issue 54, Appellant contends the statute under which he was sentenced to death violates the Eighth Amendment by allowing the jury too much discretion in

determining who should live and who should die and results in the arbitrary and capricious imposition of the death penalty. (Appellant's Br. at 138).

In Issue 55, Appellant contends that the Texas death penalty statute violates the due process mandates of the Fourteenth Amendment because it implicitly puts the burden of proving the mitigation special issue on him rather than placing the burden on the State to prove beyond a reasonable doubt that no circumstances warrant a life sentence rather than a death sentence. (Appellant's Br. at 139).

In Issue 56, Appellant contends the trial court erred in denying his motion to hold that Article 37.071, § 2(e) and (f) violates Article I, §§ 10 and 13 of the Texas Constitution. (Appellant's Br. at 140).

In Issue 57, Appellant contends that the Texas death penalty scheme violates the due process protections of the U.S. Constitution because it does not require the State to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt, contrary to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny. (Appellant's Br. at 140).

In Issue 58, Appellant contends that the Texas death penalty scheme violates his rights against cruel and unusual punishment and to due process of law under the Eighth and Fourteenth Amendments by requiring at least ten "no" votes for the jury to return a negative answer to a punishment special issue. (Appellant's Br. at 141).

184

In Issue 59, Appellant contends that the Texas death penalty scheme violates his rights against cruel and unusual punishment, to an impartial jury, and to due process of law under the Sixth, Eighth, and Fourteenth Amendments because vague, undefined terms in the punishment jury instructions effectively determine the difference between a life or death sentence. (Appellant's Br. at 142).

In Issue 60, Appellant contends that the trial court erred in overruling his motion to hold Art. 37.071, § 2(e) and (f) unconstitutional because it fails to require the jury to consider all mitigating evidence. (Appellant's Br. at 143).

In Issue 61, Appellant contends that the mitigation special issue is unconstitutional because it fails to place the burden of proof on the State to prove that aggravating evidence exists beyond a reasonable doubt. (Appellant's Br. at 141).

In Issue 62, Appellant claims that the mitigation special issue is unconstitutional under the Eighth and Fourteenth Amendments to the U.S. Constitution because it permits an open-ended discretion which was condemned by *Furman v. Georgia*, 408 U.S. 238 (1972). (Appellant's Br. at 144).

In Issue 63, Appellant contends that Texas' statutory capital sentencing scheme is unconstitutional under the Eighth and Fourteenth Amendments because it lacks meaningful appellate review. (Appellant's Br. at 144).

In Issue 64, Appellant contends that the trial court erred in overruling his motion to quash the indictment as being unconstitutional based on the numerous constitutional defects of the Texas death penalty scheme. (Appellant's Br. at 145).

In Issue 65, Appellant contends that the cumulative effect of these alleged constitutional violations denied him due process of law in violation of the Fifth and Fourteenth Amendments of the U.S. Constitution and due course of law under Article I, § 19 of the Texas Constitution. (Appellant's Br. at 147).

Appellant invites the Court to revisit its prior decisions on these issues, which he agrees have all been previously overruled. *See* Appellant's Brief at 138; *Saldano*, 232 S.W.3d at 107-09 (overruling multiple challenges to death penalty statute); *Escamilla*, 143 S.W.3d at 828-829 (overruling similar challenges). Appellant presents no new arguments for the State to address. Accordingly, the State asks this Court to decline his invitation to revisit these legal claims and to overrule issues 54 through 65.

## PRAYER

The State prays that this Honorable Court will affirm the judgment of the trial court.

Respectfully submitted,

_Chrsf Womlu_

**Craig Watkins**
**Criminal District Attorney**
Dallas County, Texas

**Christine Womble**
**Assistant District Attorney**
State Bar No. 24035991
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625
(214) 653-3643 *fax*

## CERTIFICATE OF COMPLIANCE

I hereby certify that there are 42,769 words in this document, excluding the caption, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of  issues presented, signature, certificate of service, and certificate of compliance. This number exceeds the maximum allowable number of words provided in Tex. R. App. P. 9.4(i)(2)(A).   The State is filing a Motion to Exceed the Word Count contemporaneously with this brief.

_Chrsf Womlu_
Christine Womble

187

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing brief was served on John Tatum, attorney for Appellant, 990 South Sherman Street, Richardson, Texas, 75081, by email and by United States mail, on December 30, 2014.

_____
Christine Womble